# E-filing

## PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name: <u>Ballard</u>                    <u>Benjamin</u>                    <u>Frank</u>
        (Last)                              (First)                           (Initial)

Prisoner Number: <u>D-04049</u>

Institutional Address: <u>Ben Ballard . D-04049 / 2N96-U. San Quentin, CA. 94974.</u>

---

## UNITED STATES DISTRICT CCOURT

## NORTHERN DISTRICT OF CALIFORNIA

CV 08     2550

<u>BENJAMIN FRANK BALLARD</u>
Full Name of Petitioner                              Case No. (to be provided by the
                                                      Clerk of court)

                                                      MMC     (PR

        vs.

<u>ROBERT AYERS JR.    WARDEN OF SAN QUENTIN</u>        PETITION FOR A WRIT OF HABEAS CORPUS
        Name of Respondent
        (Warden or jailor)

---

## Read Comments Carefully Before Filling In

### When And Where To File

        You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties.  Habeas L.R. 2254-3(a).

        If you are challenging your conviction or sentence and you were <u>not</u> convicted or sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located.  If you are challenging the execution of your sentence and you are not in prison in one of these counties, your petition will likely be transferred to the district court for the district that includes the institution where you are confined Habeas L. R. 2254-3(b).

- 1 -

Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody your are now and the Attorney General of the state in which the judgment you seek to attack was entered

A.    INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1.  What sentence are you challenging in this petition

(a)  Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland)

_SUPERIOR COURT OF STANISLAUS COUNTY_         _800, 11TH ST. P.O.B. 828 MODESTO, CA. 95353._
                    Court                                                            Location

(b)    Case number, if known STA-A202849

(c)    Date and terms of sentence  04/03/85  &  15 YEARS TO LIFE.

(d)    Are you now in custody serving this term?  (Custody means being in jail, on parole or probation, etc.)  Yes ☒ No ☐

Where? San Quentin State Prison.1st. Main St.  San Quentin, CA. 94974
              (Name of Institution)                          (Address)

2   For what crime were you given this sentence?  (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code number if known.  If you are challenging more than one sentence, you should file a different petition for each sentence.)

CALIFORNIA PENAL CODE SECTION 187: Second Degree Murder.
CALIFORNIA GOVERNMENT CODE SECTION 13967

3   Did you have any of the following?

Arraignment: Yes ☒ No ☐ Preliminary Hearing Yes ☒ No ☐ Motion to Suppress: Yes ☒ No ☐

4   How did you plea?

Guilty N/_____ Not Guilty _____ Nolo Contendere Was the plea I entered.

Any other plea (specify) Petitioner plea-bargained for A Second Degree Conviction Deal.

5   If you went to trial, what kind of trial did you have?

Jury ☐  Judge alone ☒  Judge alone on a transcript ☐ =

6   Did you testify at your trial?  Yes ☐  No ☒

7   Did you have an attorney at the following proceedings:
(a)   Arraignment  Yes ☒  No ☐
(b)   Preliminary hearing  Yes ☒  No ☐
(c)   Time of plea  Yes ☒  No ☐
(d)   Trial  Yes ☒  No ☐
(e)   Sentencing  Yes ☒  No ☐
(f)   Appeal  Yes ☐  No ☒
(g)   Other post-conviction proceeding  Yes ☐  No ☒

8   Did you appeal your conviction?  Yes ☐  No ☒
(a)   If you did, to what court(s) did you appeal?

Court of Appeal     Yes ☐  No ☒      N/A_____
                                     (Year)                    (Result)

Supreme Court of
California           Yes ☐  No ☒      N/A_____
                                     (Year)                    (Result)

Any other court      Yes ☐  No ☒      N/A_____
                                     (Year)                    (Result)

(b)   If you appealed, where the grounds the same as those that you are raising in this petition? N/A                Yes ☐  No ☒

(c)   Was there an opinion?     Yes ☐  No ☒

(d)   Did you seek permission to file a late appeal under Rule 31(a)
                                Yes ☐  No ☒

If you did, give the name of the court and the result:

N/A_____

9   Other than appeal, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal? N/A     Yes ☐  No ☒

NOTE: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if the petition was denied or dismissed with prejudice, you must first

- 3 -

file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition.  You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28 U.S.C. § 2244(b).

        (a)      If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding.  Attach extra paper if you need more space.

I.      Name of Court  SUPERIOR COURT OF STANISLAUS COUNTY

      Type of Proceeding State of California petition for writ habeas corpus.

      Grounds raised (Be brief but specific):

        a.    Due Process of Law violation by BPH for denying parole on Immutable Factors.

        b.    Due Process of Law violation by BPH for pro forma invocation of the some evidence test.

        c.    Liberty Interest violation by BPH for consideration of illegal / unreliable evidence.

        d.    Liberty Interest violation by BPH for illegal postponement of Parole hearing.

        e.    Liberty Interest violation by BPH for refusing petitioner the right to question witness at parole hearing.

        f.    First Amendment violation of Religious Right by forced A. A. participation

        h.    Liberty Interest violation by BPH for not actually considering all relevant and reliable evidence.

        i.    Liberty Interest violation by BPH for consideration of illegal / unreliable evidence.

        j.    Liberty Interest violation by BPH for consideration of illegal / unreliable evidence.

        k.    Equal protection violation by BPH for arbitrarily applying the regulation unsuitability on the sufficiency of petitioner's parole plans

      Result Summarily Denied without Reasoning

      Date of Result July 16, 2007.

II.    Name of Court California Appellate Court of Appeal for the Fifth District of California.

      Type of Proceeding State of California petition for writ habeas corpus.

      Grounds raised (Be brief but specific):

        a.    Due Process of Law violation by BPH for denying parole on Immutable Factors.

        b.    Due Process of Law violation by BPH for pro forma invocation of the some evidence test.

        c.    Liberty Interest violation by BPH for consideration of illegal / unreliable evidence.

        d.    Liberty Interest violation by BPH for illegal postponement of Parole hearing.

        e.    Liberty Interest violation by BPH for refusing petitioner the right to question witness at parole hearing.

        f.    First Amendment violation of Religious Right by forced A.A. participation

        h.    Liberty Interest violation by BPH for not actually considering all relevant and reliable evidence.

        i.    Liberty Interest violation by BPH for consideration of illegal / unreliable evidence.

j.  Liberty Interest violation by BPH for consideration of illegal / unreliable evidence.

k.  Equal protection violation by BPH for arbitrarily applying the regulation unsuitability on the sufficiency of petitioner's parole plans

Result Summarily Denied without Reasoning                Date of Result August 23, 2007.

III.  Name of Court California Supreme Court

Type of Proceeding Summarily Denied without Reasoning. Summarily Denied without Reasoning.

Grounds raised (Be brief but specific):

a.  Due Process of Law violation by BPH for denying parole on Immutable Factors.

b.  Due Process of Law violation by BPH for pro forma invocation of the some evidence test.

c.  Liberty Interest violation by BPH for consideration of illegal / unreliable evidence.

d.  Liberty Interest violation by BPH for illegal postponement of Parole hearing.

e.  Liberty Interest violation by BPH for refusing petitioner the right to question witness at parole hearing.

f.  First Amendment violation of Religious Right by forced A.A. participation

h.  Liberty Interest violation by BPH for not actually considering all relevant and reliable evidence.

i.  Liberty Interest violation by BPH for consideration of illegal / unreliable evidence.

j.  Liberty Interest violation by BPH for consideration of illegal / unreliable evidence.

k.  Equal protection violation by BPH for arbitrarily applying the regulation unsuitability on the sufficiency of petitioner's parole plans

Result Summarily Denied without Reasoning                Date of Result March 26, 2008.

(b)  Is any petition, appeal or other post-conviction proceeding now pending in any court?.        Yes ☐  No ☒

N/A

(Name and location of court)

- 5 -

B.    GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully.  Give facts to support each claim.  For example, what legal right or privilege were you denied?  What happened?  Who made the error?  Avoid legal arguments with numerous case citations.  Attach extra paper if you nee more space.  Answer the same questions for each claim.

Note  You must present ALL your claims in your first federal habeas petition.  Subsequent petitions may be dismissed without review on the merits.  28 U.S.C. § 2244(b); McCleskey v. Zant, 499 US. 467, 111 S.Ct. 1454, 113 L. Ed. 2nd 517 (1991)

Claim One: Due Process of Law violation by BPH for denying parole on Immutable Factors.

Supporting Facts: See Attached Grounds

Claim Two: Due Process of Law violation by BPH for pro forma invocation of the some evidence test.

Supporting Facts: See Attached Grounds

Claim Three: Liberty Interest violation by BPH for consideration of illegal / unreliable evidence.

Supporting Facts: See Attached Grounds

- 6 -

Claim Four: Liberty Interest violation by BPH for illegal postponement of Parole hearing.

Supporting Facts: See Attached Grounds

Claim Five: Liberty Interest violation by BPH for refusing petitioner the right to question witness at parole hearing.

Supporting Facts: See Attached Grounds

Claim Six: First Amendment violation of Religious Right by forced A.A. participation

Supporting Facts: See Attached Grounds

Claim Seven: Liberty Interest violation by BPH for not actually considering all relevant and reliable evidence

Supporting Facts: See Attached Grounds

- 7 -

Claim Eight: Liberty Interest violation by BPH for consideration of illegal / unreliable evidence

Supporting Facts: See Attached Grounds

Claim Nine: Liberty Interest violation by BPH for consideration of illegal / unreliable evidence

Supporting Facts: See Attached Grounds

Claim Ten: Equal protection violation by BPH for arbitrarily applying the regulation unsuitability on the

sufficiency of petitioner's parole plans

Supporting Facts: See Attached Grounds

- 8 -

If any of these grounds was not previously presented to any other court, state briefly which grounds were

not presented and why

N/A _____

_____

_____

_____

List by name and citation only, any cases that you think are close factually to yours so that the are an

example of the error you believe occurred in your case.  Do no discuss the holding or reasoning of these

cases:

Hayward v. Marshall, 512 F.3d 536 (9th Cir. 2008) _____

Trunzo v. Ornoski  2008 WL #703770  (N.D. Cal. March 13, 2008) _____

Irons v. Carey, 505 F.3d 846, 851 (9th Cir. 2007) _____

Do you have an attorney for this petition     yes ☐   no ☒

If you do, give the name and address of your attorney:

N/A _____

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this
proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

Executed on __4-28-08_____        _____Ken Ballard_____
             Date                                    Signature of Petitioner

- 9 -

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

BENJAMIN FRANK BALLARD

Petitioner,

vs.

ROBERT AYERS JR.

WARDEN OF SAN QUENTIN PRISON

Defendant.

CASE NUMBER:

**PRISONER'S**

**IN FORMA PAUPERIS
APPLICATION**

I, BENJAMIN FRANK BALLARD, declare that I am the plaintiff in the above-entitled case and that, the information I offer throughout this application is true and correct.  I offer this application in support of my request to proceed without being required to prepay the full amount of fees, costs or give security.  I state that because of my poverty I am unable to pay the costs of this action or give security, and that I believe that I am entitled to relief

In support of this application, I provide the following information:

1.  Are you currently employed        ☐ Yes        ☒ No

If the answer is "Yes" state both your gross and net salary or wages per month, and give the name and address of your employer:

Gross: N/A                         Net: N/A

Employer:  N/A

N/A

If the answer is "no" state the date of your last employment, the amount of the gross and net salary and wages per month which you received.  (If you are imprisoned, specify the last place of employment prior to imprisonment.)

N/A

N/A

2.  Have you received, within the past twelve (12) months, any money from any of the following sources:

| | | | |
|---|---|---|---|
| a. | Business, profession or other self-employment | ☐ Yes | ☒ No |
| b. | Income for stocks, bonds or royalties? | ☐ Yes | ☒ No |
| c. | Rent payments, interest or dividends | ☐ Yes | ☒ No |
| d. | Pensions, annuities or life insurance payments | ☐ Yes | ☒ No |
| e. | Federal or State welfare payment, Social Security | ☐ Yes | ☒ No |
| | Or other government source? | | |

In the answer is "Yes" to any of the above, describe each source of money and state the amount received from each.

N/A _____

N/A _____

3.  Are you married?          ☐ Yes          ☒ No

Spouse's Full Name: N/A _____

Spouse's Place of Employment:  N/A _____

Spouse's Monthly salary, Wages or Income:

Gross: N/A ____          Net: N/A _____

4.  a. List amount you contribute to your spouse's support:

$ N/A _____   _____

    b.   List the persons other than your spouse who are dependent upon you for support and indicate how much you contribute toward their support:

N/A _____

N/A _____

5.  Do you own or are you buying a home   ☐ Yes          ☒ No

Estimated Market Value: $ N/A _____          Amount of Mortgage: $ N/A _____

6.  Do you own an automobile?          ☐ Yes   ☒ No

Make: N/A ____          Year: N/A _____          Model: N/A _____

Is it financed? ☐ Yes  No If so, Total due: $ N/A _____

Monthly Payments: $ N/A _____ _____

7. Do you have a bank account? (If you are a prisoner, include funds in your prison account, and provide the certificate attached, signed by an officer of the prison)

☒ Yes    ☐ No

Name(s) and address(es) of bank: San Quentin State Prison - - CDCR Trust Account

Present balance(s):  $See attached Certification of Funds in Trust Account by Authorized Officer of the Institution.

Do you own any cash?        ☐ Yes    ☒ No    Amount: $ N/A

Do you have any other assets? (If "yes," provide a description of each asset and its estimated market value.)

☐ Yes    ☒ No

8. What are your monthly expenses?

Rent: $N/A                                         Utilities: $ N/A

Food: $ N/A                                        Clothing: $ N/A

Charge Accounts:

        Total Owed On

| Name of Account | Monthly Payment | This Account |
|---|---|---|
| N/A | $ N/A | $ N/A |
|  | $ N/A | $ N/A |

Do you have any other debts? (List current obligations, indicating amounts and to whom they are payable).

        N/A

I consent to prison officials withdrawing from my trust account and paying to the court the initial partial filing fee and all installment payments required by the court.

I declare under penalty of perjury that the foregoing is true and correct and understand that a false statement herein may result in the dismissal of my claims.   .

4 - 28 - 08

DATE

SIGNATURE OF APPLICANT

6.  GROUNDS FOR RELIEF

Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

The Board of Prison Hearings (Board) is continually using such "Immutable Factors" as the commitment offense and prior criminal convictions to find that petitioner would pose an "unreasonable risk of danger to society" in violation of my Constitutional Right to Real Due Process of Law

a.  Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

The commitment offense and prior to conviction criminal offenses together with drug and alcohol abuse are unchangeable. These factors are "Immutable".

The commitment offense was not and can never be a First-degree offense. There was no malice aforethought, nor was there any elements of evil intent. The offense was after, an offer from the District Attorney's office "Plea-bargained", and petitioner pled guilty to a 2nd Degree offense. However the elements of the underlining offense point toward a degree of offense, or level of offense in the range of "Involuntary Manslaughter". Nevertheless, petitioner has always taken full responsibility for the offense, and has always shown extreme remorse for his actions.

Petitioner has received from Dr. Starrett P.hd a " The inmate

b.  Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

In re Smith (2003) 109 Cal.App. 4th 489, 492-493 & 504-505
In re Scott (2005) 133 Cal. App. 4th 573
In re Lee (2006) 143 Cal. App. 4th 1400, 1408
I re Weider (2006) 145 Cal. App. 4th 570, 575-576        continued

MC-275 (Rev. January 1, 1999)          **PETITION FOR WRIT OF HABEAS CORPUS**          Page three of six

Ground 1   Continued

Would rate in the low range in terms of his risk management."

See Exhibit - C: Dr. Starrett Psych- Report pg. 7 "Clinical Risk Management"

Dr. Starrett went on to say,

" In summary, this individual's overall propensity to commit violence [in] the future when compared to similar violent inmates has lowered from the moderate range now to the low range. "

" The inmate's records and interview were rated on the PCL-R. The inmate rated in the low range in level of psychopathy. "

" The inmate's overall risk management has moved from the moderate to the low range."

See Exhibit C: Dr. Starrett Psych Report pp. 7-8.

Petitioner has extensive rehabilitive efforts over an extended period of several years. They include, Arts in Corrections program, Yoga Program, IMPACT, TRUST Programs, and includes Vocational Certificates from a Bakery Program and a Printers Program. Currently petitioner is half-completed a Vocational Sheet-Metal Program. There are CDC4R chrono's for A.A. participation.

continued ...

Ground 1 Continued on second attached page.

Petitioner has served his minimum sentence. Having a prisoner completed his minimum term of sentence is a noted requirement in both federal and state Courts holding the minimum is the standard bar as to the Board not being able to use the Commitment Offense to deny parole. The reasoning being the Boards assessment must reflect the prisoner's "current Risk of Danger" and the science behind predicting a prisoner's future violence potential has proved that the predictive value of the commitment offense fades over the passage of Time. The California case are Lawrence, Elkins, and Lee. The Federal cases are Irons, Biggs, and Sass.

In re Lawrence (2007) __ Cal. App. 4th ___.
In re Elkins (2006) 144 Cal. App. 4th 475.
In re Lee (2006) 143 Cal. App. 4th 1400.
Irons v. Carey (2007) 479 F. 3d 658.
Biggs v. Terhune (2003) 334 F. 3d 910.
Sass v. Board of Prison Terms (2006) 461 F. 3d 1123.

Petitioner thus has 23 years in actual custody on his 15 to life sentence. 23 years plus conduct credits due per CCR Title 15 § 2403 add 7.33 more years for a total constructive term of 30.33 years.

With a focus on petitioner's current risk some twenty plus years, or a full two decades after the commitment offense occurred without the Immutable Factors proves petitioner is suitable for parole. And petitioner Pray the Court Order his release to Parole ...

Ground 1    Continued   Supporting  Cases:

In re Elkins (2006) 144 Cal. App. 4th 475, 479-480

In re Sandra Davis Lawrence (2007) ____ Cal. App 4th ____.
Second Appellate District Division Seven. Los Angeles Co.  B190874.

In re David Barker (2007) ____ Cal. App. 4th ____.
First Appellate District Division Two.  Alameda Co. A114686

In re Henery Richard Gray (2007) ____ Cal. App. 4th ____.
Second Appellate District Division Three.  Los Angeles Co.  B197193.

In re Ramirez (2001) 94 Cal. App. 4th 549,
In re Scott-II (2005) 133 Cal. App. 4th 573.
~~In re Rosenkrantz (2002) 29 Cal. 4th 616~~
In re Dannenberg (2005) 34 Cal. 4th 1060.
McQuillion v. Duncan (9th Cir 2002) 306 F.3d. 895
Biggs v. Terhune (9th Cir 2003) 334 F.3d. 910
Board of Pardons v. Allen (1987) 482 U.S. 369, 381,
Irons v. Warden of California State Prison Solono (E.D. Cal. 2005)
358 F. Supp. 2d. 936, 939.
Irons v. Carey (9th Cir 2007) 479 F.3d. 658.
Martin v. Marshall (N.D. Cal. 2006) 431 F. Supp. 2d. 1038, 1048.
Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F. Supp. 2d. 1063,
Park Symposium Character at the Crossroads (1998) 49 Hastings L.J.
717, 771 (Recidivism rate for convicted murders - extremly - low).

## GROUND ONE.

# FEDERAL WRIT SUPPLEMENT.

On March 26, 2008, the California Supreme Court summarily denied petitioner Ballard's state habeas corpus petition without a written reasoning. (Exhibit- H). Similarly, the two lower state courts also issued summary denial without written reasoning.  The Superior Court of Stanislaus County issued its summery denial on July 16, 2007, (Exhibit-F) and the California Court of Appeal Fifth District issued its summery denial on August 23, 2007.  (Exhibit-G)      The Federal District Court in evaluating a state prisoners federal constitutional rights concerning state law via a federal habeas corpus would normally look to the last reasoned state court decision as the basis for the state court judgment. Robinson v. Ignacio, 360 F>3d 1044, 1055 (9th Cir. 2004)      In this case, where the state courts reached their decisions on the merits, but provided no reasoning to support their conclusions the federal district court can independently review the record to determine whether habeas corpus relief is available under U.S.C. § 2254(d). Himes v. Thompson, 336 F.3d 848, 853 (9th Cir 2003).  When it is clear the state courts has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's deferential standard does not apply and a federal habeas

# GROUND ONE.

court must review the claim de novo. <u>Nulph v. Cook </u>333 F.3d
1052, 1056 (9th Cir. 2003) also,

<u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002)

    The summarily denied orders issued by these state courts in
petitioners state habeas claims are "an unexplained order",
i.e., "an order whose text or accompanying opinions does not
disclose the reason for the judgment." <u>Ylst v. Nunnemaker</u>, 501
U.S. 797, 802, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991)

    The federal district court can review petitioner's case de
novo and the case most applicable to this case is <u>Hayward v.
Marshall</u>, 512 F.3d 536, 541 (9th Cir. 2008). An unpublished
decision <u>Trunzo v. Ornoski</u>, 2008 WL #703770 (N.D. Cal. March 13,
2008) is very similar in type of commitment offense and parole
denial having been made on immutable unchanging factors that
after the passage of time bear little predictive value in
determine if prisoner still poses a danger to society

   Grounds One through Three and grounds Eight through Ten are all
   Federal Due Process of Law Claims relating to evidence
   conclusion by the Board of Prison Hearings (BPH) None of these
   BPH findings have any bearing on the nexus between the facts
   used to find unsuitablity and the actual nil risk of public
   safety posed by petitioner's parole <u>Hayward</u>

- 6 -

# GROUND ONE.

> "... the findings that are necessary to deem a prisoner unsuitable for parole .. are not that a particular factor or factors indicating unsuitability exist, but **that a prisoner's release will unreasonably endanger public safety."** Id at 543 (internal quotation marks and citations omitted) (emphasis added) In fact, "' **[s]ome evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonable endangers public safety.'"**

Hayward v. Marshall, 512 F.3d 536, 543 (9th Cir. 2008).

In petitioner's case the Board used several factors to deny parole. None of the factors by themselves point to petitioner's parole release posing an unreasonable danger to society. Moreover, none of the factors in combination rise to the gravity necessary to prove parole release posing an unreasonable danger to society

Petitioner has served his minimum term with twenty-three years incarceration on a second-degree sentence of 15 year to life.

Irons v. Carey, 505 F.3d 846, 851 (9th Cir. 2007)

7. Ground 2 or Ground ___2___ (if applicable):

The Board violated my Constitutional rights when it used the "some evidence" standard in weighing the evidence in my February 23, 2007 parole hearing of the commitment offense, prior-conduct (to incarceration) & prior criminal conduct to find that I would pose an "unreasonable" risk to society.

a. Supporting facts:

When all the evidence is examined, the Board used the above "some evidence" or "modicum of evidence" factor to make a mere pro forma invocation of its tried and false mantra that every prisoners' case appearing before them is found to be "extremly callous disregard for human suffering" and "the motive for the crime is extremely trivial." Yet Penal Code 3041(a) requires parole "shall" be normally at my first parole hearing. (See Ex. A: pp. 94-95)

The reviewing courts in California have ruled only in the context of the California Constitution that the "some evidence" standard of Court review is enough to protect a prisoner's state due process rights. That Rosenkrantz and Dannenberg rulings has caused the Board to adopt the "some evidence" standard of review when conducting a parole hearing which is unconstitutional practice.

But it does not matter what a Court, or Board standard is the two, have used in the past, because CCR Title 15 § 2000(b)(48) requires the use of a "Preponderance of Evidence" standard. The "some evidence standard" is insufficient as an evidence test to protect my Constitutional Liberty Interest in Parole Freedom.

Further the California Supreme Court has refused to evalute the sufficiency of the "some evidence" standard to protect a California prisoners' Federal Constitutional due process rights during an ...

Continued

b. Supporting cases, rules, or other authority:

In re Rosenkrantz (2002) 29 Cal. 4th 616, 657 at Footnote 12
In re Dannenberg (2005) 34 Cal. 4th 1061
Biggs v. Terhune (9th Cir. 2003) 334 F. 3d 910, 915
Irons v. Carey (9th Cir. 2007) 479 F.3d. 658, 664-665
In re Elkins (2007) 144 Cal. App. 4th 492.

Ground 2   Continued

... evaluation review by a California Court to test the due process correctness of a parole hearing before the Board of Prison Hearings. The California Supreme Court stated in footnote 12 of the Rosenkrantz case that, " we have no occassion to determine whether the same standard [" some evidense test"] is also mandated under federal constitutional principles..."

In re Rosenkrantz (2002) 29 Cal. 4th 616, 658 at fn. #12.

Petitioner urges the Court to determine the "some evidence test" standard is insufficient to protect a prisoner's federal due process rights, as well as, the seperate California due process rights. Further it should be a California Court's ruling on federal due process. Instead petitioner urges the Courts to apply the same evidence review process the Board and Governor are required to use i.e.:

"Preponderance of Evidence Standard"

In re Tripp (2007) 58 Cal. Rptr. 3rd 64, 68

Petitioner would also urge the Court to apply a even more constitutional protective standard of Review i.e.; " Beyond a Reasonable Doubt" to weight evidence concerning a prisoner's suitability for parole.
The reason a more constitutional protective review standard is needed is because the sufficiency of the " some evidence" standard is so low any type of parole hearing would pass a Court's review. For example a totally arbitrary parole hearing where the Board

Continued

Ground 2   Continued on second attached page.

... just flipped a coin to determine parole suitability-that kind of arbitrary parole hearing would pass a Court Review just as long as the Board quoted some fact from the prisoner's commitment offense.

Another example would be petitioner's case where the Board had in advance decided the nature of the offense warrents a life without-die in prison-sentence, and therefore the Board conducted a pro forma sham. Where the Board went through the motions and only mouthed the correct formula of words without ever intending to grant parole. This parole hearing a "pro forma" kind would also pass through a "some evidence" standard of Court Review.

Yet both types of parole hearings; an "arbitrary" one or a "pro forma" parole hearing would be Constitutionally forbidden. So a better standard of Court Review is needed.

Petitioner prays the Court formulate a better method.

7. Ground 2 or Ground ___3___ (if applicable):

The Board considered unreliable and illegal evidence, namely a psych-report full of factual errors, and by a Dr. Inaba whom the Board apparently dismissed after mixing data between several "lifer" psych reports; to find petitioner would pose an "unreasonable risk". in violation of petitioners due process liberty Interest in parole.

a. Supporting facts:

In September of 2008 Dr. Inaba prepared a Mental Health Evaluation for the Board.

(See Exhibit: B: Dr. Inaba Report 09/11/07 pp. 6 )

The Dr. Inaba Report contained several factual errors resulting from Dr. Inaba mixing up data from other 'lifer' psych reports  For Example:

1) On page One in the first paragraph the reports state that Ballard is single and married but planning a divorce.

Petitioner has in fact never been married.

2) On page One in paragraph titled: "Social Support", He [petitioner] has a woman friend who resides in Redding [California ? Pennsylvania ?]

Petitioner has never known anyone in Redding.

Continued...

b. Supporting cases, rules, or other authority:

In re Ramirez (2001) 94 Cal. App. 4th 549.
In re Lawrence (2007) ___ Cal. App. 4th ___    DJDAR    .
In re Elkins (2006) 144 Cal. App. 4th 475
Biggs v. Terhune (9th Cir 2002) 334 F.3d, 910
Rosenkrantz v. Marshall (N.D. Cal 2006) 431 F. Supp 2d. 1063.

Ground 3 Continued.

Also for examples of mixed up factual data from several other "lifers" psych reports.

    3) On page two of Dr. Inaba's report under the paragraph titled: "Insight and Judgement" Dr. Inaba reported, "He recognizes that it was not safe for him to be in the company of young children due to his emotional instability, substance abuse and poor impulse control.

Petitioner denies ever making any statement concerning young children. As a counter-point petitioner has spent several hours, and many weekends, over the last 22 years of incarceration, in the prison visiting-room where his daughter, and other prisoners young children are running around to play. At another prisoners Christening petitioner held the baby in his arms.

    4) On page 5 of Dr. Inaba's report under the title: "Violence History" at the 2nd paragraph Dr. Inaba wrote in error, "As a teenager, he owned a 22-caliber handgun that he bought from a friend."

Petitioner has never owned a firearm, nor did he make any such statement as Dr. Inaba alleges. Instead Dr. Inaba has mixed factual data from other San Quentin lifers into petitioners report.

Ground 3  Continued on Second attached page

Petitioner contends that the mixed data in the Dr. Inaba Report also compromised the accuracy of the Axis II diagnoses, the future dangerous level, and insight into abstinence of substance abuse evaluation. Dr. Inaba mixed up other life prisoners factual data into these aspects of evaluations contained in the psych-report.

The Board knew of other life prisoners psych reports being messed up by Dr. Inaba's mix-up. This is why the Board motioned for a postponement at the September 11, 2008 parole hearing. (See Ground 4 of herewith writ of habeas corpus.) (As evident in the missing transcripts of the 09/11/07 Parole Hearing.)

Petitioner motions for an Evidentary Hearing concerning Dr. Inaba's other mixed-up / messed up lifer psych-reports, said 9/11 hearing transcripts, and employment disciplineor dismissal records of Dr. Inaba.

Petitioner's Attorney Hoffmann objected to the Board using the September 11 report of Dr. Inaba.

See Exhibit A: BPH Trans, pg. 37 line(s) 11-17.

But the Board with full knowledge of the inaccuracies, and Dr. Inaba's messed-up psych-reports for other lifers denied the Hoffman objection. The Board Commissioner Eng said,

" Again this Panel considers all relevant documents

continued ...

Ground 3   Continued on third attached page

> `"... and it's up to us how much weight we
> put on them. So we don't usually just look
> at one report. It's too static. We take a
> look and often go back to many, many.
> So your objection is noted. It's overruled."

See Exhibit A; BPH Trans. pg. 38 line(s) 4 - 11.

Petitioner contends the Board knew the Dr. Inaba psych-report
was illegal and unrelevant. Even the Board's implied correction of
the faulty report would be to give this evidence less weight,
turned out to be a lie. Because when the Board gave its writ-
ten reasons for their unsuitability findings; Dr. Inaba's report
evaluations were given the weight of the gravity of a black-hole.

See Exhibit A; BPH Trans. pp. 96 - 97 & 99 line(s) 24-27, 1-28, 1-15.

The latter Dr. Starrett report said,

> "Dr. Starrett states that the inmate would be in
> the low range for future violence and then using
> the environmental risk, risk management states
> he would also rate in the low range in terms of
> his risk management for the future.

See Exhibit A; BPH Trans. pg. 97 line(s) 18- 24.
See Exhibit B; Dr. Inaba Psych- Report pp. 1-6.
See Exhibit C; Dr. Starrett Psych- Report pp. 1-8.
continued...

Ground 3  Continued on Fourth attached page.

The Board did not use the evidence that petitioner was currently not a risk of any danger to society based upon the psych-report finding of Dr. Storrett ie. "Low risk"

Instead the Board choose to give great weight or great concern to Dr. Inaba's psych-report finding. Apparently forgetting the objections and implied little weight given. Specifically the Board said,

"But, yet, the September [Dr. Inaba] one states that, and this was what gave us some concern also is that with his -- even though he has been drug and alcohol free within the institution, with his history, this Dr. Inaba stated that relapse risk will be an ongoing issue, and at the present time he's able to maintain abstinence in a controlled set enviroment. So his ability to maintain these gains in a free enviroment in which he's exposed to significant stressors is untested.

See Exhibit A: BPH Trans. pg 98  linels) 1 - 8 ect...

Petitioner contends that the sever overcrowded California Dept. of Corrections were health treatment after getting ill is to drop to your knees and pray because seeing a doctor was a miracle. Where gang violence can occur at any moment, and gun towers start shooting. Where other inmates show disgust and ostracije him because of the nature of his offense. Is the most significant stressors one can have all with 22 years of non-violence and drug free. I pray Dr. Inaba's report be stricken from his C-file.

# GROUND THREE

Both Ground Three and subsequent Ground Four raise due process of law claims surrounding the Boards use of a Dr. Inaba's psychological report, and missing parole-hearing transcripts.

On September 11, 2006 petitioner appeared before the California. Board of Prison Hearings (BPH, or Board) for his ____ parole hearing.

During that parole hearing, the Board asked for a postponement of the hearing due to inaccuracies contained in the psychological report prepared by Dr. Inaba. The Board wanted to postpone the hearing because the inaccuracies in Dr. Inaba's report would be in violation of petitioner's due process of law right's under the State and Federal Constitutions.

**Exhibit-A**: BPH Transcripts pp. 36 & 37 line(s) 24 - 27 & 1 - 17.
**Exhibit-B**: Dr. Inaba's Psychological Report pp. 1 - 6.

The Board rescheduled the parole hearing for February 23, 2007.

During the September 11, 2006 parole, hearing the Board recorded the hearing conversation upon either tape or digital recording equipment.

In the intern time between September 11, 2006, and February 23, 2007 petitioner saw a Dr. Starrett PhD. whom prepared a new accurate psychological report. Dr. Starrett's professional opinion had this to say about petitioner's potential for violence; as quoted from Deputy Commissioner Shields:

> "Now, he [Dr. Starrett PhD.] says he administered the HCR 20 and essentially says with respect to **insight** you're in the **low** range for future violence. And, as far as

- 1 -

# GROUND THREE

environments risks and risk management that you rated in
the **low** range as far as psychopathy and says that the
inmate's [Ballard] overall risk management has moved from
moderate to **low**."


**Exhibit-A**: BPH Transcripts pg. 42 line(s) 12 - 19
**Exhibit-C**: Dr. Starrett's Psychological Report pp. 1 - 8.


However, the Board chose to rely primarily on Dr. Inaba's

psychological report instead.

At the September 11, 2006 parole, hearing petitioner's appointed

attorney Johanna Hoffmann objected to Dr. Inaba's report:

"Before we go into them[psychological reports] It's my
understanding that the psych evaluation that's dated for
the October 2006 hearing that, was actually done on
September 11, [2006]."

"Was done based on the old standards for the psych
evaluations, and as a result doesn't have the same test and
standardized ways of determining violence potential as the
new evaluation does, and so I would rather that we focus on
the new evaluation instead of the September 2006 one [Dr.
Inaba's report]"


**Exhibit-A**: BPH Transcripts pp.37, line(s) 5 - 9 & 11 - 17


Despite the objections of petitioner's attorney and the fact,

the Board had postponed the parole hearing from September 11, 2006 to

Febrarury 23, 2007 to obtain a new psychological report because of

numerous inaccuracies contained in Dr. Inaba's Psychological Report,

the Board chose to rely heavily on Dr. Inaba's report. ·

# GROUND THREE

The board justified using Dr. Inaba's report on the ground it was relevant evidence. As Presiding Commissioner Eng stated:

> "No. This is what's going to happen. Again, this Panel considers all relevant documents, and it's up to us how much weight we put on them. So we don't usually just look at one report. It's too static. We look and often go back to many, many. So your [Attorney Hoffmann] objection is noted. It's overruled. And, Miss Shields, you can continue."

**Exhibit-A**: BPH Transcripts pp.38 line(s) 4 - 11.

Apparently, Presiding Commissioner Eng is referring to California Code of Regulations:

> "Information Considered. All relevant, **reliable** information available to the panel shall be considered in determining suitability for parole. …"

CCR Title 15 § 2402(b) quoted in relevant part (emphasis added)

This is where the Board violated petitioner's due process of law stemming from the regulation. The regulation requires that the evidence be reliable and relevant. The Board chose to only consider the half of the regulation that was relevant. But relevant to what if the Board knew Dr. Inaba's Psychological Report was riddled with inaccuracies. Petitioner claims the Board used said report only because it supported its longstanding illegal no-parole policy. Or in

- 3 -

# GROUND THREE

other words Dr. Inaba's Psychological Report was only relevant to the

Boards illegal no-parole policy.

Dr. Inaba's Psychological Report stems from the Marin County

Superior Court Case Law:

In re Rutherford/In re Tito Lugo No. SC 135399 CA 1 No. A114111.

The Board hired psychologists for their known ability to write bad

psychological reports. (Exhibit J) The newly hired psychologist

included Dr. Inaba's whom gave petitioner a report riddled with

factual errors. And ironically the Board also hired Dr. Starrett PhD.

whom gave petitioner an excellent report with a low potential for

future violence. (Exhibit J)

Ground Four related to this claim is that the Board did not

consider the Board Hearing transcripts from the September 11, 2006,

parole hearing.  Further the Board did not provide neither

petitioner, nor his attorney the said transcripts, so that petitioner

could have presented them as evidence.

7. Ground 2 or Ground ___4___ (if applicable):

The Board's failure to provide petitioner with a transcript of the parole hearing held on September 11, 2006 which resulted in a postponement, nevertheless violated petitioner's due process right to have one under the California and U.S. Constitutional relevant clauses.

a. Supporting facts:

On September 11, 2006, petitioner had a parole hearing before the California Board of Prison Terms.

See Exhibit A: BPH Trans. pp. 11 & 37 line(s) 1-4 & 5-17.

At that parole hearing petitioner and his attorney objected to the Dr. Inaba Psychology Report for numerous inaccuracies, and time constraints violations of due process, as petitioner had only just received the psych report that day of September 11th. (See Gnd. 3)

At the same parole hearing, the Board, also objected to the Dr. Inaba report, for inaccuracies, and because the Board wished petitioner to receive a report from the new psych report program the Board was implementing.

The new Psycological Report programs have Board hired psycholog- ist, instead of the traditional institutions permanent psychologist. The new program, also impliments more in depth testing, as the courts have restricted the Boards innvocation of "danger to society" at every pro forma parole hearing, and the Board turns to its new found interest in having their hired gun "psychologist" prepare the new reports with an in depth testing and review never seen before.

The Board also stipulated in an injuction of the case law In re Lugo Marin County Superior Court # SC135399A CA1 no. A114111 continued ...

b. Supporting cases, rules, or other authority:

In re Lugo, Marin County Superior Court, # SC135399A CA1 no. A114111.
Greenholtz v. Inmates of Nebraska Penal and Correctional Complex (1979) 442 U.S. 1, 12.
In re Weider (2006) 145 Cal. App. 4th 570.
In re Scott (2005) 133 Cal. App. 4th 573.

Ground 4 Continued...

that the Board would not require any prisoners to post-
pone their parole hearings just to get a new psych report.
    Despite that injunction promise the Board requested a
postponement of petitioner at the September parole hearing.

    At the September parole hearing the Board tape
recorded both its and petitioner's objects to the Dr. Inaba
report and why each party was requesting a postponement.

    On February 23, 2007 petitioner had the postponed
parole hearing.  And on May 01, 2007 petitioner received
a copy of the February 23, 2007 parole hearing.

    However missing from the May 01, 2007 handover of the
BPH hearing transcripts was a copy of the transcripts of
the earlier September 2006 parole hearing.

    California Penal Code f 3041.5 (4) gives petitioner the
right to "receive a stenographic record of all proceedings"
All proceedings would include the September parole hearing
postponement proceedings.

    The United States Supreme Court in Greenholtz also established
a prisoner's federal right to a "written" copy of the parole
hearings proceedings.

    The Board violated those due process of law, and liberty
interest rights when it did not provide a copy of said hearing.

7. Ground 2 or Ground ____5____ (if applicable):

The Board of Prison Hearing's refusal to let petitioner ask a question of a witness present at his February 23, 2007 parole hearing violated petitioner's due process of law rights under the relevant clauses of the California & Federal Constitutions.

a. Supporting facts:

This contention raises a Novel Question of Law. Does a prisoner in California have the right to call and question a witness, under United States Supreme Court "clearly decided case law?

In 1979 the United States Supreme Court ruled, in the Greenholtz case, that a states statues language construction establishes a "Liberty Intrest" in parole for prisoners. The Greenholtz Court then included a list of some "rights" of prisoners to safeguard their liberty interests. The Greenholtz list included; 1) the right to be present to ask or answer questions, 2) the right to a written reason of why parole was denied, 3) the right to a written reasons of what a prisoner could do to become parole eligible, 4) the right to call and question witnesses. This list is not conclusive of all rights a prisoner has to protect his due process rights.

In 2002 the Ninth Circuit Court in McQuillion ruled California's parole statues are parallel to Greenholtz and establish a state prisoners liberty interest.

Since 2002, no court has ruled on the question of a prisoner in California having the right to call and question an witness(es) in a parole hearing.

Except for the "calling witness right, all the other Greenholtz procedural due process safeguard rights are protected by law and

continued . . .

b. Supporting cases, rules, or other authority:

California Penal Code § 3041.5
California Code of Regulations Title 15 §
Greenholtz v. Inmates of Nebraska Penal Correctional Complex (1979) 442 U.S. 1, 12.
McQuillion v. Duncan (9th Cir. 2002) 306 F.3d, 895, 901.

Ground __5__    Continued ...

... regulation i.e. California Penal Code § 3041.5, and CCR Title 15 ∅

In petitioner's February 23, 2007 parole hearing the Board refused petitioner's request to ask a question of the Stanislaus County Deputy District Attorney John Robert Mains. D.A. Mains was a witness at said parole hearing and was allowed to enter testimony against petitioner.

See Exhibit A: BPH Trans. pp. 79 - 83, 84 - 86

Yet, when petitioner requested the right to ask D.A. Mains a question the Board denied that right.

"~~Inmate Bollard:~~ I would like to direct a question to the representative of the District Attorney's office."

"Presiding Commissioner Eng: You cannot do that, but you can direct a question to me."

See Exhibit A: BPH Trans. pg. 90  line(s) 20 - 24.

When the Board refused to let petitioner directly question the witness D.A. Mains; the Board violated the liberty interest right to call a witness, or to question any witness, established by the Greenholtz and McQuillion case law.

7. Ground 2 or Ground ___6___ (if applicable):

The Board violated petitioner's First Amendment Rights by a State Government established requirement to participate in two 12-step programs whose curriculum requires a belief in God; in violation of the California and U.S. Federal Constitutions.

a. Supporting facts:

In the Board's statement of denial reasons of why petitioner was unsuitable for parole the Board made a requirment that petitioner attend A.A. or N.A.
For example the Board said,

"We recognize that you did stop going to A.A. and N.A. back in '93, but you have found other outlets, [ Impact, Kairos, ect..], but you need to continue doing this [ attend A.A. & N.A.] in order to face discuss, under [stand] [sic], cope with stress in a non-destructive manner."

(See Exhibit A: BPH Trans. pg. 100 line(s) 12-17.)
See Exhibit D: SFDJ (2007) Article Court Frees prisoner over forced A.A.
The Board has found petitioner unsuitable for parole on one-reason; i.e. his failure to attend religious A.A, or N.A. The Board has further recommended the only way for petitioner to be found suitable in the furture is for him "to continue doing" A.A. or N.A. This Board action has been ruled a violation of the First Amendment in the Turner case

b. Supporting cases, rules, or other authority:

Turner v. Hickman (2004) 342 F. Supp. 2d 887
Turner        (2007) ___ DJDAR May 10th
See Exhibit D: SFDJ (May 10, 2007) "Pro per Appeal Frees Convicted Killer"
California Constitution.
United States Federal Constitution.

7. Ground 2 or Ground __7__ (if applicable):                                    MC–275

The Board did not actually consider all relevant and reliable evidence and in fact only went through the motions while considering self-help chrono's that are favorable evidence to petitioner's parole suitability. This action violates petitioners Federal & state due process rights.

a. Supporting facts:

In petitioner's parole hearing before the BPH on February 23, 2007 parole commissioner Shields dismisses favorable chrono's by re-labling them as "participatory" from the factual lable of laudatory. This slight of reference was purposely done to discount petitioner's rehabilitation efforts in the self-help groups "IMPACT" & "TRUST" (See Exhibit A: BPH Trans. pg 43 line(s) 8 – 16.) Commissioner Shields went on to say these favorable to parole chrono's were "boiler plate and repetitive" (line6) 18 –19) This classification to boiler plate is to purposely disregard relevant and reliable evidence that shows petitioner has rehabilitated and is suitable for parole.

Commissioner Shields failed to read each favorable evidence chrono into the record so that Commissioner Eng could hear and therefore consider such evidentry proof of petitioner's lack of danger to society. Commissioner Shields felt overwhelmed by the sheer volume of the chrono evidence and said, "... it's hard for a reader to assimilate whats happing" (ExA pg. 44 lines 18-20) Just because there is a lot of evidence

b. Supporting cases, rules, or other authority: of favorable proof continued . . .

California Code of Regulation Title 15 & 2402(b)

Turner v. Hickman (2004) 342 F. Supp. 2d. 887

Turner ,

California Constitutions

United States Federal Constitution

Ground __7__ Continued ...

... Favorable to a prisoners rehabilitation, it should not be "blown off" with disinclination because the Board feels "over-whelmed" by the sheer gravity of the positive evidence.

The Board's dislike of the "Impact" group, seems to stem from the fact, the group is not A.A. or N.A. The Board's like of A.A and N.A., over other alternative groups, is because A.A and N.A. are the perfered religious belief system the California Government likes to force upon life prisoners. The Board's repeated suggestions petitioner attend A.A or N.A is in violation of Petitioner's First Amendment (see Ground __6__ ) For example the Board said,

" We recognize that you did stop going to A.A. and N.A. back in '93, but you have found other out-lets [Impact], but you need to continue to do this [A.A. & N.A.] in order to face, discuss, under, and cope with stress in a non-destructive manner. "

(See Exhibit A: BPH Trans. pg. 100, line(s) 12 - 17)

" And also, your willingness to explore alternatives for self-help because we didn't get into why you stopped the A.A., N.A., but you did seek out other avenues, okay, and that's good and don't stop there because if you're not getting..."

Ground __7__   Continued 2nd attached page.

        "... everything you need out of IMPACT or Kairos
        or whatever, there's a lot of other things that
        are available to you ... "

(See Exhibit A: BPH Trans. pp. 100 - 101 line(s) 24 - 27 & 1 - 5)

    From these two passages the Board's message to pet-
itioner is clear; the relevancy of the numerous chrono's from
Impact, Kairos, and other self-help groups is not being
considered because its "overwhelming" and not A.A. or
N.A.
    The Ninth Circuit Court has held in the Turner case
law that 1) A.A and N.A. as 12 step programs are
religous; 2) That the Board's requirement life prisoners
participate in A.A., N.A. or other 12 step programs vio-
lates a prisoners First Amendment rights.

Turner v. Hickman (2004) 342 F. Supp. 2d. 887.

    Dispite the Turner case ruling the Board continues
to require California life prisoners to attend A.A., or
N.A. Just like the Board has rejected petitioners other
self-help groups with the requirement he attend A.A.,
or N.A The Board's ingrained attitude has promted one
District Court to order the release of Turner; petitioner
urges the Court to follow this example and Order his
release too.

In re Turner (2007) ____   DJDAR

7. Ground 2 or Ground ___8___ *(if applicable):*                    MC—275

_____ The Board considered unreliable and unrelevant evidence of a CDC-128-A "counseling chrono" in violation of petitioner's due process rights under the Federal U.S. Constitution clauses, as well as, the California Constitutional clauses. _____

a. Supporting facts:

_____ In petitioner's February 23, 2007 parole hearing the California Board of Prison Hearings (BPH, or Board) used a CDC-128 -A "counseling chrono as one of the reasons to find petitioner unsuitable for parole. (See Exhibit A: BPH Trans. pg. 96 line(s) 17-20.)

_____ The CDC-128-A was dated January 16, 2004 and "counseled" petitioner for "failure to report"

_____ Pursuant to CCR § 2402(b) the Board is to consider all relevant and reliable evidence as it relates to an inmates "current" "unreasonable" risk of danger to society. Penal Code § 3041(b).

_____ There is nothing "current" about a 3 year old "counseling" chrono" that bears any relevance to petitioner's "current" risk. How does being counseled for "failure to report" actual make a person an "unreasonable" risk to society? _____

_____ The case law of In re Smith (2003) 109 Cal. App. 4th 489; 134 Cal. Rptr. 2nd 285 at FN5 held CCR § 3000 "counseling chrono's are not CCR 3312(a)(3) "discipline" chrono's and therefore the Board/Gov. cannot use them to deny parole. _____

b. Supporting cases, rules, or other authority:

_____ CCR §§§ 2402(b), 3000, 3312(a)(3)

_____ Penal Code § 3041(b)

_____ In re Smith (2003) 109 Cal. App. 4th 489; 134 Cal. Rptr. 3rd 285 FN5.

_____ California Constitution.

_____ United States of America's founding Constitution.

7. Ground 2 or Ground ___9___ *(if applicable):*                                          MC–275

  The Board used illegal evidence of 3 CDC-115 disciplinary reports to deny parole which is in violation of petitioner's due process of law rights under the Federal Constitution clauses, as well as, the California Constitutional clauses.

a. Supporting facts:

  In petitioner's February 23, 2007 parole hearing the Board considered the illegal evidence of 3 CDC-115 disciplinary reports as one of the reasons they used to find petitioner would "currently" pose an "unreasonable" risk of danger to society.

  Normally CDC-115 disciplinary reports would be relevant and reliable evidence for the Board to consider CCR § 2402(b). However the 3 CDC-115's in question are given for circumstances that are now illegal to discipline an inmate for i.e. suicide related self-mutilation. (See Exhibit A: BPH Trans pg. 96 line(s) 20-24) * ("Title of poem: "Who Was I" is evidence of suicide ideology")

  CDCR is under Federal Receivership for its Mental Health practices under the Coleman and Clark lawsuites, as a result CDCR promulgated CCR § 3317 which makes it illegal for CDCR to discipline an inmate for self-mutilation related to a suicide attempt. Petitioner's CDCR-115 disciplinaries dated November 22, 1997 and November of 1992 were issued before CDCR promulgated CCR § 3317 so subsquently the Board's use of the CDCR-115's is illegal.

b. Supporting cases, rules, or other authority:

  CCR- California Code of Regulations §§ 2402(b), 3317.
  Coleman v. Wilson (C.A.9 (Cal.) 1996) 101 F.3d. 705.
  Clark v. California (C.A.9 (Cal.) 1997) 123 F.3d. 1267.
  California State Constitution
  United States of America's founding Constitution.

7. Ground 2 or Ground ___10___ (if applicable):

The Board arbitrarily applied its parole unsuitability factor of the sufficiency of petitioner's parole plan in violation of the Equal Protection clauses of the Federal Constitution, as well as, the California Constitution.

a. Supporting facts:

The Board used as one of its reasons to deny parole, viable parole plans. (See Exhibit A; BPH Trans. | pg. 98 line(s) 15-28 continued pg. 99 line(s) 1-28 also, pg. 100 line(s) 1-5.)

The Board's concern was why the plans were for Arkansas or San Jose, California, but not to Stanislaus County which is the county of last legal residence pursuant to Penal Code § 3003.

Petitioner contends that the Board arbitrarily applies this county of last legal residence standard. The relevant Penal Code statues that require a prisoner to parole to the last county of legal residency, also confer great powers to the Board granting them the right to parole an inmate anywhere.

It is this power the Board acts arbitrary applying the standard of county of last legal residency to prisoners when they wish to find said prisoners unsuitable for parole.

However in several published case laws, of prisoners appealing the Board finding them suitable for parole, and the Governor rescinding the Board's suitability findings; the Board had found these prisoners suitable for parole even though the said prisoners parole plans were to counties other then the county of last legal residence. The Board when it wants to grant parole ~~ingners~~ ignores the county of last legal...

Continued on attached page

b. Supporting cases, rules, or other authority:

California Penal Code §§ 3000, 3001, 5058 & §§ 3000.1(b), 3003(a)
In re Ramirez (2001) 94 Cal.App. 4th 549
In re Andrade (2006) 96 Cal Rptr. 3rd 317.
California Code of Regulations, Title 15 § 2402 (1)(8) Understanding & Plans for Future.
United States and California Constitutions

Ground __10__.   Continued ...

... and routinely finds inmates suitable for parole. For example the Ramirez case, on page 553, "Ramirez pleads guilty in Ventura County" This establishes Ventura County as the last legal residence. Yet on page 556 & 557 Ramirez's parole plans are to San Jose, California which is located in Santa Clara County.

In re Ramirez (2001) 94 Cal. App. 4th 549, 553, 556-557.

At a later date the Board found Ramirez suitable for parole even though his Santa Clara parole plans were not to the county of last legal residency i.e. Ventura County.
Similarly, the Andrade case held the Board could not require a prisoner to make parole plans to the county of last legal residence when Andrade had presented "realistic" parole plans to Mexico.

In re Andrade (2006) 46 Cal. Rptr. 3rd 317.

Another recent California Appellate Court has held that prisoners whose total term of incarceration i.e. actual years served plus good time credits earned pursuant to CCR § 2410 (Title 15) is deemed the "constructive custody" term. The prisoner in the Smith case had his constructive custody term of 32.75 years minus his uniform term of Penal Code § 3041(a) set pursuant to Title 15 CCR § 2403 of 20 years making Smith 12.75 years over-served. The Appellate Court ruled this extra-time is subtracted from Prisoner Smiths parole period of 5 years leaving no parole.

In re Ernest Smith (2007) DJDAR 6217.

continued ...

Ground  10    Continued  2nd attached page ...

Petitioner like the Smith case is similarly situated only with a longer period of parole supervision. The relevant Penal Code §§ 3001 & 3000.1(b), coupled with Title 15 CCR regulations provide for a discharge of parole after 5 years for life prisoners who have the lengthier parole period, so that petitioner would be eligible for same type of relief provided by the Smith case law.

Petitioner has served 22 years actual custody past his minimum term of 15 years to life. The 22 years, plus the CCR § 2403 credits of 7.33 years equal 29.33 years constructive custody. The constructive custody term of 29.33 years minus the maximum possible matrix term per CCR § 2403 (c) is 21 years, (Presumable arguementative less matrix), It is equal to 8.33 years over-served time. This 8.33 years shall be subtracted from any parole period time leaving petitioner with no parole.

In re Ballard (1981) 115 Cal. App. 3rd. 647.

Petitioner having served for past his maximum punishment will when found parole suitable be a free man with no parole. Because petitioner will have no parole the California Penal Code § 3001 requirement that he parole to the county of last legal residence is immaterial. In America Free Men are free to live in any state, county, or even Country; therefore Petitioner's Arkansas Parole Plans are "realistic" leaving the Board no reason to continue illegally finding this prisoner unsuitable for parole.

# TABLE OF EXHIBITS

**A:** BPH Hearing Transcripts       pp. 1 - 107.

**B:** Dr. Inaba, Mental Health Evaluation      pp. 1 - 6.

**C:** Dr. Starrett, Mental Health Evaluation      pp. 1 - 8.

**D:** SFDJ (2007) Article: "Forced AA Religion Frees Prisoner."
                 Pg.      1.

**E:** San Francisoco Chronicle (2007) Article: "California
Governor not paroling Life Prisoners."     Pg.      1.

**F:** Stanislaus Superior Court Summery Denial Order of July 16,
2007.                       pp. 1 - 2.

**G:** California California Court of Appeal Fifth District Summery
Denial Order of August 23, 2007.     pp. 1 - 2.

**H:** California Supreme Court Summery Denial Order of August 23,
2007.                    pg.     1.

**I:** California State Court Petition for Writ of Habeas Corpus No.
S156331                 pp. 1 - 6.

**J:** California Lifer Newsletter No. 20 Volume 4 Number 2 excerpt
from page 8 Article titled "BPH-HIRED HATCHET PSYCHS." pg.    1.

1

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

**INMATE COPY**

|  |  |  |
|---|---|---|
| In the matter of the Life | ) | |
| Term Parole Consideration | ) | CDC Number D-04047 |
| Hearing of: | ) | |
|  | ) | |
| BENJAMIN BALLARD | ) | |
| ———————————————— | ) | |

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

FEBRUARY 23, 2007

10:48 A.M.

PANEL PRESENT:

Janice Eng, Presiding Commissioner
Patricia Shields, Deputy Commissioner

OTHERS PRESENT:

Benjamin Ballard, Inmate
Johanna Hoffmann, Attorney for Inmate
John Robert Mains, Deputy District Attorney
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

| | No | See Review of Hearing |
|---|---|---|
| _____ | Yes | Transcript Memorandum |

**KERRY VIENS**
**NORTHERN CALIFORNIA COURT REPORTERS**

ii

INDEX

                                              Page

Proceedings ...................................... 1

Case Factors ................................... 14

Pre-Commitment Factors ......................... 23

Post-Commitment Factors ........................ 36

Parole Plans ................................... 56

Closing Statements ............................. 84

Recess ......................................... 93

Decision ....................................... 94

Adjournment ................................... 106

Transcriber Certification ..................... 107

--oOo--

1

1           P R O C E E D I N G S

2           PRESIDING COMMISSIONER ENG:  Good morning.

3    This is a subsequent parole consideration hearing

4    for Benjamin Ballard, B-A-L-L-A-R-D, CDC number

5    D-04047.  Today's date is February 23rd, 2007,

6    and the time is 10:48.  We are located at San

7    Quentin State Prison.  The inmate was received on

8    April 4th, 1985, from Stanislaus County, and the

9    life term began on the same date, April 4th,

10   1985, with a minimum eligible parole date of

11   October 21st, 1993.  Controlling offense for

12   which the inmate has been committed is murder 2,

13   case number 202859, Count 1, Penal Code Section

14   187, and the inmate received a total term of 15

15   years to life.  This hearing is being tape

16   recorded, and so for the purpose of voice

17   identification, each of us will be required to

18   state our first and last names, spelling out our

19   last names.  And, sir, when it comes to your

20   turn, I want you to spell your last name sir and

21   please provide us with your CDC number.  So I

22   will begin and we will move around the room to my

23   left.  My name is Janice Eng, E-N-G,

24   Commissioner.

25           DEPUTY COMMISSIONER SHIELDS:  Pat Shields,

26   S-H-I-E-L-D-S, Deputy Commissioner.

27           DEPUTY DISTRICT ATTORNEY MAIN:  John

2

1    Robert Main, Deputy District Attorney, County of

2    Stanislaus.

3            ATTORNEY HOFFMANN:  Johanna Hoffmann,

4    H-O-F-F-M-A-N-N N, attorney for Mr. Ballard.

5            INMATE BALLARD:  Benjamin Ballard,

6    B-A-L-L-A-R-D, D-04047.

7            PRESIDING COMMISSIONER ENG:  Okay.  Thank

8    you.  For the record, we have two correctional

9    officers present for security reasons, and they

10   will not be participating in the hearing.  We are

11   missing our ADA statement.  Is there an ADA

12   statement sitting around?

13           ATTORNEY HOFFMANN:  I have one.

14           PRESIDING COMMISSIONER ENG:  We just had a

15   bunch of copies of them.  We have one.  Okay.

16   Sir, would you please read that aloud?

17           INMATE BALLARD:  To be recorded?

18           PRESIDING COMMISSIONER ENG:  Yeah, out

19   loud.

20           INMATE BALLARD:  "ADA, Americans with

21           Disabilities Act, the Americans with

22           Disabilities Act, ADA, is a law to

23           help people with disabilities.

24           Disabilities are problems that make

25           it harder for some people to see,

26           hear, breathe, talk, walk, learn,

27           think, work, or take care of

3

1    themselves than it is for others.

2    Nobody can be kept out of public

3    places or activities because of a

4    disability.  If you have a

5    disability, you have the right to ask

6    for help to get ready for your BPT

7    hearing, to get to the hearing, talk,

8    read forms and papers and understand

9    the hearing process.  BPT will look

10   at what you asked to make sure that

11   you have a disability that is covered

12   by the ADA and that you have asked

13   for the right kind of help.  If you

14   do not get help or if you don't think

15   you got the kind of help you need,

16   ask for a BPT 1074 grievance form.

17   You can also get help to fill it

18   out."

19        **PRESIDING COMMISSIONER ENG:**  Okay.  Thank

20   you.  Do you understand about your ADA rights?

21        **INMATE BALLARD:**  Yes, I do.

22        **PRESIDING COMMISSIONER ENG:**  Okay.  I

23   still have to go through a bunch of questions

24   with you anyway.  The record does reflect that

25   you signed a BPT form 1073 back on December 1st

26   of 2006, and this 1073 form is a reasonable

27   accommodation notice and request in accordance

4

1   with the provisions of Americans with

2   Disabilities Act.  And on that form, you did

3   check off that you do not have any disabilities

4   as identified under the ADA; is that correct?

5          INMATE BALLARD:  That is correct.

6          PRESIDING COMMISSIONER ENG:  Okay.  So

7   this information's still current and correct?

8          INMATE BALLARD:  Yes, it is.

9          PRESIDING COMMISSIONER ENG:  So, do you

10  have any problems walking up or down stairs or

11  for distances of 100 yards or more?

12         INMATE BALLARD:  No.

13         PRESIDING COMMISSIONER ENG:  And do you

14  require any glasses or magnifying device in order

15  to see or read any documents?

16         INMATE BALLARD:  No.

17         PRESIDING COMMISSIONER ENG:  How about

18  hearing impairments?  Anything?

19         INMATE BALLARD:  No.

20         PRESIDING COMMISSIONER ENG:  Okay.  Have

21  you ever been included in the Triple CMS or the

22  EOP programs?

23         INMATE BALLARD:  Yes.  I've been in Triple

24  CMS.

25         PRESIDING COMMISSIONER ENG:  You have.

26  And when were you in Triple CMS?

27         INMATE BALLARD:  I believe it was from

5

1    2002, apparently, I was in for approximately

2    about a year.

3         PRESIDING COMMISSIONER ENG:  So from 2002

4    to about 2003?

5         INMATE BALLARD:  Yeah.

6         PRESIDING COMMISSIONER ENG:  But you have

7    not been since that time?

8         INMATE BALLARD:  No.

9         PRESIDING COMMISSIONER ENG:  And were you

10   on any psychotropic medications?

11        INMATE BALLARD:  No.

12        PRESIDING COMMISSIONER ENG:  Okay.  And

13   you're not on any right now?

14        INMATE BALLARD:  No.

15        PRESIDING COMMISSIONER ENG:  So, while you

16   were growing up, okay, in school, do you recall

17   if you had been enrolled in any special education

18   classes?

19        INMATE BALLARD:  Briefly in like the third

20   grade, I was taken out of my normal class and put

21   in a class like special education for a time, but

22   it was only a month, and then I went back to my

23   regular class.

24        PRESIDING COMMISSIONER ENG:  Was it in any

25   one area or just in general for all classes or

26   was it in English?  Was it in math?  Or speech

27   or --

6

1    INMATE BALLARD:  I can't remember.

2    PRESIDING COMMISSIONER ENG:  Okay.  Okay.

3   But it was just a short period of time?

4    INMATE BALLARD:  Yeah.

5    PRESIDING COMMISSIONER ENG:  So, sir, do

6   you suffer from any disability that would prevent

7   you from participating in today's hearing?

8    INMATE BALLARD:  No.

9    PRESIDING COMMISSIONER ENG:  Counsel, are

10   there any ADA issues that you feel warrant

11   further discussion regarding your client?

12    INMATE BALLARD:  There are none that I'm

13   aware of.  Thank you.

14    PRESIDING COMMISSIONER ENG:  Sir, this

15   hearing is being conducted pursuant to the Penal

16   Code and the rules and regulations of the Board

17   of Parole Hearings governing Parole Consideration

18   Hearings for life inmates.  So the purpose of

19   today's hearing is to, one again, consider your

20   suitability for parole.  And, in doing so, we

21   will consider the number and the nature of the

22   crimes for which you were committed, your prior

23   criminal and social history, your behavior and

24   programming since your commitment, and your plans

25   if released.  So we've had the opportunity to

26   review your Central File, and you'll also be

27   given the opportunity to make any corrections or

7

1    to clarify the report.  Okay.  We will consider

2    your progress since your commitment, your

3    counselor's reports and your mental health

4    evaluations.  However, we will focus on your

5    progress and any new reports since your last

6    hearing.  So, any changes in your parole plans

7    should be brought to our attention.  Okay.  We

8    will reach a decision today and inform you

9    whether or not we find you suitable for parole,

10   and the reasons for our decision.  If you are

11   found suitable for parole, the length of your

12   confinement will be explained to you at that

13   time.  Before we recess for deliberations, the

14   District Attorney's representative who is

15   present, your attorney, and you, yourself, will

16   have an opportunity to make a final statement

17   regarding your parole suitability.  So, if you

18   chose to make a final statement, just remember to

19   stay focused on why you believe you are suitable

20   for parole.  We'll then recess, clear the room,

21   and deliberate.  And, once we complete our

22   deliberations, we will resume the hearing and

23   announce our decision.  California Code of

24   Regulations states that regardless of time

25   served, a life inmate shall be found unsuitable

26   for and denied parole if, in the judgment of the

27   Panel, the inmate would pose an unreasonable risk

8

1   of danger to society if released from prison.

2   You have certain rights.  Those rights include

3   the right to a timely notice of this hearing.

4   The right to review your Central File, and the

5   right to present relevant documents.  Okay.

6   Based on those rights, so far, Counsel, have your

7   client's rights been met?

8         ATTORNEY HOFFMANN:  They have to the best

9   of my knowledge.

10        PRESIDING COMMISSIONER ENG:  Okay.  Thank

11  you.  You have the additional right to be heard

12  by an impartial Panel.  You've been introduced to

13  this Panel, do you have any objections?

14        INMATE BALLARD:  No, ma'am.

15        PRESIDING COMMISSIONER ENG:  Okay.

16  Counsel, any objections to the Panel?

17        ATTORNEY HOFFMANN:  No objections to the

18  Panel.

19        PRESIDING COMMISSIONER ENG:  You will

20  receive a copy of our written, tentative decision

21  today and that decision becomes final within 120

22  days.  A copy of the final decision and a copy of

23  this transcript will be sent to you.  On May 1st,

24  2004, regulations regarding your right to appeal

25  a decision made at this hearing were repealed.

26  So, basically, to appeal, you really need to go

27  to court.  So, if you have any questions about

9

1  that, you can discuss it with your legal

2  counselor you can review the policy at your

3  prison law library.  Okay.  Sir, you are not

4  required to admit to or discuss your offense.

5  However, this Panel does accept as true the

6  findings of the court.  So do you understand what

7  that means?

8          INMATE BALLARD:  Yes, I do.

9          PRESIDING COMMISSIONER ENG:  Commissioner,

10  is there any confidential material in the file;

11  and, if so, will we be using it today?

12          DEPUTY COMMISSIONER SHIELDS:  No.

13          PRESIDING COMMISSIONER ENG:  Oh.  Okay.

14  Thank you.  I should have done this before.

15  Here's a copy of the hearing checklist marked

16  Exhibit 1.  I'm passing that around to your legal

17  counsel and then she'll initial it and pass it to

18  Mr. Main with the DA's office.  And we do that to

19  ensure that we are all operating off the same set

20  of documents for your hearing.

21          ATTORNEY HOFFMANN:  Okay.

22          PRESIDING COMMISSIONER ENG:  Okay.  So

23  that's marked Exhibit 1.  Counsel, any additional

24  documents to be submitted to the Panel this

25  morning?

26          ATTORNEY HOFFMANN:  None that I am aware

27  of, but I do reserve that the right if it comes

9

10

1   to my attention if anything is missing to submit

2   it at that point.

3           PRESIDING COMMISSIONER ENG:  Okay.  And

4   any preliminary objections?

5           ATTORNEY HOFFMANN:  I do have two

6   objections.  The first is with regard to the

7   Board report.  The last Board report that was

8   done was in July of 2006.  If a hearing happens

9   more than six months from that date, at least an

10  addendum to the Board report should be done.  I

11  do not have that information.  Hopefully, we can

12  review the Central File to make sure that all the

13  progress reports and laudatory chronos group

14  participation are present.

15          PRESIDING COMMISSIONER ENG:  Okay.

16          ATTORNEY HOFFMANN:  Second, I just

17  received today a copy of a letter from Kelly

18  Clark, which I object to both because it wasn't

19  submitted within the ten days that it is -- that

20  it should be submitted within; and, second,

21  because there's no date or address and it's

22  difficult to authenticate.

23          PRESIDING COMMISSIONER ENG:  Okay.  On

24  your first objection, this is the reason why the

25  Deputy Commissioner will be going -- bringing us

26  up-to-date through today from Mr. Ballard's last

27  hearing, and it's double checking using the

*No*

11

1    C-File.  Again, I think the reason why we don't

2    have an addendum is because of the recent

3    postponement from your previous hearing in

4    September.  It was towards the end of September.

5          **INMATE BALLARD:**  Yes.

6          **PRESIDING COMMISSIONER ENG:**  You were

7    postponed because you had just received, I

8    believe, on that day, a copy of your

9    psychological evaluation.

10         **INMATE BALLARD:**  That's correct.

11         **PRESIDING COMMISSIONER ENG:**  So I believe

12   that is why there is no addendum.  However, we

13   will be covering all the information by

14   Commissioner Shields.  Okay.  On your second

15   objection, it's noted.  I don't want -- I'm not

16   going to rule whether or not we agree or disagree

17   with that ruling.  I want to take a look at the

18   letter and you know, in deference to any victim

19   next of kin.  However, we all just received a

20   copy of the letter.  It did come through the

21   lifer desk here.  We don't know when they

22   received it.  This typically happens,

23   unfortunately, at a lot of institutions where

24   documentation comes in well within the time but

25   it not distributed out at the proper time.  So,

26   and again, a letter from the victim next of kin

27   or a victim is not going to stand by itself as a

12

1   major factor for suitability or against

2   suitability.  So, this Panel does have the

3   latitude to consider all relevant documentation

4   that is presented to us.  So, I will --

5       ATTORNEY HOFFMANN:  I just will add

6   quickly that I was, in fact, here on February

7   14th, and conducted my Central File reviews and

8   also asked the lifer desk for any supplemental

9   information which she did have, which, that would

10  have marked closer to the ten-day deadline, and

11  she did give me a packet of information which did

12  not include this letter.  So this was submitted

13  at some point after February 14th.

14      PRESIDING COMMISSIONER ENG:  Okay.  Point

15  taken.

16      ATTORNEY HOFFMANN:  Thank you.

17      PRESIDING COMMISSIONER ENG:  But, again,

18  you know, we'll determine whether or not it will

19  be read into the file.  Again, one letter is not

20  going -- you know, if we feel that it's going to

21  be a major factor, then we'll disclose that.  But

22  right now, let's say that a letter from a victim

23  is not going to be a major factor swaying our

24  decision one way or the other at this point.

25  Okay.  Anything else?

26      ATTORNEY HOFFMANN:  No.  Thank you.

27      PRESIDING COMMISSIONER ENG:  Okay.  Let's

13

1    see. So, will your client be speaking with the

2    Panel this morning?

3         **ATTORNEY HOFFMANN:** He will be speaking

4    with the Panel. He's going to exercise his right

5    not to speak about the specific facts of the

6    crime, but will be happy to answer any questions

7    that the Panel or the District Attorney has

8    regarding the circumstances and causative factors

9    of the commitment offense.

10        **PRESIDING COMMISSIONER ENG:** Okay. I

11   appreciate that. So I'll have to swear you in,

12   sir. Please raise your right hand. Do you

13   solemnly swear or affirm that the testimony you

14   give at this hearing will be the truth, the whole

15   truth, and nothing but the truth?

16        **INMATE BALLARD:** Yes, I do.

17        **PRESIDING COMMISSIONER ENG:** Okay. And

18   I'll be very cautious with my questions. And if

19   there's ever a question, I generally will look to

20   your legal counsel to say you may want to discuss

21   this to see whether or not you can answer it.

22   Okay.

23        **ATTORNEY HOFFMANN:** Thank you.

24        **PRESIDING COMMISSIONER ENG:** The first

25   order of business is I'm going to read into the

26   record the statement of facts about the crime,

27   and I am going to take that from the probation

14

 1    officer's report that's in the back of our

 2    folders on Page 2 to 3, and it's really -- it

 3    starts on the third paragraph:

 4              "On October 3rd, 1984, at

 5              approximately 10:35 p.m., Melissa

 6              Ebarb, E-B-A-R-B, age three, was

 7              admitted to Scenic General Hospital

 8              for emergency treatment.  She had

 9              been taken to the hospital after her

10              mother Aurora Clark summoned an

11              ambulance stating that Melissa was

12              not breathing.  Cardiopulmonary

13              resuscitation was initiated by

14              firemen and then continued by

15              paramedics and hospital emergency

16              personnel.  However, all efforts to

17              revive Melissa ended in vain.  The

18              autopsy determined that Melissa had

19              died from a broken neck.  Through

20              subsequent investigation, detectives

21              observed that Melissa had numerous

22              bruises on her head, neck, face,

23              back, shoulders, and buttocks.

24              Initially Mrs. Clark reported to the

25              detectives that she had been bathing

26              Melissa when she fell and struck her

27              head against a plumbing fixture in

15

1     the bathtub, causing her to break her

2     neck.  However, after further

3     questioning, Mrs. Clark advised that

4     Ben Ballard was responsible for

5     killing Melissa.  She stated quote,

6     'I don't love him enough to lie for

7     my kids,' unquote.  She stated she

8     was not present when incidents

9     occurred, however, had been informed

10    by her other children that the

11    defendant was physically abusive

12    towards them.  Subsequently, the

13    defendant was taken into custody and

14    charged with murder.  At that time,

15    the defendant was read his rights per

16    Miranda in which he stated he

17    understand and waived.  However, the

18    defendant refused to be truthful with

19    detectives and continued to state

20    that Melissa had suffered a broken

21    neck after striking her head on a

22    plumbing fixture while being bathed.

23    On October 12th, 1984, the defendant

24    requested to speak with detectives.

25    He was advised of his Miranda rights,

26    which he stated he understood and

27    waived.  The defendant admitted that

16

1    he hit Melissa in the face on October

2    3rd, 1984, at approximately 8:00 a.m.

3    because she was screaming and crying

4    and would not stop. He stated he was

5    mad about her screaming and hit her

6    three times across the face with his

7    open hand.  After hitting her, she

8    started bleeding from her nose and

9    turning blue about the lips.  He

10   shook her to try and revive her and

11   put cold water on her head to wake

12   her.  However, he was unable to

13   revive her.  She was still bleeding,

14   and he took her to the bathroom to

15   wipe her nose.  He became very scared

16   and laid Melissa on the couch.  He

17   ran to the camper to get Melissa's

18   mother, Mrs. Clark.  The defendant

19   stated he had spanked Melissa before

20   approximately six times in the

21   previous month.  He also stated he

22   had spanked Melissa earlier that

23   morning for wetting her pants.  The

24   defendant kept stating quote, 'I

25   didn't mean to get that mad at her,

26   and I didn't mean to kill her,'

27   unquote.  Additionally, the defendant

17

1       stated he had been using heroin for

2       approximately eight months prior to

3       the incident.  He stated he had been

4       using approximately $80 worth of

5       heroin per day and was quote 'fixing'

6       unquote in his forearms.  The

7       detectives observed several sites of

8       non-sterile injections along the left

9       and right forearm.  The defendant

10      stated the last time he had quote

11      'fixed' was at approximately 7:00

12      a.m. on October 3rd, 1984.  At that

13      time a urine sample was taken from

14      the defendant.  The urine sample was

15      later tested and proved positive for

16      morphine in parenthesis (heroin)."

17          I'm going to ask counsel if you wanted me

18  to read -- he doesn't want to discuss the crime,

19  correct?

20          **ATTORNEY HOFFMANN:**  Correct.

21          **PRESIDING COMMISSIONER ENG:**  So what I

22  generally do is read into the record an inmate's

23  version if there is one unless you don't --

24  unless you object to that.

25          **ATTORNEY HOFFMANN:**  If the Panel thinks

26  it's necessary to read his version, I think he --

27  his version has remained consistent through the

18

1    years if the Panel wants that information.

2          **PRESIDING COMMISSIONER ENG:**    I just like

3    to complete it to give the fact of the crime and

4    then the inmate's version.

5          **ATTORNEY HOFFMANN:**    I think most of what

6    is in the Board report in terms of his version,

7    anyhow, goes to the causative factors of the

8    crime, which is information he's happy to speak

9    with about today.

10          **PRESIDING COMMISSIONER ENG:**    Okay.    That's

11    fine.    This is very short, and I was going to

12    take it from, you know, the one paragraph from

13    the July 2006 Board report where it states that

14    you said that:

15          "I did not realize what I was doing.

16          When the crime occurred, I was under

17          the influence of heroin.    I was

18          hearing voices and was drinking very

19          much, and I was mentally unstable for

20          the four years prior to my crime.

21          I'm truly sorry for what happened.    I

22          would give my own life up if I could

23          bring her back.    I love children, and

24          have never hurt a child deliberately.

25          I was unable, at that time, to

26          control my anger.    Deeply hurt and

27          sorry.    It's hard to accept that I

19

1          cannot change what already happened."

2          So, based on all this and everything else

3 I've read, you basically agree as to the

4 statement of facts about the life crime that I

5 read into the record; is that correct?

6          INMATE BALLARD:  Yes, that's correct.

7          PRESIDING COMMISSIONER ENG:  Okay.  When

8 you think back during that period of time and

9 even up through now, even putting aside the fact

10 that you were taking heroin on a regular basis,

11 did you always have a problem in dealing with

12 anger or did you used to lose your temper very

13 easily?

14          INMATE BALLARD:  Yes, I always had a

15 problem with anger and violence was always the

16 result of the anger.

17          PRESIDING COMMISSIONER ENG:  Before we

18 talk more about that, I want to read into the

19 record some of the background because that might

20 help pull everything together.  In terms of

21 your -- in terms of your prior criminality and

22 arrest, I see here in terms of a juvenile record

23 that you were arrested back in 1975, March of

24 1975 in Stanislaus county for joyriding and

25 burglary, and you received probation for that.

26 Okay.  Do you recall that incident?

27          INMATE BALLARD:  Yes, I do.

20

1    PRESIDING COMMISSIONER ENG:  Okay.  So

2  what was the burglary about back then?

3    INMATE BALLARD:  Me and some friends, we

4  were in junior high school and just, you know,

5  had real negative influences on each other, and

6  we all decided we wanted to have some extra money

7  and committed a burglary.

8    PRESIDING COMMISSIONER ENG:  Were you

9  drinking or doing drugs back in 1975.

10    INMATE BALLARD:  Yes, I was.

11    PRESIDING COMMISSIONER ENG:  Did you start

12  drinking first or start doing drugs first or was

13  it at the same time.

14    INMATE BALLARD:  I started drinking in the

15  summer after the sixth grade, so I was probably

16  12 or 13.

17    PRESIDING COMMISSIONER ENG:  That's when

18  you started drinking?

19    INMATE BALLARD:  Yes.

20    PRESIDING COMMISSIONER ENG:  Was that just

21  a can of beer every now and then or a bottle of

22  wine.  I mean, when you say you started drinking,

23  how did you define that.  How much were you

24  drinking and how often?

25    INMATE BALLARD:  It was occasional.  It

26  was like my older brothers would have alcohol and

27  I would steal it from them.  And sometimes we

21

1    would pay an adult to go to the liquor store and

2    buy beer for us.

3         PRESIDING COMMISSIONER ENG:  Would you

4    say -- if you started at about the age of 12,

5    would you say that you started drinking to a

6    point where it became a regular occurrence for

7    you to be drinking a lot?  Or was it just sort of

8    a --

9         INMATE BALLARD:  No, I think it progressed

10   and maybe by the time I was 15 or 16 that it was

11   like a normal part of my, you know, existence

12   that I thought that that's what everybody did.

13        PRESIDING COMMISSIONER ENG:  So you were

14   drinking regularly by the time were you 15 or 16.

15   So you were consuming like the same amount of

16   alcoholic beverages on a daily basis and sort of

17   leveled off to a certain usage?

18        INMATE BALLARD:  Yeah, if I worked, if I

19   had a job, when I got off work I drank.

20        PRESIDING COMMISSIONER ENG:  Okay.  Would

21   you drink to get drunk all the time or would you

22   just drink for the sake of drinking to get high?

23        INMATE BALLARD:  Yeah, you know, to get

24   high.

25        PRESIDING COMMISSIONER ENG:  Would you say

26   that you did have a drinking problem back then?

27        INMATE BALLARD:  Yes, I did.

22

1      PRESIDING COMMISSIONER ENG:  That was

2  under control or out of control?

3      INMATE BALLARD:  It was out of control.

4      PRESIDING COMMISSIONER ENG:  So when did

5  you move from the drinking to experimenting with

6  the drugs.

7      INMATE BALLARD:  From the time I grew

8  older from the time I quit going to school at age

9  14, from 14 until my arrest, I progressively

10  found more high intensity intoxicants, you know,

11  stronger stuff.

12      PRESIDING COMMISSIONER ENG:  Well, I read

13  into the record that I believe had you been

14  shooting up heroin for about eight months prior

15  to this life crime?

16      INMATE BALLARD:  Yes, I was.

17      PRESIDING COMMISSIONER ENG:  Okay.  Prior

18  to doing the heroin, were you injecting yourself

19  with other drugs?

20      INMATE BALLARD:  Yeah, prior to starting

21  heroin, I had used, briefly I had used

22  methamphetamines, codeine and barbiturates.

23      PRESIDING COMMISSIONER ENG:  Even at a

24  young age, though, when you think back, you said

25  that you would lose your temper explosively?

26      INMATE BALLARD:  Yes, ma'am.

27      PRESIDING COMMISSIONER ENG:  So as far

23

1    back as you can remember, would you say that you

2    had a problem with a temper.

3        INMATE BALLARD:  I remember in the sixth

4    grade, I was seeing a psychiatrist for my anger,

5    but it was suppressed from the -- in my initial

6    hearing concerning this crime.  They said that

7    this evidence was not available from the county,

8    but it was a county order for me to see the

9    psychiatrist, from the school, a referral.

10       PRESIDING COMMISSIONER ENG:  Okay.  So

11   that's -- I'll see if -- I don't recall seeing

12   any of that in the things.  We'll get more into

13   that because now I'm starting to remember

14   different things.  So, was that the only problem

15   that you had as a juvenile regarding law

16   enforcement, is this joyriding burglary?

17       INMATE BALLARD:  I had truancy, I wasn't

18   going to school.

19       PRESIDING COMMISSIONER ENG:  Okay.

20       INMATE BALLARD:  I had been arrested for

21   being out of control a few times, fighting with

22   my siblings.

23       PRESIDING COMMISSIONER ENG:  As a

24   juvenile.  Okay.  Okay.  And then the next thing

25   that I see in terms of as an adult in 1978, so

26   about three years later in Mariposa is taking a

27   vehicle without the owner's consent.

24

1          INMATE BALLARD:  Yes.

2          PRESIDING COMMISSIONER ENG:  Okay.  And

3   were you arrested and released.  So you stole

4   somebody's car?

5          INMATE BALLARD:  Yes.

6          PRESIDING COMMISSIONER ENG:  And then in

7   1983 in Modesto, battery an a person, arrested

8   and released.  What happened with that?

9          INMATE BALLARD:  I got into it with my

10  step father.

11         PRESIDING COMMISSIONER ENG:  So that's who

12  you hit?

13         INMATE BALLARD:  Yeah.

14         PRESIDING COMMISSIONER ENG:  Your step

15  father.  Okay.  Okay.  Did I miss anything?  Was

16  that it in terms of arrests and up until the life

17  crime?

18         INMATE BALLARD:  I think -- I think that's

19  it.

20         PRESIDING COMMISSIONER ENG:  Okay.  Well,

21  if I find something else, we can always add it

22  into the record.  And then we go back into your

23  personal history, which we started to tap into

24  there because you said that you had been ordered

25  to -- to see a counselor or a therapist at a very

26  young age with anger issues.  It states here that

27  you were born on Modesto on July 3rd, 1959.  So

25

```
 1   you were around 25 at the time of the life crime,
 2   and you're now 48?
 3          INMATE BALLARD:  Forty-eight.
 4          PRESIDING COMMISSIONER ENG:  Forty-eight.
 5   Okay.  It states here that you have three half
 6   brothers and three half sisters.  Are they all
 7   older than you?
 8          INMATE BALLARD:  Yes.
 9          PRESIDING COMMISSIONER ENG:  So were you
10   the only one -- were you the only child from
11   Alfred Ballard and Rose Brown?
12          INMATE BALLARD:  No.  I have one older
13   brother and two younger sisters.  So there's ten
14   total.
15          PRESIDING COMMISSIONER ENG:  Wow, so it's
16   a very large family.  All right.  You were placed
17   in a foster home, it says, for a short time at a
18   young age.  So what happened?  Is this the time
19   that you were talking about that you -- how old
20   were you when you went to a foster home?
21          INMATE BALLARD:  I believe I was four or
22   five.  I can't remember how old I was, but I
23   remember it.
24          PRESIDING COMMISSIONER ENG:  So pretty
25   young?
26          INMATE BALLARD:  Yeah.
27          PRESIDING COMMISSIONER ENG:  You remember
```

26

1    why you went to a foster home?

2          INMATE BALLARD:  Well, I remember being

3    told that my mother and father divorced and my

4    father was not being responsible for providing,

5    you know, for our care, so my mother had to get a

6    job, and she didn't have the money to rent a

7    house, so she had to put us in foster homes so

8    she get a job and save enough money to get a

9    house and then get us back out.

10         PRESIDING COMMISSIONER ENG:  So you were

11   one of ten kids?

12         INMATE BALLARD:  Yes.

13         PRESIDING COMMISSIONER ENG:  And all ten

14   of you ended up being split up and going to

15   foster homes.

16         INMATE BALLARD:  No.  There is a support

17   letter from my sister Kathleen about a lot of

18   things that happened before I was born that I did

19   not know about.  And that caused my mother and

20   father to be divorced.

21         PRESIDING COMMISSIONER ENG:  Okay.

22         INMATE BALLARD:  So there was things

23   happening that I wasn't aware of.

24         PRESIDING COMMISSIONER ENG:  So some of

25   your older siblings are much older?

26         INMATE BALLARD:  Yes.

27         PRESIDING COMMISSIONER ENG:  But,

27

1    basically, when your parents divorced, it sort of

2    split up the family?

3          INMATE BALLARD:  Yes.

4          PRESIDING COMMISSIONER ENG:  So you went

5    to live with some foster parents, and it states

6    here that they used you in Satanic rituals and

7    that you were abused and raped during this

8    period.  How long were you with those --

9          INMATE BALLARD:  I don't know how long it

10   was, but I remember that they used to tie me up

11   and --

12        PRESIDING COMMISSIONER ENG:  That's okay.

13   If it's too difficult right now, take a breath.

14   But is that around the same time that you were

15   referring to before that you were in therapy?

16        INMATE BALLARD:  No.  I was in therapy

17   when I was seeing a therapist in the sixth grade

18   so it was probably six or seven years later.

19        PRESIDING COMMISSIONER ENG:  So all this

20   was occurring when you're about four, five, six?

21        INMATE BALLARD:  In the foster home, yes.

22        PRESIDING COMMISSIONER ENG:  Did you have

23   any siblings with you in that foster home?

24        INMATE BALLARD:  Yes, I did.

25        PRESIDING COMMISSIONER ENG:  You did.

26        INMATE BALLARD:  My brother Robert.

27        PRESIDING COMMISSIONER ENG:  Your brother.

28

1        INMATE BALLARD:  Ballard.

2        PRESIDING COMMISSIONER ENG:  Your brother

3   Robert.  Is he older?

4        INMATE BALLARD:  Yeah.  He's two years

5   older.

6        PRESIDING COMMISSIONER ENG:  Did he

7   experience this too?

8        INMATE BALLARD:  I'm pretty sure he did.

9        PRESIDING COMMISSIONER ENG:  Have you ever

10  talked about it, the two of you?

11       INMATE BALLARD:  Never.

12       PRESIDING COMMISSIONER ENG:  Okay.  How

13  did you get out of that foster home?

14       INMATE BALLARD:  My mother rented a home

15  and went to the county and said that she now had

16  the ability to take care of us.

17       PRESIDING COMMISSIONER ENG:  Okay.

18       INMATE BALLARD:  Did you ever talk to her

19  about what happened?

20       INMATE BALLARD:  No.

21       PRESIDING COMMISSIONER ENG:  So you pretty

22  kept it to yourself.

23       INMATE BALLARD:  Well, it's not that I

24  kept it to myself; it's that my subconscious just

25  buried it.

26       PRESIDING COMMISSIONER ENG:  Uh-huh.

27  Okay.  So, it wasn't until later that you started

29

1    up that you were with the anger?

2            INMATE BALLARD:  Later, from where?

3            PRESIDING COMMISSIONER ENG:  Well, while

4    you were going through this in the foster home

5    for a few years, correct, so when did you get

6    back to your mother, when were you about eight or

7    nine?

8            INMATE BALLARD:  No.  We were only in the

9    foster home for a brief period of time.

10           PRESIDING COMMISSIONER ENG:  Okay.

11           INMATE BALLARD:  So it might have been

12   only a few months.

13           PRESIDING COMMISSIONER ENG:  Okay.  Okay.

14   Okay.  It says here, yeah, that you dropped out

15   of school in the ninth grade and that you wanted

16   to work to help support the family.

17           INMATE BALLARD:  Yup.

18           PRESIDING COMMISSIONER ENG:  Okay.  I'm

19   assuming you did that?

20           INMATE BALLARD:  I tried.

21           PRESIDING COMMISSIONER ENG:  But then in

22   1977, you enlisted in the US Army, but you didn't

23   stay in very long, for about a month?

24           INMATE BALLARD:  A month, yeah, maybe five

25   or six weeks.

26           PRESIDING COMMISSIONER ENG:  What

27   happened?

30

1          INMATE BALLARD:  Well, they found out I

2     had a fraudulent enlistment, that I didn't have a

3     high school diploma.  So they told me that if you

4     go back out and get your high school diploma, you

5     can rejoin.

6          PRESIDING COMMISSIONER ENG:  Okay.  So you

7     didn't do that?

8          INMATE BALLARD:  No.

9          PRESIDING COMMISSIONER ENG:  Okay.  Okay.

10    Did you ever get married?

11         INMATE BALLARD:  No.

12         PRESIDING COMMISSIONER ENG:  Okay.  But I

13    see here that you have a daughter.

14         INMATE BALLARD:  Yes, ma'am.

15         PRESIDING COMMISSIONER ENG:  Sarah?

16         INMATE BALLARD:  Yes.

17         PRESIDING COMMISSIONER ENG:  And she lives

18    in Oregon?

19         INMATE BALLARD:  Yes.

20         PRESIDING COMMISSIONER ENG:  And how old's

21    Sarah?

22         INMATE BALLARD:  She's 25.

23         PRESIDING COMMISSIONER ENG:  25.  Are you

24    in touch with her?

25         INMATE BALLARD:  Yeah.

26         PRESIDING COMMISSIONER ENG:  Okay.  It

27    says here that you started drinking alcohol at

31

1    around 12, whiskey on a daily basis and the

2    heroin eight months prior to your offense.  Okay.

3    So you ever discuss the life crime with your

4    daughter?

5            INMATE BALLARD:  Yes, I have.

6            PRESIDING COMMISSIONER ENG:  Okay.

7            INMATE BALLARD:  I wrote her a letter and

8    basically explained to her exactly what happened,

9    and I gave that letter to a person I trusted, and

10   they mailed it to her.

11           PRESIDING COMMISSIONER ENG:  Okay.  So

12   you'd say that, that you easily used to lose your

13   temper?

14           INMATE BALLARD:  Yes.

15           PRESIDING COMMISSIONER ENG:  And when you

16   would lose your temper, would you act out

17   physically?

18           INMATE BALLARD:  Yeah, I would break

19   things.  I would, you know, I'd go into rage.

20   I'd break windows.

21           PRESIDING COMMISSIONER ENG:  When you were

22   going through all this, did you think that was a

23   normal way to respond?

24           INMATE BALLARD:  In retrospect, I know it

25   isn't, but then I probably didn't know any better

26   because, you know, I seen that a lot in my

27   friend's family too, that it wasn't just the way

32

1    I lived, that that was happening in other places.

2         PRESIDING COMMISSIONER ENG:  Well, when

3    you would, let's say lash out at things, you'd

4    say that you'd break things, would you also hit

5    people.

6         INMATE BALLARD:  Yes.

7         PRESIDING COMMISSIONER ENG:  Did you ever

8    hit your daughter like that?

9         INMATE BALLARD:  No.

10        PRESIDING COMMISSIONER ENG:  Were you

11   around her?

12        INMATE BALLARD:  I was only with her mom

13   for a brief period.  She was approximately three

14   months old when I came back, and I only stayed

15   with her a couple of months, and her mother

16   didn't approve of me and didn't -- she made it

17   very difficult for us to maintain a relationship,

18   so I decided that it was better if I just left.

19        PRESIDING COMMISSIONER ENG:  Why would

20   your daughter's mother feel that way?  Did you do

21   something to her?

22        INMATE BALLARD:  No.  I was using drugs.

23        PRESIDING COMMISSIONER ENG:  It was

24   because of drugs.

25        INMATE BALLARD:  And drinking, yeah.

26        PRESIDING COMMISSIONER ENG:  Had you ever

27   hit her?

33

1          INMATE BALLARD:   No.

2          PRESIDING COMMISSIONER ENG:   And any

3    relationships that you had prior to that, did you

4    ever hit any of the women that you were with?

5          INMATE BALLARD:   No.  I only had two

6    relationships prior to that.

7          PRESIDING COMMISSIONER ENG:   Okay.  When

8    you would lose your temper, would it matter if it

9    was male or female or young or old?

10         INMATE BALLARD:   No.

11         PRESIDING COMMISSIONER ENG:   If you struck

12   out to somebody?

13         INMATE BALLARD:   No.

14         PRESIDING COMMISSIONER ENG:   Did you ever

15   figure out what would, what would trigger you to

16   lash out violently like that towards someone or

17   something?

18         INMATE BALLARD:   Did I figure it out when

19   it was happening or now?

20         INMATE BALLARD:   Well, if you think back,

21   were there certain things that would just set you

22   off?

23         INMATE BALLARD:   Yeah.

24         PRESIDING COMMISSIONER ENG:   Like what?

25         INMATE BALLARD:   People yelling in my

26   face.

27         PRESIDING COMMISSIONER ENG:   Excuse me?

34

1        **INMATE BALLARD:** People yelling in my face

2    or trying to physically, like suppress me, you

3    know, like grab me or, you know, be physically

4    violent towards me.  I would react very strongly.

5        **PRESIDING COMMISSIONER ENG:** Okay.

6    Anything else?

7        **INMATE BALLARD:** I can't recall.

8        **PRESIDING COMMISSIONER ENG:** Okay.  Okay.

9    Yeah.  How did this young Melissa, okay, how did

10   young Melissa trigger you?

11       **INMATE BALLARD:** Well, she --

12       **PRESIDING COMMISSIONER ENG:** Trigger that

13   reaction?

14       **INMATE BALLARD:** Well, she was crying, you

15   know, and I tried to discipline her and it just

16   made her worse and she was screaming, you now, it

17   just got her (inaudible).

18       **PRESIDING COMMISSIONER ENG:** But, I mean,

19   how does a three year old sort of threaten you

20   like that and yell at you?

21       **INMATE BALLARD:** She wasn't.  She wasn't

22   threatening me.

23       **PRESIDING COMMISSIONER ENG:** So I still

24   don't quite understand what could have triggered

25   you to have that drastic of a response compared

26   to what we were discussing before where you were

27   lose your temper, you know, what would trigger

35

1    that level of anger that you lashed out

2    physically towards something or someone, so,

3    because children cry.  They scream.

4         INMATE BALLARD:  I think that if it hadn't

5    been her, it would have been somebody else or

6    someone else.  It was like it was just going to

7    happen, and it happened that day and it happened

8    to be her.

9         PRESIDING COMMISSIONER ENG:  Were there

10   other things going on in your mind that were

11   affecting you?

12        INMATE BALLARD:  Yeah, I was delusional.

13   My mind was pretty well gone.  I mean, I was

14   having severe mental issues.  I was hearing

15   voices coming out of the fan, you know, and I

16   thought people were after me, and you know, I was

17   paranoid, and I was just spiraling downhill,

18   everything, my health, my mental stability, my

19   life, my ability to cope, everything was just

20   collapsing.

21        PRESIDING COMMISSIONER ENG:  And were you

22   living with Mrs. Clark at that time and the

23   children?

24        INMATE BALLARD:  Yes, I was.

25        PRESIDING COMMISSIONER ENG:  And how long

26   had that been going on?

27        INMATE BALLARD:  For about a month.

36

1      PRESIDING COMMISSIONER ENG:  And you

2  were -- you were doing heroin on a regular basis.

3  When you first started living together, did

4  having those children around bother you?

5      INMATE BALLARD:  No.

6      PRESIDING COMMISSIONER ENG:  Okay.  Okay.

7  I'm going to move on right now.  I'll probably

8  come back and ask you some more questions, but

9  Commissioner Shields is going to bring us

10 up-to-date regarding different things that you

11 have been doing.

12     DEPUTY COMMISSIONER SHIELDS:  What I'm

13 going to do is, actually, I want to start with

14 the psychological evaluations.  I ordinarily do

15 it another way, but it just seems to me it might

16 make more sense in this particular case, and we

17 actually have two.  And this is, probably, do you

18 think a good time to change the tape?

19     PRESIDING COMMISSIONER ENG:  Probably.

20     DEPUTY COMMISSIONER SHIELDS:  All right.

21 We'll pause for a moment.  I'll change the tape,

22 and then  --

23              [Off the record.]

24     DEPUTY COMMISSIONER SHIELDS:  Okay.  This

25 is side two of Mr. Ballard's hearing.  Let me

26 start, there were two psychological evaluations

27 done within about the past six months.  Let me

37

1    just go through both of them, and then I think I

2    may have some comments.

3          ATTORNEY HOFFMANN:  Can I ask a question?

4          DEPUTY COMMISSIONER SHIELDS:  Yes.

5          ATTORNEY HOFFMANN:  Before we go into

6    them.  It's my understanding that the psych

7    evaluation that's dated for the October 2006

8    hearing that, was actually done on September

9    11th.

10          DEPUTY COMMISSIONER SHIELDS:  Uh-huh.

11          ATTORNEY HOFFMANN:  Was done based on the

12    old standards for the psych evaluations, and as a

13    result doesn't have the same tests and

14    standardized ways of determining violence

15    potential as the new evaluation does, and so I

16    would rather that we focus on the new evaluation

17    instead of the September 2006 one.

18          PRESIDING COMMISSIONER ENG:  Again -- I'm

19    sorry.  Go ahead.

20          DEPUTY DISTRICT ATTORNEY MAIN:  I would

21    note that -- I don't mean to preempt the

22    commissioners, but in looking at these two

23    reports, the level of detail in the January

24    report is substantially less than the level of

25    detail in the September report as to certain

26    things, for instance, the history of violence is

27    one forlorn paragraph in the newer report.  It's

38

1    five paragraphs in the September 2006 report.  I

2    think both reports need to be taken together to

3    took a look at --

4        **PRESIDING COMMISSIONER ENG:**  No.  This is

5    what's going to happen.  Again, this Panel

6    considers all relevant documents, and it's up to

7    us how much weight we put on them.  So we don't

8    usually just look at one report.  It's too

9    static.  We take a look and often go back to

10   many, many.  So your objection is noted.  It's

11   overruled.  And, Miss Shields, you can continue.

12       **DEPUTY COMMISSIONER SHIELDS:**  Okay.  Well,

13   that's what I was going to say.  And, I think,

14   actually, I think the way I was going to phrase

15   it is I think both reports have helpful

16   information for our decision and I agree with the

17   Commissioner that how much weight we choose to

18   give to different reports is sort of within our

19   discretion.  Let me go through -- one of the

20   things I don't know that we've noted, and I'm

21   starting with the September 11th evaluation is

22   that you do have a diagnosis of Hepatitis C, and

23   I don't know if we had talked about that.  The

24   report acknowledges or says that you acknowledge

25   that you're aware that it's not safe for you to

26   be in the company of young children.  This report

27   notes, as a strength that engage in meditation

39

1   and mindfulness exercises through a Buddhist

2   spiritual practice.  Under diagnostic impression,

3   Axis I is mood disorder NOS, opiod dependence in,

4   basically in remission, polysubstance abuse in

5   remission, intermittent explosive disorder by

6   history and personality disorder NOS, borderline

7   on anti-social traits, and again, on Axis III

8   notes your Hep C positive status.  Under

9   relevant, sort of mental condition and causative

10  factors, I just wanted to state, because I

11  thought it neatly summed up when you've been

12  talking about before, your own abusive upbringing

13  and your consequent inability to empathize with

14  others were contributing factors to the crime.

15  His maladaptive personality traits left him with

16  few, if any adaptive emotional responses or

17  behaviors necessary for successfully meeting the

18  emotional needs of a young child.  It notes -- it

19  notes that you had active participation in AA and

20  you had a Chairman role that you're currently

21  participating in voc sheet metal.

22          **INMATE BALLARD:**  If I may --

23          **DEPUTY COMMISSIONER SHIELDS:**  Just tell me

24  yes or no, and we'll verify it when we go through

25  the chronos.  It says that you were expected to

26  remain violence free in a controlled setting.

27  This report uses a violence scale, the HARE

40

1    PCL-R, and it says that you're -- the clinical

2    diagnosis of psychopathy is still below the

3    cutoff range on that scale but on a second scale

4    it says that you continue to have a moderately

5    high risk.  Under violence history, it notes that

6    you had a history of violent outbursts of anger

7    from a young age where you would yell, punch,

8    punch windows, walls and doors and also notes,

9    and I think this is somewhat relevant to your

10   adjustment in the institution that you do have

11   some concerns about your relationship with other

12   inmates because of your commitment offense.  It

13   says that both your history indicate a lack of

14   adequate coping skills, that risk factors would

15   include any return to the use of intoxicants or

16   mood altering substances, exposure to elevated

17   levels of stress, responsibility for meeting the

18   dependency needs of others and associating with

19   substance abuse using peers.  Under clinical

20   observations, it states Mr. Ballard is a vastly

21   improved person due to his self-study and

22   participation in a range of positive activities.

23   It notes that given your history of past

24   outbursts of explosive anger, any form of

25   intoxication would constitute a significant

26   elevation of risk.  And then I think the

27   psychologist sums up her conclusions with two

41

1   sentences, in a stable environment with positive

2   influences and ongoing substance abuse

3   prevention, support, Mr. Ballard is likely to

4   remain non-violent.  In a chaotic, hostile, or

5   stress filled environment, he would be much less

6   likely to be able to maintain his gains and would

7   be at greater risk for relapse and recidivism.

8   Now, I want to go -- I'm switching to the second

9   report which is Dr. Starrett's.

10           **ATTORNEY HOFFMANN:**  Right.

11           **DEPUTY COMMISSIONER SHIELDS:**  In this one,

12   he confirms what you had recounted about being on

13   heroin for eight months prior to the incident and

14   also using cocaine and methamphetamines on a

15   regular basis for four years.  Oh, wait.  Hold

16   it.  I switched to the -- I apologize.  I jumped

17   to the wrong thing here.  Well, it's a little

18   confusing.  Now I am on Dr. Starrett's report.

19   Under development history, he says, you deny any

20   emotional or health problems in childhood.  There

21   was trauma and abuse.  The inmate was in foster

22   care at four years of age and in juvenile hall at

23   15.  That didn't seem to me to be particularly

24   consistent with both your statement and the other

25   report.  It just sort of notes that there was

26   physical, emotional and sexual abuse of the

27   children without going into details.  He states

42

1    in his report that you were in the mental health

2    program in 1984 -- was it between 1984 and 1987,

3    and then it appears that you were in one year in

4    1995 and 1997, and I looked through the file and

5    couldn't really come up with that, but he

6    reports, based on those comments that you were

7    diagnosed with schizoaffective disorder and an

8    adjustment disorder.  Then, as far as his

9    diagnostic impression now, he diagnoses you as

10    polysubstance abuse in remission and treatment

11    with an Axis II diagnosis of anti-social

12    personality disorder.  Now, he says he

13    administered the HCR 20 and essentially says with

14    respect to insight that you're in the low range

15    for future violence.  And, as far as environments

16    risks and risk management that you rated in the

17    low range as far as psychopathy and says that the

18    inmate's overall risk management has moved from

19    moderate to low.  Let me just say, having read

20    both of those, they don't particularly mesh in my

21    mind.  If somehow I could put the two together, I

22    might have sort of a complete picture.  So,

23    personally, let me say up front that I find the

24    combination of the two reports inconclusive and

25    confusing frankly.

26          **ATTORNEY HOFFMANN:**  Well --

27          **DEPUTY COMMISSIONER SHIELDS:**  Let me

43

1    finish.  The other concern I have in trying to

2    sort out, the C-File is -- again, I see things

3    referenced in the psychological reports that I

4    don't see documentation in of the C-File.  You

5    know, you were involved in the arts and

6    corrections program and in the yoga program.  I

7    see chronos with respect to that.  I don't see

8    any chronos related to AA participation, and the

9    other thing that's problematic is that you're

10   involved in the IMPACT program and the TRUST

11   program, and these are acronyms.

12           **INMATE BALLARD:**  Uh-huh.

13           **DEPUTY COMMISSIONER SHIELDS:**  What's hard

14   is they're labeling their chronos as laudatory,

15   where they really are participatory, and on their

16   12-and 16-week, but then each week they're

17   issuing a chrono, so it leaves it difficult for

18   me to really, and they're somewhat boiler plate

19   and repetitive.  I'm not saying that they aren't

20   good programs, what I'm saying is an outsider

21   trying to digest all this, it's pretty hard to

22   figure out.  I mean, you have a lot of chronos.

23   You obviously went to a lot of workshops.  So, in

24   that vein, let me try to -- see, here, you were

25   in the IMPACT -- here's a chrono date the

26   February 14th, '05.  You were in the IMPACT

27   16-week workshop on addiction, and it says that

44

1   you participated in section 3 with 100 percent

2   attendance, but it's not clear to me if he went

3   to one session.  So I don't want to minimize

4   this, but you did apparently complete a 16-week

5   workshop on addiction.  It would be more helpful

6   for me if I had one document that said that you

7   did that instead of you, know, 16 chronos.  You

8   received, what was appropriately labeled as a

9   laudatory chrono for the arts in corrections

10   program, and it's pretty clear from me from

11   reviewing your record that you have good art

12   skills, and you know, there have been multiple

13   references to that.  There's another chrono for

14   the addition workshop.  And then, see, IMPACT

15   also has 16-week workshops and then they list a

16   lot of things.  Here's one that's dated April

17   17th, '06, and, again it appears to me that each

18   time you go to a class, they're issuing a chrono,

19   so it's hard for a reader to assimilate what's

20   happening.  I mean, to be candid.  So I think

21   with respect to the chronos participated in yoga,

22   participated in the arts and correction program,

23   participated in a number of courses in

24   self-improvement on IMPACT and TRUST program.  I

25   don't see any chronos on AA that I could find.

26   Also, it -- you have certificates in drafting,

27   baking, print shop, and then are you in the

45

1   middle of sheet metal working now?

2           INMATE BALLARD:  Yes, I am.

3           DEPUTY COMMISSIONER SHIELDS:  So you're

4   working on that.  And then do you also work in

5   PIA?

6           INMATE BALLARD:  No.  I have previously

7   worked as PIA as a draftsman for five years.

8           DEPUTY COMMISSIONER SHIELDS:  For how

9   long?

10          INMATE BALLARD:  Five years.

11          DEPUTY COMMISSIONER SHIELDS:  Okay.  And

12  then when did you stop that?

13          INMATE BALLARD:  It was '99, believe, and

14  the Board had asked me to take another trade, so

15  I --

16          COMMISSIONER ENG:  Oh.  Okay.  I'm going

17  interrupt right now.  All right.  Are those --

18  you've completed vocational in drafting and print

19  shop?

20          INMATE BALLARD:  Yes.

21          PRESIDING COMMISSIONER ENG:  So those are

22  completed and there are certificates in the

23  C-File.

24          DEPUTY COMMISSIONER SHIELDS:  See, there

25  aren't --

26          PRESIDING COMMISSIONER ENG:  That shows

27  that he he's completed those vocations.

46

1     **DEPUTY COMMISSIONER SHIELDS:**  See, that's

2     the problem is the C-File is -- it may be in a

3     prior C-File, but the documentation is very

4     spotty.  There are references, for example, in

5     the psych report or the Board report, but I

6     can't --

7          **PRESIDING COMMISSIONER ENG:**  The proof in

8     the pudding is whether it's in the C-File.

9          **DEPUTY COMMISSIONER SHIELDS:**  I can't put

10    it together on the fly here.

11         **ATTORNEY HOFFMANN:**  Do we have the other

12    Central File to --

13         **PRESIDING COMMISSIONER ENG:**  You did a

14    review of your Central File back in May.  Did you

15    notice whether or not your certificates, copies

16    of your certificates of completion for any of

17    these things were in your Central File?

18         **INMATE BALLARD:**  I believe I saw I have

19    completion for vocational drafting.  I have a

20    GED.  I have a high school diploma.  I have a

21    chrono from print shop saying that I'm certified

22    in a specific area of printing.  I'm certified in

23    a specific area of baking, and I'm currently

24    working on my national certification in my sheet

25    metal job.

26         **PRESIDING COMMISSIONER ENG:**  And you did

27    see those when you reviewed your Central File?

47

1          INMATE BALLARD:  Yes, I did.

2          DEPUTY COMMISSIONER SHIELDS:  Well, my

3   information is they have to be presented in a way

4   where we can kind of assimilate it.

5          ATTORNEY HOFFMANN:  Would you like to take

6   a recess so you can have time to review the

7   Central File?

8          PRESIDING COMMISSIONER ENG:  If --

9          DEPUTY COMMISSIONER SHIELDS:  I'm not

10  going to do it.

11         PRESIDING COMMISSIONER ENG:  I do want to

12  take a brief recess.  Because, in all fairness to

13  Mr. Ballard where he states that you did review

14  your Central File back in May?

15         INMATE BALLARD:  Yes, I did.

16         PRESIDING COMMISSIONER ENG:  And you

17  stated that they are in there.  Do you happen to

18  have copies with you of those key certificates?

19         INMATE BALLARD:  I don't think I do, but

20  let me check.

21         PRESIDING COMMISSIONER ENG:  I just

22  thought I'd check with you because a lot of times

23  inmates come in with copies of all those

24  certificates in case they go missing.

25         ATTORNEY HOFFMANN:  It would be all the

26  way in the back.

27         PRESIDING COMMISSIONER ENG:  Let's take a

48

1    brief recess.  I'll tell you what, you can be

2    checking that.  Let's take a brief recess and

3    clear the room, and we'll make sure that we do a

4    double check in the C-File.  Okay.

5              **DEPUTY DISTRICT ATTORNEY MAIN:**  Back in

6    ten minutes or so?

7              **PRESIDING COMMISSIONER ENG:**  Yup.  He's

8    got two files?  He's got four?  He has not been

9    in that long.  Okay.  Because they have to be in

10   here somewhere.  Legal, disciplinary,

11   miscellaneous.  Okay.  He's got to have the

12   certificates.  Okay.

13             **DEPUTY COMMISSIONER SHIELDS:**  I'm not sure

14   that, you know, chronos.  See, the only thing I

15   found --

16             **PRESIDING COMMISSIONER ENG:**  There's got

17   to be a place where they have all the

18   certificates.  So they got to be here somewhere.

19             **DEPUTY COMMISSIONER SHIELDS:**  Okay.  I

20   found -- not in this --

21             **DEPUTY COMMISSIONER SHIELDS:**  Okay.  We're

22   back on the record.  We looked through all the

23   files that we have, and found two certificates of

24   related to drafting and those were in 1993.  I

25   don't have anything after that.  What I wanted to

26   do, I also looked through your current chronos

27   and didn't find any chronos on AA, so I was

49

1    wondering -- or NA, so I was wondering what

2    you're doing as, you know, to try to address your

3    addiction.

4         INMATE BALLARD:  Well, both the TRUST

5    group and the IMPACT group deal with additions

6    and, you know, it's -- they go into every aspect.

7    You know, addictions can be, it's not necessarily

8    drugs, it can be gambling or anything.

9         DEPUTY COMMISSIONER SHIELDS:  So what kind

10   of ideas do they have about controlling

11   addictions?  What techniques did you learn?

12        INMATE BALLARD:  Well, we learned to

13   define what each one of the terms mean and how

14   it's a process that you, you know, it's like

15   learned behavior.  If you learn how to cope,

16   people learn how to cope because people see other

17   people doing it, you know.  And, you know, I

18   can't articulate very well on the spot like this,

19   but --

20        DEPUTY COMMISSIONER SHIELDS:  Okay.  Did

21   they have any ideas for relapse prevention?

22        INMATE BALLARD:  Yeah.

23        DEPUTY COMMISSIONER SHIELDS:  Do you

24   remember any kind of --

25        INMATE BALLARD:  Yeah, well, there's a lot

26   of times people will be doing good for a long

27   time and they'll thing that they deserve a reward

50

1   for doing so good, and they'll relapse by, you

2   know, bad thinking, basically, thinking that they

3   deserve this since they've been good for so long.

4       DEPUTY COMMISSIONER SHIELDS:  Yeah.  And

5   what would be a way not to do that?  That might

6   be a good example if you got a date and you

7   paroled, you might think, well, boy, that's

8   something to celebrate.

9       INMATE BALLARD:  Well, that would be like

10  the last thing I would do because number one, I

11  have a disease that's causes my liver can't

12  process any type of chemicals at all, so it would

13  be like poisoning myself.  And number two, I

14  would never jeopardize the relationships I've

15  established over the years is based on trust and

16  I would never jeopardize my relationships for

17  some momentary feeling of authority from

18  intoxicants.

19      DEPUTY COMMISSIONER SHIELDS:  What would

20  be one of those relationships you think would you

21  lose?

22      INMATE BALLARD:  The -- my family

23  relationships.  The relationship with my

24  daughter.  The relationship with my girlfriend.

25  The relationship I have with my peers in these

26  groups.

27      DEPUTY COMMISSIONER SHIELDS:  Okay.   I

51

1   think that's it from my report.

2          ATTORNEY HOFFMANN:  Before we move on,

3   Commissioner, you had asked a couple of questions

4   of Mr. Ballard when you were reviewing the

5   psychological evaluations, and I just want to go

6   back to the psych evaluations quickly.  I had

7   represented Mr. Ballard in September.  I had

8   given him this.  I was handed the psych

9   evaluation the day that that hearing was supposed

10  to happen.  He reviewed it with me that day.  The

11  entire reasons that the hearing was postponed was

12  because this evaluations wasn't received in time,

13  and he didn't have the chance to review it and

14  correct errors.  Those errors were corrected,

15  then, with this new evaluation.  So, I don't

16  know, none of those errors were pointed out, and

17  I think you mentioned that you can't quite

18  balance these two evaluations with one another

19  and that one of the reasons for that can be the

20  errors that I mentioned, and it was Mr. Ballard's

21  understanding that some of the statements that

22  were included in the October 2006 psych

23  evaluation were actually in reference to another

24  person.  And if you go through and read that --

25          DEPUTY COMMISSIONER SHIELDS:

26  Commissioner, what do you think?  Why don't we

27  just have her go through the corrections and I'll

52

1    note any changes she wants to make, and we'll

2    decide where to go from there.

3          PRESIDING COMMISSIONER ENG:  How many

4    corrections do you have?

5          ATTORNEY HOFFMANN:  Not - about five or

6    so.

7          DEPUTY COMMISSIONER SHIELDS:  Do you want

8    to just do that?  We'll just note the

9    corrections?

10         PRESIDING COMMISSIONER ENG:  Yeah.

11         DEPUTY COMMISSIONER SHIELDS:  Okay.

12   Starting on Page 1?

13         ATTORNEY HOFFMANN:  Paragraph 1, it

14   indicates that at the present time Mr. Ballard is

15   planning a divorce.  He is never been married as

16   we all know.

17         DEPUTY COMMISSIONER SHIELDS:  What line?

18         INMATE BALLARD:  Third line, second word

19   from the left.

20         DEPUTY COMMISSIONER SHIELDS:  Oh.  Okay.

21         ATTORNEY HOFFMANN:  Then it goes on

22   further to state that he has a grown daughter

23   from his first marriage.  Again, he was never

24   married.  Down at the bottom of the page under

25   social report, third line in the middle indicates

26   he has a woman friend who resides in Redding.  He

27   does not know anyone in Redding.  That is not

53

1   him.  And then moving onto Page 5 --

2          **DEPUTY COMMISSIONER SHIELDS:**  Excuse me

3   one second.  Your daughter is not married or was

4   it referring to you?

5          **INMATE BALLARD:**  They were referring to me

6   being married.

7          **DEPUTY COMMISSIONER SHIELDS:**  I must be

8   looking at the wrong thing then.

9          **PRESIDING COMMISSIONER ENG:**  The first

10   Page of the September 22th, 2006.

11          **ATTORNEY HOFFMANN:**  Uh-huh.

12          **PRESIDING COMMISSIONER ENG:**  Okay.  It

13   says you were (inaudible) from your 25-year-old

14   daughter who is now married.  Oh.  It's up there.

15   Okay.  Okay.  I was looking at something else.

16   Never mind.

17          **DEPUTY COMMISSIONER SHIELDS:**  Okay.

18          **ATTORNEY HOFFMANN:**  Page 5 under violence

19   history, there's an entire paragraph about a

20   person who owned a .22 caliber handgun.  That's

21   not Mr. Ballard.  There's no evidence in the

22   record to indicate it was in reference to him.

23   It was in reference to someone else.

24          **DEPUTY COMMISSIONER SHIELDS:**  Uh-huh.

25          **ATTORNEY HOFFMANN:**  And I think as a

26   result of those errors, some of the conclusions,

27   though I agree that some of the clinical

54

1  observations and some of the recommendations and

2  conclusions are relevant and do apply to Mr.

3  Ballard, I think some of them also --

4  specifically the one that refers to a violence

5  history that Mr. Ballard doesn't have aren't

6  relevant or grounded.

7          DEPUTY COMMISSIONER SHIELDS:  Okay.  Were

8  there any errors in the most recent evaluation?

9          ATTORNEY HOFFMANN:  There are none that I

10  am aware of.  And you had pointed out on Page 2

11  that there was a juvenile hall placement at the

12  age of 15.

13          DEPUTY COMMISSIONER SHIELDS:  Uh-huh.

14          ATTORNEY HOFFMANN:  That you didn't

15  remember finding any support for, and Mr. Ballard

16  did indicate that that was for the truancy, I

17  think, earlier in the hearing when he was

18  speaking with Commissioner Eng.

19          DEPUTY COMMISSIONER SHIELDS:  I think we

20  can just note those and factor that into our

21  thinking.

22          PRESIDING COMMISSIONER ENG:  And, for the

23  record, I did take a look at that one paragraph

24  as a teen he owned a .22 caliber, and for some

25  reason I didn't feel -- there was something about

26  it that didn't feel right and that if I thought

27  it was pertinent than we were going to ask you

55

1    about that and would have found out that that

2    wasn't you, and we would have crossed it off, but

3    I this when the psychologicals, I think, as

4    Commissioner Shields pointed out, there's other

5    areas that we really focus on that are very, very

6    pertinent to you.

7        **INMATE BALLARD:** Okay.

8        **DEPUTY COMMISSIONER SHIELDS:** Okay. I

9    think that ends my report.

10        **PRESIDING COMMISSIONER ENG:** Okay. Have

11    you covered any disciplinaries? Has he had any

12    disciplinaries?

13        **DEPUTY COMMISSIONER SHIELDS:** He hasn't

14    had any disciplinaries. I'm sorry. No

15    disciplinaries.

16        **PRESIDING COMMISSIONER ENG:** Well, there

17    was one in '04.

18        **DEPUTY COMMISSIONER SHIELDS:** Really.

19        **PRESIDING COMMISSIONER ENG:** There's a 128

20    in '04.

21        **ATTORNEY HOFFMANN:** A 128's not a

22    disciplinary, but a counseling chrono.

23        **PRESIDING COMMISSIONER ENG:** But still,

24    that should be (inaudible).

25        **DEPUTY COMMISSIONER SHIELDS:** For some

26    reason, you know, I -- okay. What was the date

27    on that?

56

1          PRESIDING COMMISSIONER ENG:  Well, there

2    was a 128A on January 16th of '04 for failure to

3    report.  But other than that --

4          DEPUTY COMMISSIONER SHIELDS:  I don't --

5          PRESIDING COMMISSIONER ENG:  That's okay.

6    Mr. Ballard hasn't had anything else?

7          INMATE BALLARD:  Can I speak to that?

8          PRESIDING COMMISSIONER ENG:  Certainly.

9          INMATE BALLARD:  Our boss had told us that

10   we might have Monday off, so I didn't show up to

11   my job assignment, and then they called me and

12   said, no, we are working, so he had already

13   written the 128 by the time I got there.

14         PRESIDING COMMISSIONER ENG:  Oh.  Okay.

15   Okay.  I'll go ahead.

16         DEPUTY COMMISSIONER SHIELDS:  I don't see

17   it in the C-File though.

18         PRESIDING COMMISSIONER ENG:  Okay.  I'll

19   go ahead and go on.  Let's talk about your

20   potential parole plans.  According to this July

21   2006 Board report, it states that if were you

22   granted, at this time, you would like to parole

23   to Arkansas.

24         INMATE BALLARD:  Yes.

25         PRESIDING COMMISSIONER ENG:  To live with

26   your sister Mary Baker who lives in Fayetteville,

27   Arkansas.  And that she has purchased -- she's

57

1    purchased you a mobile home?

2         INMATE BALLARD:  Uh-huh.

3         PRESIDING COMMISSIONER ENG:  That she is

4    going to place on her five acres.  Has she

5    already done that?

6         INMATE BALLARD:  Yes, she has.

7         PRESIDING COMMISSIONER ENG:  So she's got

8    a mobile home for you there on her five acres of

9    land, but it states also that you have obtained

10   alternate plans if required to stay in

11   California.

12        INMATE BALLARD:  Yes, I have.

13        PRESIDING COMMISSIONER ENG:  And with Mr.

14   Stan Lawson who resides in San Jose, and he's

15   offered assistance with a place of residence if

16   you're paroled at this time, and then your

17   daughter, Sarah Wright who lives up in Oregon has

18   also offered a place of residence.  Steven and

19   Christopher Lawson are your brothers?

20        INMATE BALLARD:  Yes, ma'am.

21        PRESIDING COMMISSIONER ENG:  So Stan

22   Lawson, is that a brother or is that a nephew.

23        INMATE BALLARD:  That's an older brother.

24        DEPUTY COMMISSIONER SHIELDS:  Stan?

25   Stan's your older brother?

26        INMATE BALLARD:  Yes, ma'am.

27        PRESIDING COMMISSIONER ENG:  Okay.  And

58

1    he's the one who lives in San Jose.

2         **INMATE BALLARD:**  Yes, ma'am.

3         **PRESIDING COMMISSIONER ENG:**  Are these

4    your half brothers?

5         **INMATE BALLARD:**  Yes, ma'am.

6         **PRESIDING COMMISSIONER ENG:**  They've

7    written letters of support and regarding

8    employment that you would seek employment as a

9    graphic illustrator, draftsman or any of several

10   print-related jobs based on your training while

11   being incarcerated, and you'd like to volunteer

12   to be a part of various community services.  What

13   I'll do is take a look and see what kind of

14   letters we have back here that I can read into

15   the record, and then we can have a little

16   discussion.  Okay.

17        **INMATE BALLARD:**  Okay.

18        **PRESIDING COMMISSIONER ENG:**  Okay.  First

19   letter I have here is from Wade Williams, and

20   this is your nephew, correct?

21        **INMATE BALLARD:**  Yes.

22        **PRESIDING COMMISSIONER ENG:**  Okay.  I have

23   no address, and I have no date.  But it states

24   that he's known you his whole life, and he was

25   very young when you would watch over him.  He and

26   his brother and sister.  Okay.  So, what does he

27   do now?

59

1        **INMATE BALLARD:** He's a --

2        **PRESIDING COMMISSIONER ENG:** How old is

3    he?

4        **INMATE BALLARD:** He's working in heating,

5    ventilation, and air-conditioning, and he's a

6    subcontractor in Modesto.

7        **PRESIDING COMMISSIONER ENG:** He says here

8    that he was glad to hear that you were graduating

9    from HVAC school because he's worked in that

10   field for almost 20 years, so have you -- have

11   you done work with that?

12       **INMATE BALLARD:** I was near completion of

13   the course and they changed the curriculum, so

14   now I'm working on getting national

15   certification.

16       **PRESIDING COMMISSIONER ENG:** That's the

17   one you were talking about. Okay. All right.

18   Because he knows it's a good trade and you can

19   make a good living in that field of work, and he

20   states that he can't guarantee any jobs, but he

21   knows a lot of people in the trade. Where does

22   your nephew live?

23       **INMATE BALLARD:** In Modesto.

24       **PRESIDING COMMISSIONER ENG:** He's in

25   Modesto. Okay. Okay. So that's a general

26   support letter.

27       **INMATE BALLARD:** Uh-huh.

60

1          PRESIDING COMMISSIONER ENG:  July 23rd,

2   2006 from Audrey Billings, and this is, I think,

3   another general support.  Let's see.  This is

4   your niece.  Okay.  And we can go on a little

5   longer.

6          DEPUTY COMMISSIONER SHIELDS:  Uh-huh.

7          PRESIDING COMMISSIONER ENG:  Is this

8   Wade's sister.

9          INMATE BALLARD:  Yes, it is.

10          PRESIDING COMMISSIONER ENG:  Is this one

11   of your older brother's children.

12          INMATE BALLARD:  Yeah, oldest sister,

13   Barbara.

14          PRESIDING COMMISSIONER ENG:  Okay.  So

15   where does -- where does Audrey live?

16          INMATE BALLARD:  She lives in Houston,

17   California.  It's near Modesto.

18          PRESIDING COMMISSIONER ENG:  Near Modesto.

19   Okay.  All right.  All right.  She's a human

20   resource assistant and she can help you with any

21   challenges that may arise due to technological

22   advances during his years of confinement.  Okay.

23   So this is a general support letter.

24          INMATE BALLARD:  Yes.

25          PRESIDING COMMISSIONER ENG:  Okay.

26   Another one, same date, oh, it's the same one,

27   Audrey Billings.  I have like three in a row.

61

1    And we have pictures.

2         INMATE BALLARD:  That's my daughter and

3    her husband.

4         PRESIDING COMMISSIONER ENG:  This is your

5    daughter in the middle?

6         INMATE BALLARD:  Yes.

7         PRESIDING COMMISSIONER ENG:  And she's got

8    a little one?

9         INMATE BALLARD:  Oh, no.

10         PRESIDING COMMISSIONER ENG:  Who's the

11    baby?

12         INMATE BALLARD:  That's her.  That's my

13    daughter and that's me and my daughter's mother.

14         PRESIDING COMMISSIONER ENG:  Oh.  Okay.

15    And this is your daughter all grown up now?  The

16    middle?

17         INMATE BALLARD:  And her husband.

18         PRESIDING COMMISSIONER ENG:  And she

19    doesn't have any children yet?

20         INMATE BALLARD:  No.

21         PRESIDING COMMISSIONER ENG:  Okay.  May

22    28th, 2006 letter.  Okay.  Ben is my half

23    brother.  Okay.  Different mother, same fathers,

24    raised together.  And she goes onto tell about

25    your childhood, about the beatings, sexual and

26    psychological abuse.  The older kids ran away in

27    Arkansas and went to Jonesborough.  So this is

62

1      from --

2            INMATE BALLARD:  Kathleen Blaylocke.

3            PRESIDING COMMISSIONER ENG:  Yeah,

4      Kathleen Blaylocke, and she lives in Brandon --

5      oh, so is that Missouri?

6            INMATE BALLARD:  Mississippi.

7            PRESIDING COMMISSIONER ENG:  Mississippi.

8      I'm sorry.  I should know my two letter -- down

9      south, Brandon, Mississippi.  She's been disabled

10     since 2002.  She owns a two-bedroom mobile home

11     in Brandon, a dependable car, phone, and computer

12     and would be proud to share anything I have with

13     Ben in the event he's paroled.  She would help

14     you with a job search, place to live or anything

15     it would take to give him a chance to regain.

16     That's a very nice, supportive letter from your

17     half sister and she's disabled.

18           INMATE BALLARD:  Yes.

19           PRESIDING COMMISSIONER ENG:  So, but she

20     remembers the tough life all you kids have.  How

21     we doing?  Should we flip?

22           DEPUTY COMMISSIONER SHIELDS:  How many

23     letters -- yeah, I think we should.  Let's --

24           PRESIDING COMMISSIONER ENG:  Okay.  Go

25     ahead and change.

26                  [Off the record.]

27           DEPUTY COMMISSIONER SHIELDS:  Okay.  We're

63

1   back on the record.

2          PRESIDING COMMISSIONER ENG:    Is this Tape

3   2?

4          DEPUTY COMMISSIONER SHIELDS:    This is Tape

5   2, Side 1.

6          PRESIDING COMMISSIONER ENG:    All right.

7   Thank you.  The next letter I have is from your

8   daughter, Sarah Wright, W-R-I-G-H-T.  I don't

9   know the date of this.

10          ATTORNEY HOFFMANN:    I think it's September

11   18th.

12          PRESIDING COMMISSIONER ENG:    Well,

13   somebody's written something in the corner, but,

14   okay.  If I could help my father in anyway I

15   would have written this letter long ago.  I

16   didn't know if my letter would make a difference,

17   but if I didn't try I would be failing him.  I'd

18   do anything and everything I could do to help my

19   dad adjust to life outside the prison walls.  And

20   she enclosed those two pictures.  She states she

21   does not want to spend another birthday without

22   him.  Okay.  Unless I'm missing anything in here,

23   it is a general support letter.

24          INMATE BALLARD:    Uh-huh.

25          PRESIDING COMMISSIONER ENG:    Okay.  But

26   it's a very nice letter from your daughter.

27   March 8th, 2006, Stanley Lawson in San Jose.

64

1    This is your brother?

2            INMATE BALLARD:  Yes.

3            PRESIDING COMMISSIONER ENG:  And this is

4    one that you said is your backup for residence.

5            INMATE BALLARD:  Yes.

6            PRESIDING COMMISSIONER ENG:  It's your

7    half brother.  He sees he's been in constant

8    contact with you since your incarceration at San

9    Quentin.  You talk on a weekly basis and write

10   each other.  He states that you will receive any

11   support and assistance that he can provide as far

12   as job searches, financial assistance, and

13   anything else with his transition to community

14   life.  He states that you've taken advantage of a

15   lot of programs and workshops.  It talks about

16   your back ground.  Okay.  Your rehab.  Kept out

17   of trouble.  Okay.  He'll stand by you and help

18   you with transitional challenges.  Okay.  Then we

19   have Steve Baker.

20           INMATE BALLARD:  Yes.

21           PRESIDING COMMISSIONER ENG:  Your brother

22   in-law.  Okay.  It looks like this is dated 3/1,

23   and I think it's '06.  He's known you for 25

24   years, brother-in-law.  He moved to Arkansas in

25   '91.  He's kept in touch with you through letters

26   and through phone.  Okay.  If Ben's paroles to

27   Arkansas, I'll do anything I can to help him find

65

1    employment.  You've got a letter, another one

2    dated March 6th, 2006, from Farmington, is that

3    Arkansas?

4            **INMATE BALLARD:**  Yes.

5            **PRESIDING COMMISSIONER ENG:**  Tina Baker.

6            **INMATE BALLARD:**  That's my niece.

7            **PRESIDING COMMISSIONER ENG:**  So is that --

8            **INMATE BALLARD:**  That's the father.

9            **PRESIDING COMMISSIONER ENG:**  Steve's

10   daughter?

11           **INMATE BALLARD:**  Yes.

12           **PRESIDING COMMISSIONER ENG:**  Okay.  She's

13   17.  And your niece.  And I believe this is a

14   general support letter.

15           **INMATE BALLARD:**  Uh-huh.

16           **PRESIDING COMMISSIONER ENG:**  Okay.  Then

17   we have one 3/1/06 from Justin Baker.

18           **INMATE BALLARD:**  Her brother.

19           **PRESIDING COMMISSIONER ENG:**  This is her

20   brother.  And how old is Justin?

21           **INMATE BALLARD:**  I think he's 20 now.

22           **PRESIDING COMMISSIONER ENG:**  Okay.  He was

23   only two and a half months old when you were sent

24   to prison.  He's visited you a few times, he

25   says, before he moved from California.  So is

26   Justin in Arkansas also?

27           **INMATE BALLARD:**  Yes, ma'am.

66

1       **PRESIDING COMMISSIONER ENG:**  We have a

2  hand written letter from Rachel Murphy.

3       **INMATE BALLARD:**  That's my sister.

4       **PRESIDING COMMISSIONER ENG:**  In

5  Fayetteville.

6       **INMATE BALLARD:**  That's a niece.  That's

7  sister to --

8       **INMATE BALLARD:**  Yeah, because she says

9  Ben is my uncle.  I'm known him all my life.  She

10  says you're currently training to get your

11  national certification in heating, ventilation

12  and air-conditioning.  Okay.  Is this a general

13  support one also?

14       **INMATE BALLARD:**  Uh-huh.

15       **PRESIDING COMMISSIONER ENG:**  Okay.  Very

16  nice.  Okay.  We have another hand written one

17  dated March 6th of '06, Mary Baker.

18       **INMATE BALLARD:**  My sister.

19       **PRESIDING COMMISSIONER ENG:**  Your sister.

20  Okay.

21       **INMATE BALLARD:**  The mother of --

22       **PRESIDING COMMISSIONER ENG:**  Okay.  Is

23  this a half sister or --

24       **INMATE BALLARD:**  No.

25       **PRESIDING COMMISSIONER ENG:**  This is a

26  full sister.  Okay.  Okay.  Nice support letter.

27  Okay.  She says that I'll make sure he has food,

67

1    clothing, transportation, search for a job and

2    moral support. I feel Ben is an honest and

3    responsible person. But she's -- she's in

4    Arkansas?

5         **INMATE BALLARD:**  Yes, ma'am.

6         **PRESIDING COMMISSIONER ENG:**  Okay.  Okay.

7    She's -- okay.  Is she the one that -- Mary's the

8    one that bought you the mobile home?

9         **INMATE BALLARD:**  Yes.

10         **PRESIDING COMMISSIONER ENG:**  That's this

11    letter.  Mary.  So that's where you would prefer

12    to live on her five acres.

13         **INMATE BALLARD:**  Yes.

14         **PRESIDING COMMISSIONER ENG:**  And then

15    Corrina Neal.  Is that Corrina?

16         **INMATE BALLARD:**  Yes.

17         **PRESIDING COMMISSIONER ENG:**  Neal,

18    N-E-A-L.

19         **INMATE BALLARD:**  Friend of the family.

20         **PRESIDING COMMISSIONER ENG:**  Okay.  Okay.

21    Very short, sweet letter.  It's not dated.  Where

22    is she?

23         **INMATE BALLARD:**  She's in Arkansas.

24         **PRESIDING COMMISSIONER ENG:**  Okay.

25    General support.  He's been there a long time so

26    I hope you will let him come home because we miss

27    him so very much.  Another hand written letter

68

1    from Steven Lawson and Christopher Paul Lawson.

2         INMATE BALLARD:  My half brothers.

3         PRESIDING COMMISSIONER ENG:  Steven and

4    Christopher.  Okay.  Yeah, okay.  And where are

5    they?

6         INMATE BALLARD:  They're in Arkansas.

7         PRESIDING COMMISSIONER ENG:  Arkansas

8    also.  So I'm guessing that this is a general

9    support.  We can assure you that -- we'll provide

10   for all your needs including financial, housing,

11   employment, and anything else he needs to become

12   a productive member.  Where do they live relative

13   to Mary?

14        INMATE BALLARD:  Maybe a half hour away.

15        PRESIDING COMMISSIONER ENG:  So the family

16   is in relatively close proximity.

17        INMATE BALLARD:  Uh-huh.

18        PRESIDING COMMISSIONER ENG:  Another

19   handwritten letter, March 27th, 2006, I guess.

20   It looks like it's date stamped arriving here

21   April 15th of '06, another general support letter

22   from, is it Ralin?  R-A-L-I-N, Baker?

23        ATTORNEY HOFFMANN:  Robin.

24        PRESIDING COMMISSIONER ENG:  Oh.  That's a

25   B.  Oh, I couldn't quite tell.

26        INMATE BALLARD:  That's --

27        PRESIDING COMMISSIONER ENG:  Robin baker?

69

1      **INMATE BALLARD:**  Yeah.  I believe it's a

2      cousin to one of my nephews.

3      **PRESIDING COMMISSIONER ENG:**  Well, they'd

4      like to meet and you see how you're doing.  Okay.

5      And then we have a letter dated March 15th, 2006

6      from Derrick Cruikshank, C-R-U-I-K-S-H-A-N-K,

7      says he's never met you but he knows you through

8      your family.  He knows your sister Mary and her

9      family, and he has been friends with your nephew

10     Justin for about seven years, so he's read

11     letters, et cetera.  So it's a general support

12     letter.  And I'm guessing that Derrick lives in

13     Arkansas also.  Okay.  Have I missed any letters?

14     **ATTORNEY HOFFMANN:**  You haven't missed any

15     letters, but --

16     **INMATE BALLARD:**  I would like to --

17     **ATTORNEY HOFFMANN:**  Mr. Ballard wants to

18     point something out to you.

19     **INMATE BALLARD:**  Show the photo from of my

20     daughter.  This is Stan Lawson.  He works for

21     NASA, as stated in his letters.  He's receiving a

22     civil servant's award.  He deals with national

23     defense software.  He debriefs generals and

24     colonels in national defense software programs,

25     and his word, his word is impeccable, and I would

26     sincerely hope that the word would take credence

27     into his statements.

70

1          **PRESIDING COMMISSIONER ENG:**  Did I read --

2     I did read a letter from Stan?

3          **INMATE BALLARD:**  Yes, you did.

4          **PRESIDING COMMISSIONER ENG:**  Okay.  I'm

5     sure that -- oh, here it is Stanley Lawson.

6     Okay.  That's right in San Jose.  Good.  All

7     right.  You state that you'd like to seek

8     employment as a graphic illustrator.  Okay.  Have

9     you inquired about that?  Do you have any

10    documentation to show the Panel that you have

11    made in terms of seeing what types of

12    opportunities there are in that field?

13         **INMATE BALLARD:**  Well, there's a situation

14    right now, well, I'm sure you've heard of

15    Napster?

16         **PRESIDING COMMISSIONER ENG:**  Uh-huh.

17         **INMATE BALLARD:**  They were kind of like

18    borrowing people's music without permission.

19         **PRESIDING COMMISSIONER ENG:**  Yes.

20         **INMATE BALLARD:**  I don't want to put my

21    stuff out there and have it stolen.  I would wait

22    until I could be in control of the images and

23    stuff, but I have won several awards from various

24    foundations like William James through the art

25    program here, and I've participated in five

26    different art shows and received very nice

27    reviews of my work --

71

1     INMATE BALLARD:  Okay.

2     PRESIDING COMMISSIONER ENG:  From art

3 students and professors.  What about -- what

4 other types of plans or what other things are you

5 thought about regarding potential parole that you

6 think are important for you to survive, succeed,

7 and be a contributing member of the community?

8     INMATE BALLARD:  Well, I know that if I

9 can't get the job that I want right away, I'll

10 take any job that is available until I can work

11 myself into a better job.  I plan to stay active

12 in the IMPACT group and the Kairos group through

13 the catholic church and TRUST group and maybe if

14 I'm in another state where they don't have those

15 groups in the prisons there or in the community

16 that maybe I could be facilitator to implement

17 those programs into other states.

18     PRESIDING COMMISSIONER ENG:  Okay.  I'm

19 going to ask you something else right now.  Your

20 daughter is about 25, married.  Okay.  What are

21 you going to do when she has a child?  Your first

22 grandchild?

23     INMATE BALLARD:  I can't wait.

24     PRESIDING COMMISSIONER ENG:  Explain to

25 the Panel.  What do you mean?

26     INMATE BALLARD:  You know, it's what every

27 father looks forward to being a grandfather and,

72

1    you know, she's told me in the past that she's

2    not -- would not be afraid, you know, to bring a

3    child into this world, would not be afraid if I

4    was staying with her and she had a child in the

5    house.  She has no fear of that whatsoever.

6             PRESIDING COMMISSIONER ENG:  How about

7    you?

8             INMATE BALLARD:  No.

9             PRESIDING COMMISSIONER ENG:  You don't

10   have any fear about that?

11            INMATE BALLARD:  No.

12            PRESIDING COMMISSIONER ENG:  How do you

13   explain then in one of these psych reports where

14   you had stated about your concern or fear that

15   you -- oh, that you recognize that it's not safe

16   for you to be in the company of young children

17   due to your emotional instability, substance

18   abuse, and poor impulse control.  Even though you

19   had that in the past, okay, explain how you feel

20   that you -- that that doesn't exist today or

21   tomorrow?

22            INMATE BALLARD:  Well, because the

23   situation and circumstances that created the

24   person that I was, I've unraveled the puzzle, you

25   know, and I've put it back together and I see the

26   picture, the whole picture now, and I realize

27   that who I was then was a very reactionary person

73

1   and I know now that I'm more responsible.    I

2   don't react to things.    I respond to them because

3   it implies responsibility that, you know, I don't

4   just, when something happens, I don't just

5   automatically react to it, so I think about

6   things for a long time, and I'll seek counsel if

7   I'm not certain about something, I'll ask the

8   advice of somebody, what would you think about

9   this or what would you do in this situation?    You

10   know, and I'd take into consideration other

11   people's opinions about how they would deal with

12   the situation before I came to a conclusion how I

13   would respond.

14        **PRESIDING COMMISSIONER ENG:**    Well, there

15   are going to be instances where you wouldn't have

16   the luxury of stepping back maybe and going and

17   seeking counsel because you could find yourself

18   in many situations where you do have to make

19   split-second decisions, okay, and you have to

20   make a choice.    I'm just throwing this out to

21   you.    So explain to this Panel how we should be

22   assured that you would make a good choice and not

23   one that could result in violence again.

24        **INMATE BALLARD:**    Well, because of what

25   happened to me when I was young and the trauma

26   and the fear and the depression and anxiety all

27   of those things that I had carried with me over

74

1    all those years, I never want to create fear or

2    sadness or even being unsafe with anyone in any

3    situation.  So my number one priority in my life

4    is to make sure that I am safe and that the

5    people around me are safe.

6         PRESIDING COMMISSIONER ENG:  But how will

7    you deal -- explain to this Panel what you have

8    done, okay, to change your reaction to what used

9    to trigger you all the time.  Okay.  If you

10   thought somebody was screaming at you or if you

11   thought somebody was going to lay their hands-on

12   you, you sat there and you stated that you would

13   respond in a physical somewhat violent manner.

14   Okay.  So what has changed?  If somebody would

15   come after you or you perceived somebody being a

16   threat to you, explain to this Panel and

17   everybody else how, what would you do and how you

18   have changed?

19        INMATE BALLARD:  Well, previously, I never

20   had the tools to deal with those situations.

21   That's why I was so violent.  But, through

22   learning human behavior, you know, and

23   understanding the human mind, I realize there's a

24   cause for whatever this person's doing, and

25   there's a reason that person's doing it, and it

26   may not even have anything to do with me at all,

27   but it's being directed towards me and again I

75

1   have to try to understand just something causing

2   this behavior but deal with it instantaneously

3   maybe and try not to harm the person.  It happens

4   every day here.  Something happens all the time

5   here.  I've been attacked here.

6           **PRESIDING COMMISIONER ENG:**  So what are

7   those tools?  What tools work for you?  What have

8   you gotten from going IMPACT?  Going to TRUST?  I

9   mean, I know you stopped in the AA NA, but

10  there's elements of IMPACT that deal with

11  substance abuse and that there's parts of IMPACT

12  that also deal with anger issues, so you've been

13  doing, you know, some of this self-help, what

14  specifically has been the most valuable thing

15  that you have gotten from any of those or all of

16  them that has really helped you overcome this

17  reaction, this reaction that you have?  And

18  propensity towards reacting in a violent manner?

19  What, in all those, what's the tool?  What's the

20  key thing?

21          **INMATE BALLARD:**  I would have to say that

22  it's basically a good self-esteem and good

23  self-respect, if you care about yourself and you

24  care about what kind of reality you create

25  because you have effect on reality that you're

26  less likely to be in a situation where you're

27  around people that are violent, so it has a lot

76

1  to do with the effect you have on reality.  Your

2  sphere of influence is determined by your

3  self-esteem.  And people with low self-esteem,

4  that's why junkies hang out with junkies and

5  certified public accountants hang out with

6  certified public accountants.

7          PRESIDING COMMISSIONER ENG:  So what was

8  it that helped you build up your self-esteem

9  through those years?

10          INMATE BALLARD:  By going back and into my

11  childhood, realizing I was not in control what

12  the adults were doing.  I wasn't in control of

13  what was happening to me and by forgiving me, by,

14  you know, really looking inside myself and

15  deciding do I want to hold this anger and stuff

16  and fear for the rest of my life so I was able to

17  forgive them so I can have a normal life.

18          PRESIDING COMMISSIONER ENG:  I give you

19  credit for that, and I don't want you to think

20  that my questions are attacking you in any way.

21  You've had, you know, you've had a horrible

22  upbringing, I mean, absolutely, devastating to

23  most humans, so but I think it's very, very

24  important for you to be able to talk about that

25  and explain what key things have really helped

26  you bridge that gap from where you were 27 years

27  ago to where you are today because coming from

77

1   the type of background that you came from, what

2   did you do to overcome of that, and some of those

3   things are very difficult, and some of them you

4   may not, but there are ways that you may learn

5   how to deal with it so that doesn't set you up

6   for failure, for continued failure.  So that's

7   really what I'm trying to get a dialogue with you

8   and to better understand.  Does that make sense

9   here?

10          INMATE BALLARD:  Yes, it does.

11          PRESIDING COMMISSIONER ENG:  Okay.  So

12   aside from the situation with your Hepatitis C as

13   being sort of a blocker for you going back to

14   drinking or drugs, you know, on the outside,

15   things do not go smoothly.  Even in the best of

16   circumstances.  You know, the world we live in is

17   just stressful period.  Okay.  So what type of

18   safety nets have you set up for yourself to deal

19   with these situations?

20          INMATE BALLARD:  Well, I have, you know,

21   things that I've learned and I go over these

22   thing on a daily basis, all from the very

23   beginning of my self-help groups, all way back to

24   '85, '86 when I started the first group, and I

25   review these things every day and I have a

26   support group of friends who have, you know, been

27   down that road, and we relate to each other and

78

1    we realize, you know, we're all in this together,

2    and we want to create community.  We want to be

3    responsible.  You know, responsibility is a big

4    thing and I'm only responsible for myself but I

5    take responsibility for myself now where in the

6    past I could never accept that I did it, that I

7    caused it.

8         PRESIDING COMMISSIONER ENG:  Have you ever

9    talked with -- what was her name, Mrs. Clark?

10        INMATE BALLARD:  No, I haven't.

11        PRESIDING COMMISSIONER ENG:  After the

12   incident occurred?

13        INMATE BALLARD:  No, I haven't.

14        PRESIDING COMMISSIONER ENG:  Did you ever

15   find out what happened to -- with the other

16   children?

17        INMATE BALLARD:  In the --

18        PRESIDING COMMISSIONER ENG:  And the

19   impact that Melissa's death had on the rest of

20   them?

21        INMATE BALLARD:  In my 1999 parole

22   hearing, I had asked the Panel to ask the

23   District Attorney if he could find out if they're

24   okay, you know, if they have relatively normal

25   lives, and I was concerned that they were having

26   the same types of problems that I had because I

27   had passed this violence on to them because they

79

1   were impressionable, but I never received an

2   answer back, but I'm very concerned with, you

3   know, if they're okay.

4           **PRESIDING COMMISSIONER ENG:**  Okay.  So you

5   understand, you understand why you did what you

6   did back then.

7           **INMATE BALLARD:**  I do.

8           **PRESIDING COMMISSIONER ENG:**  I'm going to

9   ask my co Commissioner if she has any other

10  questions.

11          **DEPUTY COMMISSIONER SHIELDS:**  No, no, I

12  don't right now.

13          **PRESIDING COMMISSIONER ENG:**  Well, if I

14  come up with something, I'll just go ahead and

15  ask it, and right now I'm going to ask Mr. Main

16  if he has any questions that he would like posed

17  to Mr. Ballard to the Panel.

18          **DEPUTY DISTRICT ATTORNEY MAIN:**  I do have

19  a few.

20          **PRESIDING COMMISSIONER ENG:**  Okay.

21          **DEPUTY DISTRICT ATTORNEY MAIN:**  I wanted

22  to find out when the last time was that he was in

23  either NA or AA regularly?

24          **PRESIDING COMMISSIONER ENG:**  Okay.  Sir,

25  do you recall the last time that you attended

26  either one of those self-help groups.

27          **INMATE BALLARD:**  I believe that was '93.

80

1       **PRESIDING COMMISSIONER ENG:**  It was a

2   while ago, wasn't it?

3       **DEPUTY DISTRICT ATTORNEY MAIN:**  I'm sorry,

4   was that '93?

5       **PRESIDING COMMISSIONER ENG:**  1993.

6       **DEPUTY DISTRICT ATTORNEY MAIN:**  Thank you.

7   Now, you just had a question about whether you

8   talked to Mrs. Clark after the crime, and you

9   said no, but did you talk to her about putting

10  together a story to tell the police?  You both

11  gave a similar story to the police after the

12  crime?

13      **PRESIDING COMMISSIONER ENG:**  Can you think

14  back as to when this occurred.

15      **ATTORNEY HOFFMANN:**  I would object to that

16  question in that it goes, it violates the right

17  that Mr. Ballard is exercising.  He's not going

18  to talk about the commitment offense.

19      **PRESIDING COMMISSIONER ENG:**  Okay.

20      **ATTORNEY HOFFMANN:**  You're still free to

21  answer the question if you want to, but you don't

22  (inaudible).

23      **INMATE BALLARD:**  I'm going to answer this

24  question.  I told her a lie.  I made up a story,

25  and she went along with it, and then she realized

26  the severity of the situation, and she told the

27  truth.

81

1          PRESIDING COMMISSIONER ENG:  I'm going to

2    follow-up with a question.  Was Mrs. Clark a

3    heroin user too?

4          INMATE BALLARD:  Yes, she was.

5          PRESIDING COMMISSIONER ENG:  Okay.

6          DEPUTY DISTRICT ATTORNEY MAIN:  And just

7    for my own clarification, you talked about the

8    abuse in the foster home.  Was that something you

9    became aware of only after therapy some years

10   later?

11         PRESIDING COMMISSIONER ENG:  Do you

12   understand that?

13         INMATE BALLARD:  Yes, I do.

14         PRESIDING COMMISSIONER ENG:  Yeah.  Okay.

15         INMATE BALLARD:  I was sitting in the chow

16   hall in CMC, California Men's Colony in 1988, and

17   the person sitting across the table from me was

18   slurping his food, and I was totally enraged, and

19   I couldn't understand why.  I got up.  I left the

20   table.  I went back to my cell, and I laid there

21   and all the things from my childhood started

22   coming back to me, and I realized that that was

23   slurping food was one of things that I used to

24   get beat up for, and as a started going to

25   therapy and then more became surfaced in my

26   consciousness and then I began to (inaudible).

27         PRESIDING COMMISSIONER ENG:  I'm sorry,

82

1   Mr. -- I'm going to follow-up with a question

2   here.  So you mean to say, so I did not get that

3   from the reading, so for a large portion, from

4   your teenage years up to your time at CMC,

5   through the time that you were incarcerated that

6   you had no memory of what had happened to you

7   when were you in that foster home?

8           INMATE BALLARD:  None.  The only reference

9   that ever came to me was from my biological

10  father when I was 18 or 19, I briefly went to

11  stay with him in Oregon for about two months and

12  he told me when you came out the foster home, you

13  didn't talk for two months, and I did not know

14  what he was talking about.

15          PRESIDING COMMISSIONER ENG:  Okay.  Okay.

16  Sorry, Mr. Main.  Go ahead.

17          DEPUTY DISTRICT ATTORNEY MAIN:  You talk

18  about passing the violence on to the other

19  children in the Clark household.  Did you have

20  anger problems with those children as well as

21  Melissa?

22          INMATE BALLARD:  Yes.  Yes.  I already

23  stated on the record that I was abusive to them.

24          PRESIDING COMMISSIONER ENG:  From what you

25  recall, had you hit them also?

26          INMATE BALLARD:  Yes.

27          PRESIDING COMMISSIONER ENG:  Was it like

83

1   typical spanking for them being bad or was it a

2   lot more than that.

3          INMATE BALLARD:  It was more severe than

4   it needed it to be.  Much more severe than

5   warranted.

6          DEPUTY DISTRICT ATTORNEY MAIN:  No further

7   questions.

8          PRESIDING COMMISSIONER ENG:  Counsel, any

9   questions to ask your client?

10          ATTORNEY HOFFMANN:  I think every one has

11   been asked and answered by the Panel already.

12          PRESIDING COMMISSIONER ENG:  Okay.

13          ATTORNEY HOFFMANN:  With the exception of

14   one question, which is why is it that you would

15   chose to parole outside of Stanislaus County?

16          INMATE BALLARD:  Well, because of the

17   victim's family and the notoriety, I would be

18   afraid that, you know, the various victims'

19   groups with create a situation to where I would

20   be not welcome in the neighborhood, and I could

21   probably deal with that myself but I don't want

22   to put anything else through that because they

23   don't deserve it.

24          ATTORNEY HOFFMANN:  Do you have any

25   support network there?

26          INMATE BALLARD:  Yeah, my nephew and my

27   sister.

84

1         **ATTORNEY HOFFMANN:**  Okay.

2         **INMATE BALLARD:**  But I'd prefer not to go

3    to Stanislaus County.  I think it would be

4    detrimental to my success.

5         **ATTORNEY HOFFMANN:**  Okay.  Thank you.  I

6    have no further questions.

7         **PRESIDING COMMISSIONER ENG:**  Okay.  Okay.

8    Miss Shields any questions?

9         **DEPUTY COMMISSIONER SHIELDS:**  No.

10        **PRESIDING COMMISSIONER ENG:**  Okay.  We'll

11   move right onto final statements.  Mr. Main?

12        **DEPUTY DISTRICT ATTORNEY MAIN:**  Thank you.

13   The People oppose the parole of Mr. Ballard at

14   this point.  I'd like to start first with the

15   nature of the offense.  This is a particularly

16   despicable murder.  This is a three-year-old

17   child who had been struck and then killed by Mr.

18   Ballard.  There is simply no reason for that.

19   There's no satisfactory explanation for that, and

20   Mr. Ballard's anger problem came out and killed

21   this three-year-old child.  Mr. Ballard poses an

22   unreasonable risk to society.  Both the

23   psychiatric reports have some pretty clears

24   flaws.  Counsel pointed out some issues in the

25   September report.  I have no reason to disbelieve

26   that those statements are errors, especially when

27   Mr. Ballard is described as single and planning a

85

1    divorce, that is not the kind of care that you'd

2    like to see.  Nonetheless, in the September

3    report, the violence list appraisal guide was

4    used to put a risk of recidivism, of violent

5    recidivism of 55 percent over seven years.  Even

6    if we lower that somewhat, that's a very high

7    risk to society.  I note that the other report

8    says that he had been continuously in AA for four

9    years.  That's also clearly not so.  We're

10   dealing with an unfortunate -- and I know

11   mistakes are made, and I know they're long

12   records, but it's unfortunate to see that.  We

13   can see that Mr. Ballard's plans for after

14   parole, he has some plans.  He has some

15   discussion of a residency, which is important.

16   It appears that his job plans may be a little bit

17   unrealistic.  To make money as an artist is very

18   difficult, even for people with great talent, and

19   I have no reason to disbelieve here that Mr.

20   Ballard has substantial interest and talent.

21   That seems to be referenced multiple times.  We

22   also see a combination here today that Mr.

23   Ballard has some substantial understanding.  His

24   progress is very substantial from any of the

25   earlier reports, but we also see some things that

26   cause concern.  He said that one of things that

27   set me off were people getting in my face and

86

1   screaming at me and physical violence. But,

2   obviously, there were other things that would set

3   him off, virtually anything. And a statement

4   like I tried to discipline her and it just got

5   out of hand. The effort here was on consistent

6   with any kind of effort to discipline. But we

7   also see some things that are insights. I think

8   it if hadn't been her, would have been someone

9   else, and I think that's step forward for Mr.

10  Ballard to understand that his anger was going to

11  explode, that it was going to end in a tragic

12  result like the one that we saw. In the end, we

13  look at this time and we look at where Mr.

14  Ballard is. I think he poses an unreasonable

15  risk to society to parole at this time. He has

16  made progress. There's no question that he has

17  made progress from his first parole hearing.

18  It's not sufficient. There's still too much of a

19  hazard to society at large to let Mr. Ballard

20  out. Thank you.

21          **PRESIDING COMMISSIONER ENG:** Okay. Thank

22  you. Okay. Counsel, final statement?

23          **ATTORNEY HOFFMANN:** Thank you. First I'm

24  just going to respond to some of the statements

25  made by the District Attorney. The District

26  Attorney indicates that the crime is one of the

27  primary factors that their office will continue

87

1    to oppose parole.  While the crime what's a

2    horrible crime and resulted in the death of a

3    very young child, none of us can do anything to

4    change the circumstances of that offense.  We're

5    here today to determine whether or not Mr.

6    Ballard poses an unreasonable risk today, not

7    what he did over 20 years ago was something that

8    was harmful or egregious or necessary.  The

9    District Attorney states there is no satisfactory

10   explanation for the crime, which is probably

11   true.  Mr. Ballard, though he sat here today and

12   provided a context to the Panel of what was going

13   on in his life both as a child and immediately

14   before the commitment offense, has not presented

15   to the Panel as an other excuse, and absolutely,

16   as conceded previously, what happened to Melissa

17   was devastating; and, again, none of us can do

18   anything to change those factors.  All that we

19   can expect from Mr. Ballard is that he does what

20   he can to improve himself so that when he is

21   released, he can live a safe, law abiding life in

22   the community.  The District Attorney also

23   indicates that he believes that Mr. Ballard poses

24   an unreasonable risk to the public if he were to

25   be released.  That statement not only goes

26   against, I think a great weight of evidence that

27   was presented before the Panel today but it also

88

1   goes against the professional opinions of

2   psychologists, including a psychologist who

3   interviewed Mr. Ballard less than a month ago.

4   In terms of the District Attorney's opposition to

5   Mr. Ballard's unsatisfactory parole plans with

6   respect to his employment opportunities, the DA

7   chose to focus on one of the options, which was

8   that Mr. Ballard hopes to pursue his art upon his

9   release.  He also, however, does have a number of

10  other marketable skills in industries in which he

11  would be happy to work in when he's released.

12  Mr. Ballard has a minimum eligible release date

13  of 1993.  He's now been in prison for over 20

14  years.  He has no record for any type of

15  violence.  In fact, the only prior criminal

16  history that he has occurred when he was a

17  juvenile for joyriding.  His institutional

18  behavior also shows absolutely no record of

19  violence.  That's 20 plus years of no record of

20  any sort of violent behavior with the exception

21  of some self-destructive behaviors that were

22  directly related to his own depression and other

23  mental health issues that were happening.  Mr.

24  Ballard's gone through some significant self-help

25  and therapy that has, without a doubt, increased

26  his insight and understanding into both the

27  causative factors of the commitment offense and

89

1  into gaining skills and tools for him to ensure

2  that he doesn't engage in any sort of violent

3  behavior ever again and that he is able to cope

4  in the world upon his release.  He has zero

5  violent disciplinary records.  He only has two

6  serious 115's, the last, the most recent one in

7  1997, the one prior to that in 1992.  Both of

8  those serious 115's were for self-mutilation.  He

9  does have a number of 128A's in his record.  I

10  draw the Panel's attention again that 128A's are

11  not factors determinative of parole suitability

12  or unsuitability.  Mr. Ballard has viable and

13  supportive parole plans in a number of different

14  locations, both within and outside of California,

15  a large support network including friends and

16  family.  He has job assistance offers as well as

17  financial assistance, residences and other sorts

18  of support through a number of different people

19  in his life.  And lastly, I would just like to

20  draw the Panel's attention to the issue of Mr.

21  Ballard's social history because I really hope

22  that when the Panel reaches their decision, they

23  don't consider his social history as a factor

24  weighing against him; because, as we all know

25  from reading through the record today, that

26  wasn't -- none of the negative circumstances and

27  very traumatic circumstances that Mr. Ballard

90

1    experienced during his childhood were anything
2    that he can control.  And, if the Panel wishes, I
3    have a memorandum that was issued by the former
4    chair of the Board relating to -- that I can
5    leave with you before I leave, relating to
6    circumstances that tend to show unsuitability and
7    specifically indicated that circumstances which
8    are outside of the control of the person who you
9    are judging should not be considered in terms of
10   unstable social history.  So with that, given
11   that Mr. Ballard has shown no indication that he
12   is violent in any way has overcome some very
13   traumatic and devastating circumstances in his
14   childhood, I would urge the Panel to find him
15   suitable today.  Thank you.
16          **PRESIDING COMMISSIONER ENG:**  Mr. Ballard,
17   if you'd like to, this is your opportunity to
18   make a final statement regarding parole
19   suitability to the Panel.
20          **INMATE BALLARD:**  I would like to direct a
21   question to the representative of the District
22   Attorney's office.
23          **PRESIDING COMMISSIONER ENG:**  You cannot do
24   that, but you can direct a question to me.
25          **INMATE BALLARD:**  Okay.  I'd first like to
26   apologize for the fear that I've put into my
27   community by committing the crime and the fear

91

1    and sadness that I created in the family's, the

2    victim's family and brothers and sisters and the

3    parents and the grandparents, and I'd like to

4    take full responsibility for everything I've done

5    and hope that some day I can have a life that

6    would honor the death of Melissa Ebarb.  Thank

7    you.

8    　　　　　　　PRESIDING COMMISSIONER ENG:  Okay.  I've

9    decided I'm going to go ahead and read this

10   letter.  It looks like it was faxed on February

11   15th, at 12:51 p.m., and it is from Kelly Clark.

12   　　　　　　　"I am writing this letter to voice my

13   　　　　　　　reasons why the inmate in question

14   　　　　　　　should not be granted parole.  I am

15   　　　　　　　the eldest sister of Melissa Ebarb.

16   　　　　　　　I was 11 years old when my little

17   　　　　　　　sister was taken from my life.  I was

18   　　　　　　　only in the beginning of my sixth

19   　　　　　　　grade year when my whole world was

20   　　　　　　　torn apart.  The family and security

21   　　　　　　　I had always known was taken from me.

22   　　　　　　　However, it was not just myself who

23   　　　　　　　suffered.  I had two other siblings

24   　　　　　　　who were only eight years and one

25   　　　　　　　year.  We were separated for the

26   　　　　　　　first time in our lives and put in

27   　　　　　　　the care of strangers.  It was a

92

1    stranger who told me of my sister's

2    death.  Being the eldest of the

3    family, I had a strong sense of

4    responsibility.  I went through years

5    of blaming myself for not being there

6    to protect my little sister.  I felt

7    lost, helpless, and worthless.  I had

8    to watch my baby sister being taken

9    away and had to have set visits to

10   see my little brother.  I was not

11   allowed to attend my own sister's

12   funeral so I could say good by.  The

13   toll this tragedy took on my little

14   brother and myself put scars inside

15   us that have affected us ever since.

16   It is painful still when I remember

17   the events that followed my little

18   sister's death.  I write this letter

19   in support of my mother even though

20   it still hurts too much to remember.

21   I hope my plea is heard so at least

22   my mother has the comfort to know the

23   person who took her baby girl away

24   forever will not be released.  As for

25   my siblings and me, we are unable to

26   forget or forgive all we have lost.

27   I ask on behalf of my remaining

94

1  CALIFORNIA BOARD OF PAROLE HEARINGS

2  D E C I S I O N

3  **DEPUTY COMMISSIONER SHIELDS:**  Okay.  We're

4  back on the record.

5  **PRESIDING COMMISSIONER ENG:**  Okay.  The

6  time is 1:29, and everyone who was present prior

7  to the recess for deliberations has since

8  returned.  In the matter of Benjamin Ballard, CDC

9  number D-04047, the Panel has reviewed all of the

10  information from the public and relied on the

11  following circumstances in concluding that the

12  prisoner is not suitable for parole and would

13  pose an unreasonable risk of danger to society

14  and a threat to public safety if released from

15  prison.  The Panel finds that the commitment

16  offense was just a very cruel and vicious attack

17  on this child.  The inmate basically beat a

18  three-year-old child to death simply for crying

19  and screaming.  We find that the events was

20  carried out in a manner that demonstrates an

21  extremely callous disregard for human suffering.

22  Not only did this child suffer from the beating,

23  but had numerous bruises on her neck, face, back,

24  shoulders and buttocks and suffered a broken neck

25  but also because of the other children who had

26  also been physically abused by this inmate prior

27  **BENJAMIN BALLARD  D-04047  DECISION PAGE 1   02/23/2007**

96

1    been -- he had been arrested and yet released for

2    battery on a person, and specifically his step

3    father back in December of '83, and he did have

4    an escalating pattern of criminal conduct,

5    although we notated that it was minimal.  Mr.

6    Ballard had, I believe it was for joyriding and

7    burglary as a juvenile, and he received

8    probation.  And then, as an adult, he took a

9    vehicle without the owner's consent which he was

10   arrested and released and then right after that

11   the battery on a person.  Specifically the inmate

12   stated it was his step father where he was

13   arrested and released, but that led up to the

14   instant offense where this three-year-old young

15   girl was beaten to death.  Regarding Mr.

16   Ballard's institutional behavior, we do note ate

17   that his conduct while incarcerated does include

18   13 128A counseling chronos, the last one being in

19   January 16th of 2004 for failure to report, which

20   Mr. Ballard did discuss with us.  And then he's

21   had three 115 disciplinaries, the last one being

22   November 22nd, 1997, for self- mutilation, which,

23   also, he had received another one for

24   self-mutilation back in November of 1992.  The

25   psychological reports, we're stating both of

26   them, the one on September 11th of 2006 and the

27   **BENJAMIN BALLARD  D-04047 DECISION PAGE 3    02/23/2007**

1    one January 19th of 2007, the one in September

2    authored by Dr. Inaba and then the one in January

3    authored by Dr. Starrett, S-T-A-R R E T T, we

4    find that they are not totally supportive of

5    release in that both of these psychologicals do

6    diagnose the inmate under Axis II with

7    anti-social personality disorder by history and

8    then the September one does have a diagnosis

9    under Axis I, not only of mood disorder, not

10   otherwise specified, opiod dependence in a

11   controlled environment, polysubstance dependence

12   in a controlled environment and also intermittent

13   explosive disorder by history.  And then the

14   January report also states that the rate this

15   inmate within a moderate range in terms of his

16   likelihood to commit future violent acts.  And

17   then the September one -- although, you know, and

18   also in the January one, in terms of insight, a

19   clinical factor, Dr. Starrett states that the

20   inmate would be in low range for future violence

21   and then using the environmental risk, risk

22   management states he would also rate in the low

23   range in terms of his risk management for the

24   future.  But, yet, the September one states that,

25   and this was what gave us some concern also is

26   that with his -- even though he has been living

27   **BENJAMIN BALLARD  D-04047  DECISION PAGE 4    02/23/2007**

98

1    drug and alcohol free with in the institution,

2    with his history, this Dr. Inaba stated that

3    relapse risk will be an ongoing issue, and at the

4    present time he's able to maintain abstinence in

5    a controlled environment.  So his ability to

6    maintain these gains in a free environment in

7    which he's exposed to significant stressors is

8    untested.  And given his history of past

9    outbursts of explosive anger, any form of

10   intoxication would constitute a second elevation

11   of risk.  And then they go onto state in a

12   chaotic, hostile, or stress-filled environment,

13   he would be much less likely to be able to

14   maintain his gains and would be at greater risk

15   for relapse and recidivism.  Regarding Mr.

16   Ballard's parole plans.  He does have parole

17   plans; however, they are in the state of Arkansas

18   and they are viable here.  However, he doesn't

19   have any viable residential plans in the last

20   county of legal residence, but we understand why,

21   but I believe that you stated we do a support

22   letter from your brother in San Jose?

23           **INMATE BALLARD:**  Uh-huh.

24           **PRESIDING COMMISSIONER ENG:**  And we don't

25   see any evidence of acceptable employment plans

26   even though you did state that you would look at

27   **BENJAMIN BALLARD  D-04047  DECISION PAGE 5    02/23/2007**

99

1    jobs in the graphic design.  However, so we do

2    know you have a marketable skill, but you need to

3    firm up those parole plans.  It's always in your

4    best interest.  And, again, the more specific

5    your support letters can be in terms of what

6    they're offering so it doesn't leave any doubt

7    that they're offering you a room for X number of

8    months or X number of years and what type of

9    financial support because it is difficult to

10   transition once you get out.  So, even though

11   your desire would be to have a job right away, a

12   well paying job right away, it's good for you to

13   take a look at what's realistic out there.  If it

14   does not happen, what are you going to do?  And

15   the whole key for you is to try to keep the

16   stress to a minimum for you.  It will be

17   stressful enough.  So it's always in your best

18   interest to really take a look and if you have to

19   start writing down, you know, basic plans, you

20   know, what's your primary plan because if that

21   doesn't work out, something happens, what's your

22   back up plan.  Okay.  Does that make sense to

23   you?

24          **INMATE BALLARD:**  Yes, ma'am.

25          **PRESIDING COMMISSIONER ENG:**  Because you

26   will have to parole in California unless there's

27   **BENJAMIN BALLARD  D-04047  DECISION PAGE 6   02/23/2007**

100

1    some sort of a compact with Arkansas, and I don't
2    know if you've looked into that yet and you've
3    got a very good support network in Arkansas going
4    for you.  However, you know, if you're going get
5    paroled, it's going to be into California.  We do
6    note that the represent from the District
7    Attorney's office of Stanislaus County is present
8    and they did state their opposition to parole at
9    this time.  The Panel makes the following
10   findings that the prisoner does need to continue
11   with your documented self-help in any form --
12   whatever works for you.  We recognize that you
13   did stop going to AA and NA back in '93, but you
14   have found other outlets, but you need to
15   continue doing this in order to face, discuss,
16   under, and cope with stress in a non-destructive
17   manner.  And we feel that unless more progress is
18   made that you continue to be unpredictable and a
19   threat to others.  But, again, we feel that you
20   should be commended for quite a few thing,
21   actually.  Both of us talked about it, and he
22   want to commend you for being up front and honest
23   with us and being able to discuss some very
24   painful issues from your past.  And, also, your
25   willingness to explore alternatives for self-help
26   because we didn't get into it why you stopped the
27   **BENJAMIN BALLARD  D-04047  DECISION PAGE 7   02/23/2007**

1    AA, NA, but you did seek out other avenues, okay,

2    and that's good and don't stop there because if

3    you're not getting everything you need out of

4    IMPACT or Kairos or whatever, there's a lot of

5    other things that are available to you to either

6    group participate, individually, you might read a

7    magazine article.  You might see a video.

8    Documentation means that you don't need to go

9    somewhere to get tickets stamped.  If you

10    write-up a little paragraph to, you know, put a

11    date on it, the time you saw it, what it was,

12    what was the purpose of it and what did you

13    personally get out of it.  All you have to do is

14    maybe write one or two statements, all right, and

15    be able to talk to a Panel about what did you

16    walk away with?  What's the lesson that you

17    learned that's specific to you that's helping you

18    to maintain that path to success.  Does that make

19    sense to you?

20          INMATE BALLARD:  Yes, it does.

21          PRESIDING COMMISSIONER ENG:  So don't stop

22    with that you've been doing very, very good with

23    that, and I've got to tell you that I think that

24    even though this is the first time this Panel is

25    seeing you, our impression is you're getting

26    stronger every day.  From where you've come from

27    **BENJAMIN BALLARD  D-04047  DECISION PAGE 8   02/23/2007**

. . .

102

1   to where you are today, you're getting stronger.

2   Don't give up even though this is a denial, okay

3   you're on a road to recovery, and it takes time

4   because by the time, if that date -- if and when

5   that date comes that you are paroled, you want to

6   know, you want to be the strongest you can be to

7   know that there's nothing that's going to stop

8   you from succeeding and that you don't have a

9   trigger response that could be inadequate.  Okay.

10  So these positive aspects of your behavior do not

11  outweigh the factors of unsuitability.  Sir, you

12  know, you've been accused of murder of a

13  three-year-old child so we're giving you right

14  now a three-year denial.  In a separate decision

15  the hearing Panel finds that you have been

16  convicted of murder and it's not reasonable to

17  expect that parole would be granted at a hearing

18  during the next three years.  And, again, the

19  commitment offense, it was committed in a very,

20  very cruel manner in that this was a defenseless

21  child that had her whole life ahead of her and

22  basically in a matter of how ever long it took

23  for her to finally succumb to the injuries and

24  the broken neck, she lost her life.  It was,

25  again, we find that it demonstrates a very

26  callous disregard for human suffering.  We don't

27  **BENJAMIN BALLARD   D-04047   DECISION PAGE 9    02/23/2007**

103

1    know how long this little child was really

2    suffering from the injuries that was inflicted

3    upon her.  And the motive for the crime was

4    extremely trivial.  For whatever reasons were

5    occurring at your life at that time, children

6    scream and they cry.  No one expects them to be

7    killed because of it.  And, again, this inmate

8    does have some history of criminality and

9    misconduct.  And, again, that goes back to, even

10   though we're not going to discount it completely,

11   but we're not weighing that heavily but it shows

12   a pattern where you started out with the

13   joyriding, et cetera, and then you, you know,

14   taking the vehicle without the owner's consent,

15   moving up to a battery and then moving up to

16   where your reaction got out of control and you

17   ended up killing this child so all escalating to

18   the life crime.  We also know that that this

19   prisoner does have a history of drug and alcohol

20   abuse.  Your alcohol beginning at the young age

21   of 12 and really becoming a real problem at the

22   age of 15 or 16 and that led up to your

23   intravenous drug addiction,  And, again, the

24   psychological reports, the two recent ones, the

25   one dated September 11th of 2006 authored by Dr.

26   Inaba and the one dated January 19th, 2007,

27   **BENJAMIN BALLARD  D-04047  DECISION PAGE 10  02/23/2007**

104

1  authored by Dr. Starrett, both indicate a need

2  for a longer period of observation, evaluation,

3  and treatment.  So and that's why the three-year

4  denial, we feel that it will be a while before

5  the Board should find that the prisoner is

6  suitable for parole.  In the interim, sir, the

7  Panel recommends that you remain disciplinary

8  free, okay, no more 128's, no more 115's, and

9  that if available, that you continue to upgrade

10  yourself vocationally and educationally.  That's

11  only going to help you.

12       INMATE BALLARD:  Uh-huh.

13       PRESIDING COMMISSIONER ENG:  It helps you

14  to be more marketable on the outside, the more

15  skills that you accumulate.  Okay.  And that, if

16  available, that you should continue with your

17  self-help in any and all types that you can get

18  and remember what he said about documenting it

19  and coming into the next Panel fully prepared

20  with that type of information.  Okay.  And that

21  also, if available, that you do participate in

22  any type of therapy.  We -- we're asking that you

23  cooperate with clinicians where we did find -- we

24  got specific because of what was that called, the

25  intermittent --

26       DEPUTY COMMISSIONER SHIELDS:  The

27  BENJAMIN BALLARD  D-04047  DECISION PAGE 11  02/23/2007

105

1    intermittent explosive disorder.

2        PRESIDING COMMISSIONER ENG:  Yeah, because

3    of one of current psych found your intermittent

4    explosive disorder and the fact that over our

5    discussions that you become very angry and lose

6    your tempter.  We thought it would be beneficial

7    to you to have another psychological evaluation,

8    specifically dealing with that, and I think that

9    would help you to understand better, too, whether

10   or not you have that under control and what tools

11   you have in other words to ensure that you don't

12   suffer from any type of explosive disorder if

13   that makes sense to you.

14        INMATE BALLARD:  Yes, ma'am.

15        PRESIDING COMMISSIONER ENG:  So we think

16   that should help you and to have that prior to

17   your next hear.  But, in the interim, there's a

18   lot of different things you can do to build

19   yourself up and get that much stronger between

20   now the next time you come before a Panel, and I

21   would expect you to be fully prepared for the

22   next Panel.  Okay.  So I wish you luck.  That

23   concludes the reading of decision.  I'm going to

24   ask my fellow Commissioner if she has anything to

25   add?

26        DEPUTY COMMISSIONER SHIELDS:  No.  I'd

27   **BENJAMIN BALLARD  D-04047  DECISION PAGE 12  02/23/2007**

106

1    just like to reaffirm that, you know, you have

2    made a lot of progress and it's obvious talking

3    to you and it's good luck to you, sir, and keep

4    up the good work.

5              ATTORNEY HOFFMANN:   Thank you.

6              PRESIDING COMMISSIONER ENG:   The time is

7    1:40.

8                    A D J O U R N M E N T

9                        --o0o--

10

11

12

13

14

15

16

17

18

19

20

21

22

23   PAROLE DENIED THREE YEARS.

24   THIS DECISION WILL BE FINAL ON: JUN 2 3 2007 _____

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   BENJAMIN BALLARD  D-04047  DECISION PAGE 13  02/23/2007

107

### CERTIFICATE AND

### DECLARATION OF TRANSCRIBER

I, KERRY VIENS, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed two tapes, which cover a total of pages numbered 1 - 106 which recording was duly recorded at SAN QUENTIN STATE PRISON, SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of BENJAMIN BALLARD, CDC No. D-04047, on FEBRUARY 23, 2007, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tapes file to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated ARPIL 5, 2007 at Sacramento County, California.

*Kerry L. Viens*

_____

Kerry Viens, Transcriber

**Northern California Court Reporters**

**EXHIBIT-**

# A

BALLARD, Benjamin D-04047                                    September 11, 2006

## MENTAL HEALTH EVALUATION
## FOR THE BOARD OF PRISON TERMS
## OCTOBER 2006 LIFER HEARING
## SAN QUENTIN PRISON



### I. Identifying Information:

Mr. Ballard is serving a 15-year to Life sentence for (P187) murder in the second-degree, committed on `10-3-84. Mr. Ballard is single at the present time although he is planning to divorce. He has one grown daughter from his first marriage. The report is based on a review of the inmate's central files, medical record and a face-to-face interview conducted in the staff offices of San Quentin State Prison. Mr. Ballard was informed of the limits of confidentiality in that information provided would be included in a report to the Board of Prison Terms. Mr. Ballard stated that he understood this and was able to demonstrate an understanding of the purpose of the interview. He denied any need for assistance or for any adaptive aides and stated that he was fully able to participate in the interview.

### II. Psychiatric and Medical History:

Mr. Ballard has ongoing health concerns secondary to his diagnosis of Hepatitis C. He experiences fatigue and weight loss. Mr. Ballard has a history of brief mental health treatment in CDC following episodes of self-mutilating behavior.

### III. Plans if Granted Release:
### Housing:

Mr. Ballard has an offer of housing from a brother in San Jose and from a sister who would be able to provide him with housing on property she owns in the state of Arkansas. His sister has purchased a mobile home in which Mr. Ballard would be able to reside. He has also received an invitation from his 25-year old daughter, who is now married and living in the state of Oregon.

### Financial Support:

Mr. Ballard has been able to work in prison in spite of his present health problems. He would expect to complete a sheet metal apprenticeship if released from prison. He also has skills in printing, graphic arts and graphic illustration. Mr. Ballard also expects that he would be able to sell the artwork that he has sent to his daughter for safekeeping.

### Social Support:

Mr. Ballard has made efforts to make amends to family members and actively works "to repair the damage I've done." He has several offers of help from family members. He also has a woman friend who resides in Redding and has written and visited him since 1994. He also plans to continue his involvement with groups and organizations such as IMPACT that provide programming in both the community and prison.

## CLINICAL ASSESSMENT

III.    Current Mental Status/Treatment Needs:

**Physical**

Mr. Ballard came to the appointment on time and showed calmness and patience while he waited for the examiner to finish another interview. He was personally well groomed. He is thin and taller than average.

**Movement**

There were no tics or postural abnormalities observed. Movements were smooth and well coordinated.

**Communication**

. Mr. Ballard was quite articulate in expressing his answers to a wide range of questions. He was not evasive or defensive, and willingly answered all questions with completeness, putting much thought into his answers. He seemed not to have any problem communicating effectively. Rate, volume and content of speech were within normal limits. Eye contact was good.

**Cognition**

Based on Mr. Ballard's responses to interview questions, his intellectual ability appeared to be above average range. Fund of knowledge was greater than expected given his long period of incarceration. He claimed some difficulty with memory that he felt was secondary to his Hepatitis. Although this area was not formally assessed, he showed no apparent difficulty.

**Affect/Mood**

Mood was dysthymic and stable.    Affect was constricted.    He reported some symptoms of depression such as recent weight loss and fatigue. His affect was sad, but he stated that he found it emotionally difficult to talk about his crime. He denied having loss of appetite (when preferred foods were available), or poor sleep, sadness or feelings of hopelessness. He expressed a history of a chronic feeling low self-esteem that has resolved with his success at painting and engagement in self-help activities. There was no evidence of difficulty with concentration. He denied any suicidal or homicidal ideation.

**Perception**

Mr. Ballard denied any present symptoms of perceptual distortions such as paranoia, delusional thought, auditory, or visual hallucinations.

**Insight and Judgment**

Mr. Ballard has significant insight into the motivation behind his crimes. He finds that at the time the crime occurred, he was not able to control his underlying anger. He recognizes that it was not safe for him to be in the company of young children due to his emotional instability, substance abuse and poor impulse control. He states that

BALLARD, Benjamin D-0-047                                    September 11, 2006

he had been raised in violent environments and did not know any other way to be. As stated by Mr. Ballard, "I grew up with violence everywhere. I was just reacting to everything. I couldn't shut off my emotions. There was no shut off valve. I didn't know how to stop it."

He now comprehends the damage he caused to the lives of those with whom he came in contact during this period. He summarized the effect of his out-of-control anger as follows, "I destroyed a life and created fear and suffering. I destroyed my own life. It's the worst thing you can do, to kill a child."

When talking about what he has learned, Mr. Ballard stated, "Our actions determine our reality. Everything I though I knew about life, about people was wrong. I had to erase all that and start over."

Mr. Ballard's judgment has also continued to improve. He is less sensitive to the judgments of others. He is discriminating about what he exposes himself to and works to eliminate all violent images and influences from his life. This extends to his selections of reading or viewing materials. He self-monitors for feelings of anger and uses preventative coping strategies that he has learned. He engages in meditation and mindfulness exercises supported by his Buddhist spiritual practice.

## IV. DIAGNOSTIC IMPRESSIONS:

AXIS I:    296.90  Mood Disorder, NOS (mildly depressed)
           304.00  Opioid Dependence (in a controlled environment)
           394.80  Polysubstance Dependence (in a controlled environment)
           312.34  Intermittent Explosive Disorder (by history)

AXIS II:   301.9  Personality Disorder, NOS (borderline, antisocial traits)

AXIS III:  Hepatitis C complications

AXIS IV:  Life term

AXIS V:  GAF = 75

Current Level of Care: Mr. Ballard is currently in the General Population. He is not receiving mental health services as a participant in the MHSDS. His present mental status indicates that he does not suffer impairment or clinically significant distress in social, occupational, or other important areas of functioning. He reports a lack of energy and chronic problems with low self-esteem. His perception is that the lack of energy is a result of his health problems, and he has had a history of problems with self-esteem since childhood. He is also not in favor of using of mood altering medications because of his substance abuse history. He does not feel a need at the present time for mental health services.

Treatment Activities: He is currently a participant in AA/NA, and self-help programs, but is not in any mental health treatment

Medications: No psychotropic medications.

Prognosis: Not applicable in terms of a major mental illness. With regard to personality features, Mr. Ballard presents a longstanding and stable pattern that is associated with guarded prognosis for behavioral change. He has however made significant positive gains.

## V. Review of Life Crime:

Inmate's version of offense/assessment of causative factors:

Mr. Ballard' offense occurred while he was in charge of the children of his live-in girlfriend. Mr. Ballard observed that the 4 year old had wet and left a puddle of urine where she had been sitting. Mr. Ballard became enraged soon after, and hit the child several times in the head while holding her by her clothing. He stopped after she became limp, and then tried to revive her. Failing to do so, he tried to enlist help from the child's mother.

Relevance of mental condition to life crime/causative factors:

Mr. Ballard's substance abuse problems were indirectly related to the crime in that he was not in control of his impulses at the time. His own abusive upbringing and his consequent inability to empathize with others were contributing factors to the crime. His maladaptive personality traits left him with few, if any, adaptive emotional responses or behaviors necessary for successfully meeting the emotional needs of a young child. There was no evidence that a major mental illness was a causative factor in the commission of the life crime.

Inmate's level of insight/remorse:

Mr. Ballard has thought a great deal about his crime and feels a genuine sense of guilt and shame regarding his offense. He understands that he was in a state of rage during the crime and directed his rage toward a helpless child. Mr. Ballard has made a connection between his own victimization as a child and his uncontrolled rage, stating that it does not lessen his responsibility for the crime.

## VI. Assessment of Dangerousness

Within a Controlled Setting:

Mr. Ballard has been disciplinary free since 1997 when he received a CDC115 for Self-mutilation for Manipulation Purposes. He stated at the time that he cut on himself with a razor as an alternative to fighting with a problematic cellmate. Mr. Ballard's record does not indicate that he has been violent toward others while in prison. He is presently participating in a variety of self-help and personal growth activities such as IMPACT, T.R.U.S.T., Yoga, and Arts in Corrections. Mr. Ballard is committed to participation in AA and has taken a leadership role as Chair of the meetings. He also has a strong interest in painting which he has been able to pursue at San Quentin. Mr. Ballard has also been a participant in the Vocational Sheet Metal program for 2 ½ years. Given his positive

BALLARD, Benjamin D-04047                                    September 11, 2006

programming and present institutional adjustment, he would be expected to remain violence free in a controlled setting.

If Released to the Community:
Mr. Ballard was assessed on two instruments used to assess risk of future criminal behavior and violence in forensic populations. On the Hare PCL-R, a measure of psychopathy, he scored at the 48th percentile for North American male offenders. This score was still below the cutoff most often used for clinical diagnosis of psychopathy. On the Violence Risk Appraisal Guide (VRAG) he was noted to have the following factors associated with violent recidivism: separation from biological parent prior to the age of 16, early maladjustment in school, history of alcohol problems, prior criminal history, failure on conditional release, and young age at time of index offense. He also had a moderately high score on the psychopathy checklist. Mr. Ballard's score on the VRAG was associated with an actuarial probability of violent recidivism of 0.55 over a 7 year period. This would constitute a moderately high risk.

Violence History
Mr. Ballard described his father as a violent alcohol. He disappeared from Mr. Ballard's life after his parents divorced. He stated that his mother had difficulty controlling the behavior of Mr. Ballard and his siblings, and used a belt for attempts at discipline. Mr. Ballard described his mother's discipline as "not severe, but it would be against the law now." Sibling interactions involved fighting, that included his sisters. Mr. Ballard stated that his sister would hit him with objects such as soda bottles and he would slap her and pull her hair. Even though Mr. Ballard and his brothers fought, he denied causing significant injury to any family members.

Mr. Ballard was placed in foster care and relates that his foster parents abused him.

As a teenager, he owned a 22-caliber handgun that he bought from a friend who had stolen the gun. He fired it at trees before selling it to an older guy. His only other contact with the use of a weapon was during his brief stint in the military. He denies ever using a weapon during the commission of a crime.

Mr. Ballard had a history of violent outbursts of anger from a young age where he would yell, and punch windows, doors and walls. He stated that these outbursts took place "because I couldn't control my anger."

He denied that he has ever lost control because of anger in prison. He has had physical altercations with other inmates, but has never felt a need to retaliate because of being a target for assault. He had ongoing concerns about threats from other inmates related to his commitment offense.

Significant Risk Factors/Precursors to Violence:
Mr. Ballard's crime and his history indicate a lack of adequate coping skills. Risk factors include any return to the use of intoxicants or mood altering substances, exposure to

elevated levels of stress, responsibility for meeting the dependency needs of others, and association with substance using peers.

VII.Clinician Observations/Comments/Recommendations:

Mr. Ballard is a vastly improved person due to his self-study and participation in a range of positive activities. He has been able to build a well-rounded life for himself inside prison. This includes work, spiritual growth, vocational skill training, ongoing substance abuse training, anger management and social skill building, volunteerism, and artistic expression.

Mr. Ballard has made a commitment to clean and sober living to which he has held. His ability to live a drug and alcohol free life is impressive given his history of his heavy involvement with both alcohol and drugs from 12 years of age. For someone with Mr. Ballard's history, relapse risk will be an ongoing issue. At the present time, he is able to maintain abstinence in a controlled environment. His ability to maintain these gains in a free environment in which he is exposed to significant stressors, is untested. Given his history of past outbursts of explosive anger, any form of intoxication would constitute a significant elevation of risk.

Mr. Ballard's ability to maintain his present gains is likely to be directly related to the amount of positive support and acceptance he receives, access to pro-social groups and activities, the amount of order and structure in his environment, and the absence of destabilizing stressors.

In a stable environment, with positive influences and ongoing substance abuse prevention support, Mr. Ballard is likely to remain non-violent. In a chaotic, hostile, or stress filled environment, he would be much less likely to be able to maintain his gains and would be at greater risk for relapse and recidivism.

Several significant factors in Mr. Ballard rehabilitation have evolved as a result of Mr. Ballard's more positive decision-making. His artistic ability and the positive regard he has been able to receive because of it, is a very significant mitigating factor as it greatly enhances his self-esteem and acceptance. His interest in studying stress management and anger management as well as following non-violent spiritual practices are also significant factors that have resulted in positive gains on cognitive, emotional and behavioral levels. He would benefit from continuing whatever additional self-help and substance abuse interventions, which would be available to him.


Michel Lynn Inaba, Ph.D.                                     9-11-06
Contract Psychologist
San Quentin State Prison

**EXHIBIT-**

# B

Life-Term Inmate Evaluation for the Board of Parole Hearings
MENTAL HEALTH EVALUATION

SAN QUENTIN STATE PRISON

PSYCHOSOCIAL ASSESSMENT

I.  IDENTIFYING INFORMATION

| | |
|---|---|
| NAME: | Ballard, Benjamin |
| CDC #: | D-04047 |
| AGE: | 48 years |
| DOB: | 07/03/59 |
| MARITAL STATUS: | Single |
| RACE: | Caucasian |
| SEX: | Male |
| RELIGION: | Catholic/Buddhist |
| DATE OF REPORT: | 01/19/07 |

This report is based on review of the inmate's medical file, review of his C-File, prior Board of Parole Hearings evaluations, prior psychological evaluations, current classification information and probation officer's report.  The current interview with the inmate and the report are limited by the amount of information given to this examiner by the inmate at the time of the interview.  The following information is accurate to the extent that the records and the inmate's self-report are accurate.  As a result, the absolute accuracy cannot be assured. The primary purpose of this report is to provide the Board of Parole Hearings psychological data, psychiatric diagnostic information and an assessment of dangerousness in regard to his possible release to the community. This evaluator is not responsible for any inaccurate statements or changed opinions expressed by the inmate at a later date.   The inmate was interviewed for approximately 60 minutes, the initial medical file and C-File were reviewed for the interview for 1 hour, the inmate's C-File file was reviewed for approximately 4 to 6 hours and dictating, report writing and editing took 4 hours.

The inmate was informed that the interview was not confidential and a report with the results of the evaluation would be submitted to the Board of Parole Hearings to assist in determining his eligibility for parole.  The inmate was informed that any disagreement with the substantive conclusion could be most appropriately address at the inmate's Board hearing. The inmate appeared to understand the nature of the evaluation and the possible consequences of the interview to the best of the inmate's ability.  For reasons not limited to the possibility that an individual may have a mental disability or condition which may qualify under the American's with Disabilities Act, the evaluation was conducted by a licensed clinical psychologist.

This information is based on the inmate's statements during the time of the interview. The inmate's crime occurred on October 3, 1984. He was received into California Department of Corrections on April 3, 1985. He was 24 years old at the time of the crime. He was convicted of PC §187 Murder in the Second Degree. He received a 15 years to life sentence. His minimum eligible parole date is October 21, 1993. He has served 21 years. His initial Board was in 1992. He has had five subsequent Boards.

This information is based on the inmate's statements during the time of the interview. The inmate has had three CDC 115 disciplinaries. None have been for alcohol or drugs or fighting. Two were for self mutilation. The last one was in 1997. The inmate states that the correctional officer was talking to other inmates about his crime and he used self-mutilation to get out of the situation.

The inmate received his Graduate Equivalency Diploma and high school diploma while incarcerated. He has had vocational upgrades in drafting, baking and print shop. He is in sheet metal at the current time. He plans to work in drafting, art or printing when he is released. The inmate has been in the Impact program for about two and a half years, receiving alcohol and drug treatment. He has about four years of continuous involvement in AA or NA. He is involved in his religion. The inmate has completed approximately 16 self-help groups. He has been in the Trust program for two years, Yoga program for two years, and the Kairos program. The inmate states he plans to be active in these areas once released. He would like to help other people and be a facilitator for the impact program on the street.


II. DEVELOPMENTAL HISTORY:

This information is based on the inmate's statements during the time of the interview. The inmate was born in Modesto. He denies any prenatal or birth complications or birth defects growing up. He states that his development in terms of speech, language and motor skills were within normal limits. He did wet the bed up until the age of 9. He denies any emotional or health problems in childhood. There was trauma and abuse. The inmate was in foster care at 4 years of age and Juvenile Hall at 15.


III. EDUCATION:

The inmate dropped out of school in the 7th grade because he did not fit in and felt inferior. He had learning problems and briefly saw a psychologist is school years. He was never suspended or expelled. He did use alcohol and drugs during high school years and got into some fights.

He has had educational upgrades.


Ballard, Benjamin                    PAGE 2              MENTAL HEALTH EVALUATION

## IV. FAMILY HISTORY:

The inmate was born and raised in Modesto. He was raised by his mother and then mother and step-father. He is the eighth of ten children. The family has lived in multiple residences and he had out of home placements. His father was a laborer and his mother was homemaker. His father was violent and an alcoholic and left when he was 4 years of age. He describes his mother as nice but passive. Both of them are deceased. There are some health problems in the family history. There was use of alcohol. His brother has mental health problems. Other members of the family have been arrested. There was spousal abuse. There was emotional, physical and sexual abuse of the children.

## V. PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

The inmate had two significant sexual relationships prior to incarceration. He describes his sexual orientation as heterosexual in nature. He denies any high risk behavior, such as prostitutes, intravenous drug use or exposure to HIV. His crime is a violent crime against a child.

## VI. MARITAL HISTORY:

The inmate has never been married. He was involved in a live-in relationship and there was one child. He has no contact.

## VII. MILITARY HISTORY:

The inmate was in the military for two months and received an honorable discharge because he had no high school diploma.

## VIII. EMPLOYMENT/INCOME HISTORY:

The inmate states that his longest job was in a lumber mill for a year and a half. He did receive food stamps but never received Social Security.

## IX. SUBSTANCE ABUSE HISTORY:

The inmate began drinking at the age of 13. Alcohol was a problem for him and involved in his case. The inmate states he has used all kinds of drugs, opiates and uppers. It has caused him problems and it also was involved in his case. He was never involved in a treatment program on the street but has been incarcerated.

Ballard, Benjamin                    PAGE 3          MENTAL HEALTH EVALUATION

X. PSYCHIATRIC AND MEDICAL HISTORY:

Medical:

The inmate denies any allergies, asthma, cardiac, respiratory, vision, hearing or orthopedic problems. The inmate states he does have a possible liver disease. He has fatigue from a suppressed immune system. The inmate had prior surgeries on his nasal cavities. The inmate has had a couple of head injuries while he was drunk. He denies any seizures, thyroid or diabetes. He does have Hepatitis C. It is in remission. He sees his current health as good.

Mental Health:

The inmate is not currently in the mental health system. In the past, he was in the mental health system between 1984 and 1987 and 1995 and 1997. He was diagnosed with Schizoaffective Disorder and Adjustment Disorder. He was being treated for depression, anxiety and fear. These symptoms are currently not a problem for him.

XI. PLANS IF GRANTED RELEASE:

The inmate would like to parole to Oregon and live with his daughter. He also has a brother in San Jose that would help him and provide him with a job. He has a job offer in Oregon. The inmate states that he could have support through the Kairos program.

CLINICAL ASSESSMENT

XII. CURRENT MENTAL STATUS/TREATMENT NEEDS:

The inmate was oriented by person, place and time. He was alert and cooperative. His simple registration was intact, but there was impairment in terms of his short-term memory. He could only remember two of three words across time and inserted inappropriate words. His mathematical ability was intact. His simple abstract thinking was intact. His complex problem solving abilities were impaired.

At the current time, he denies any problems with depression, anxiety, mood swings or mood disorder. He denies any auditory or visual hallucinations. He denies any delusional or paranoid thinking. He denies any eating or sleeping problems. He denies any mental health problems as a child. He denies any suicidal or homicidal thinking.

DIAGNOSTIC IMPRESSIONS DSM-IV:

AXIS I        304.8   Polysubstance Abuse, in remission and treatment.

AXIS II       301.7   Antisocial Personality Disorder, by history.

AXIS III              Multiple Health Concerns.

AXIS IV               Psychosocial Stressors: Incarceration.

AXIS V                Global Assessment of Functioning (GAF): 80

The inmate is currently in the General Population and is not a member of the MHSDS system while incarcerated.


XIII.  REVIEW OF LIFE CRIME:

The inmate was convicted of PC §187 Murder in the Second Degree.  He received a 15 years to life sentence.  His minimum eligible parole date is October 21, 1993.  He has served 21 years.

Summary of the Crime:  On October 3, 1984, at approximately 10:35 p.m., Melissa Edbard was admitted to Scenic General Hospital for emergency treatment. She was taken to the hospital after her mother, Aurora Clark, summoned an ambulance, stating Melissa was not breathing. Melissa died after all efforts to revive her failed. The autopsy revealed Melissa died from a broken neck. Through subsequent investigation, detectives observed that Melissa had numerous bruises on her neck, face, back, shoulders, and buttocks. Mrs. Clark initially stated that Melissa fell and struck her head against a plumbing fixture while being bathed, causing her neck to be broken. After further questioning, she advised officers that Ben Ballard was responsible for Melissa's death. Mrs. Clark stated she was not present when the incident occurred, however she had been informed by her other children that Ballard was physically abusive towards them. Ballard was subsequently taken in to custody and charged with murder. He was advised his Miranda Rights, which he stated he understood and waived. During the questioning Ballard continued to be untruthful with the detectives and stated that Melissa suffered a broken neck after striking her head on plumbing fixture while being bathed. On October 12, 1984, Ballard requested to speak to detectives. He admitted that he hit Melissa in the face on October 3, 1984 at about 8:00 a.m. because she was crying and screaming and would not stop, he hit her three times across the face with his open hand. She started bleeding from the nose and turning blue about the lips. He stated that he shook her trying to revive her and put cold water on her head to try to awaken her, but he was unable to. He took her to the bathroom to wipe the blood from her face. He became very scared and laid Melissa on the couch.

He ran to a camper to get Melissa's mother. Ballard stated he had spanked Melissa earlier that morning for wetting her pants. He kept stating, "I didn't mean to get that mad at her and I didn't mean to kill her." Ballard stated he had been using about $80.00 worth of heroin per day, intravenously. The detectives observed several sites of non-sterile injections along the right and left forearms. Ballard stated the last time he used heroin was about 7:00 a.m. on October 3, 1984. At that time, a urine sample was taken from Ballard. The urine sample was later tested and proven positive for morphine (heroin).

Inmate's Version: I did not realize what I was doing when the crime occurred. I was under the influence of heroin. I was hearing voices and was drinking very much. I was mentally unstable for the four years prior to my crime. I am truly sorry for what happened, and I would give my own life up if it could bring her back. I love children, and have never hurt a child deliberately. I was unable at that time to control my anger. I am deeply hurt and sorry. It is hard to accept that I cannot change what has already happened.

Aggravating Factors: The crime involved great bodily harm and disclosing a high degree of cruelty. Melissa was particularly vulnerable due to her age of three. The murder was senseless and served no purpose in completing the crime. Ballard was under the influence of drug during the commission of the crime.

Mitigating Factors: None.

Juvenile Arrest History:   March 5, 1975, Stanislaus County, Joyriding, Burglary. Probation.

Adult Arrest History: April 11, 1978, Mariposa VC10851, Take vehicle without owners consent. Arrested and Released.   December 28, 1983, Modesto PC496.1, Battery on Person. Arrested and Released.

The inmate states that he first started getting into trouble in elementary school. He was arrested about the age of 8 or 9 and in Juvenile Hall at the age of 13. When asking the inmate why he was getting into trouble as a young man, he states it was how he was raised, and the fact that he lived in poverty. His self image was bad. He did not fit in. He started hanging with the wrong crowd and the wrong peers. "I had no morals, no values and no self respect." He was making bad decisions and believing that bad things were just happening to him.

The inmate was given the offense summary and his prior account to read. The inmate states that his is the same.

When asking the inmate why he got involved in this crime. He said it had to do with the way he was raised, the lack of control he had over his emotions and his drug use. He said, "The child's mother and I were the worst case scenario together. I blamed others for my anger."

Ballard, Benjamin                  PAGE 6            MENTAL HEALTH EVALUATION

The inmate goes on to say that the impact of what he did was devastation. "The worst possible thing you can do is take a life of a child. I robbed that family of all the joys of seeing that child grow up." He said he apologizes for the fear that he caused in the community, to the victim's family and his family. He said, "I deprived the father of the same joy I have with my daughter."

When asking the inmate what has changed about him so that something like this will not happen again, he says violence is not an alternative for him. He has been in the Alternative to Violence project and knows how to recognize high risk factors and control himself. He said he has courses on the victims' issues. He said he has learned the way around violence is through communication.

## XIV.  ASSESSMENT OF DANGEROUSNESS:

In order to determine the inmate's risk of representing a substantial danger of physical harm t o o thers, h e w as a ssessed o n a n umber of research derived risk factors that are associated with an increased risk for future violence.

The inmate's records and interview were administered the HCR-20.

History of Violence:

According to the Probation Officer's Report and prior records, the inmate's criminal history would be an aggravating factor. In rating this individual on the historical factors, he would rate in the moderate range in terms of his likelihood to commit future violent acts when compared to other inmates with similar crimes.

Clinical/Insight:

In rating this individual in the clinical factor, he would rate in the low range for future violence. He has developed insight. His response to treatment has been positive. He is no longer impulsive and not responding to mental health symptoms.

Environmental Risks/Risk Management:

The inmate would rate in the low range in terms of his risk management for the future.

In summary, this individual's overall propensity to commit violence the future when compared to similar violent inmates has lowered from the moderate range now to the low range.

The inmate's records and interview were rated on the PCL-R. The inmate rated in the low range in his level of psychopathy.

Ballard, Benjamin                    PAGE 7             MENTAL HEALTH EVALUATION

The inmate's overall risk management has moved from the moderate to the low range.

XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

It is recommended that the inmate continue be discipline-free.  It is recommended that the inmate continue to be active in his religion, in AA or NA and in self-help.

Thank you for the opportunity to assist in this interesting consultation.

_____
RICHARD STARRETT, Ph.D., Ph.D.
Contract Psychologist, CA License PSY 13628
San Quentin State Prison

RS/ls/cam

_____1-19-7
Date

Ballard, Benjamin              PAGE 8          MENTAL HEALTH EVALUATION

**EXHIBIT-**

# C

# California

SAN FRANCISCO DAILY JOURNAL • THURSDAY, MAY 10, 2007 • PAGE 2

# Pro Per Appeal Frees Convicted Killer

**By John Roemer**
Daily Journal Staff Writer

A convicted killer who spent 28 years behind bars has been released after arguing he was unfairly ordered to attend religious-themed Narcotics Anonymous meetings.

Inmate Charles Edward Turner protested that the 12-step program's curriculum requires a belief in God, amounting to a state-established religious obligation violating the First Amendment.

Turner, now 49, left a state prison in Vacaville on Tuesday and traveled to his home in San Diego. He was 21 when he was sentenced to 15 years to life for felony murder.

Parole officials repeatedly turned down Turner's pleas for freedom, noting that he was a model prisoner but insisting he take participate in the program to be considered for release.

A federal judge at first rejected his claim that the requirement was unconstitutional. But acting as his own lawyer, Turner persuaded a federal appellate panel that his case was strong enough for him to be appointed counsel.

Lawyers from Los Angeles' Quinn Emanuel Urquhart Oliver & Hedges represented him in further proceedings.

U.S. Magistrate Judge Kimberley J. Mueller of Sacramento concluded that officials could no longer deny Turner a release date on the basis of his refusal to attend the meetings. Turner v. Hickman, 342 F. Supp. 2d 887 (2004).

The First Amendment violation was clear, Mueller held. A federal judge affirmed her ruling.

Michael G. Lee of Sacramento, the deputy attorney general who opposed Turner's release, said he disagreed with Mueller's decision. Lee, who no longer works for the attorney general, had no further comment Wednesday.

Among Turner's first moves on release was to phone B. Dylan Proctor the Quinn Emanuel partner who led his appellate defense.

"He couldn't get over the idea of talking on a cell phone," Proctor said Wednesday. "He's been in a time warp since the time of Jimmy Carter."

Proctor stressed that it is unusual for inmates serving indeterminate life sentences to gain their freedom.

"It was more surprising that Gov. Schwarzenegger signed off on it," he said. "I think the fact that Mr. Turner made a case for himself had an impact."

Proctor said he and several colleagues plan to travel to San Diego and take their former client to a Padres game.

"Something outdoors," he said.

> **'I think the fact that Mr. Turner made a case for himself had an impact.'**
>
> **B. Dylan Proctor,**
> Quinn Emanuel

**EXHIBIT-**

# D

# Governor eases off on parole for lifers

*By Mark Martin*
CHRONICLE SACRAMENTO BUREAU

SACRAMENTO — After ushering in a more lenient parole policy by freeing nearly 80 convicted murderers and kidnappers in his first year-and-a-half in office, Gov. Arnold Schwarzenegger has clamped down on the release of inmates serving life sentences.

Schwarzenegger drew praise from inmate advocates and scorn from crime victims groups in 2003 and 2004 when he showed far more willingness to release "lifer" inmates than former Gov. Gray Davis, who rejected virtually every inmate corrections officials deemed suitable for parole. But in 2005 and 2006, Schwarzenegger dramatically decreased his rate of release. In 2006, he disagreed with his parole board on 90 percent of the inmates they concluded could be safely returned to society.

The change came as Schwarzenegger ran for re-election and despite his acknowledgement that the state prison system was dangerously overcrowded. The governor recently suggested he was open to releasing some inmates to help alleviate overcrowding, and three federal judges have threatened to impose a population cap

▶ **PRISONS: Page B2**

## Inmates paroled by governors

**Arnold Schwarzenegger**

**4**
IN 2007

**23**
IN 2006

**35**
IN 2005

**72**
IN 2004

**6**
IN 2003

**Gray Davis**

**6**
IN NEARLY FIVE YEARS

**Pete Wilson**

**123**
IN EIGHT YEARS

*Source: Board of Parole Hearings.*

on the system that could result in freeing some prisoners.

Among those rejected for release by the governor are an 81-year-old who is nearly blind and has trouble walking, a Bay Area man convicted of murder in 1979 as a teenager who had no discipline problems in prison for 20 years and a job offer upon release, and a former drug addict who aided in a kidnap and robbery but who has kicked drugs, received extensive vocational training and become a peer counselor in the women's prison where she's been housed for 11 years.

Administration officials say there has been no policy change during Schwarzenegger's tenure, and note that in the governor's first year in office he approved for release many inmates who had been repeatedly found safe to let out by parole officials but who were denied by Davis. That first group of inmates the governor reviewed may have had more compelling cases for parole, said Andrea Hoch, Schwarzenegger's legal affairs secretary.

Statistics provided by the state parole hearings board show a marked change between the governor's first year-and-a-half in office and now.

In 2004, for example, Schwarzenegger allowed 72 lifers who had been recommended for release by the parole board to go free, including 62 people convicted of first- and second-degree murder. That was 35 percent of the 207 inmates granted a parole date by the state Board of Parole Hearings — a significant increase in the number of releases allowed by either Davis or former Gov. Pete Wilson.

But in 2006, Schwarzenegger only gave 23 inmates permission to go free out of the 204 that parole officials approved for release, or 10 percent of the cases he reviewed.

Observers of the state's parole policy agree Schwarzenegger appears to have changed course.

"When he first came in, he was a breath of fresh air," said Michael Satris, an attorney who represents inmates. "He was somewhat reasonable. But that seems to have changed."

"We definitely think he's gotten better," said Christine Ward, executive director of the Doris Tate Crime Victims Bureau.

Hoch said the governor reviews each case individually in the weekly meetings he conducts with him. The two go over each inmate that has been found suitable for parole by a two-person panel composed of one gubernatorial appointee and one civil servant.

Because of a 1988 voter-approved initiative, the governor has the power to override parole officials and reject parole for murderers, and can also ask for reconsideration of kidnappers who are found suitable for parole. The process dictates the terms served by inmates sent to prison on indeterminate sentences such as seven years to life, 15 years to life, and 25 years to life. There are about 22,000 lifer inmates currently in prison.

"The overriding concern is if this person is released, are they a public safety risk to the public?" Hoch said, noting that Schwarzenegger considers factors like the nature of the crime, the social history of the inmate, the inmate's behavior in prison and his or her parole plans.

Many, however, may argue that it's hard to see how 81-year-old Wen Lee is a major threat to public safety.

Lee was convicted of second-degree murder in 1989 after a business dispute led to confrontations with a man to whom Lee had sold his restaurant. Lee had intended to kill the man and then himself, but instead killed the man's wife. He was found suitable for parole in 2005, when the parole board noted he had no behavior problems in prison, a plan to live with his family upon release and, with several medical problems, was a "very low risk of violence in the community."

Schwarzenegger overruled the parole board, arguing that the crime Lee committed was atrocious and that Lee had only partially accepted responsibility for his actions.

Lee was freed, however, after a state appellate court ruled against Schwarzenegger's decision last year. Another lifer inmate, Jeffrey Elkins of Pleasanton, who killed another man as a teenager, also was released recently due to a ruling by an appeals court.

While Hoch insisted that "politics are not in the picture" when the governor makes parole decisions, others suggest Schwarzenegger may have scaled back on releasing lifer inmates because of outside pressure and an anticipated tough fight for re-election.

Crime victims groups complained loudly during his first term that Schwarzenegger was ignoring crime victims and too lenient on criminals. They aired commercials about his parole policies, and Ward's group, named for the mother of murdered actress Sharon Tate, posted information on its Web site about the governor's decisions and the number of inmates each member of the parole board has recommended for release under the heading "California's Parole Board Crisis."

Ward said the group is still concerned that Schwarzenegger is being too lenient.

Last year, Schwarzenegger created a Cabinet-level position in his administration for a crime victim advocate and filled the post with Susan Fisher, who had previously headed the Doris Tate group. While Hoch said she and her legal staff were the only ones involved in the weekly reviews of lifer cases, Fisher does speak with the governor on parole issues. The administration did not make her available for comment on this story.

"He clearly buckled under the pressure from the victims groups," said Bill Schmidt, an attorney who represents lifer inmates. Schmidt represents Kimberlee Martin, 42, a former methamphetamine addict who was recently denied parole by the governor after a two-person parole board noted that Martin had behaved well in prison, taken college classes, been active in drug rehabilitation programs, helped counsel other inmates and had a job lined up upon release.

Martin has another hearing before the full parole board this week.

Others note there is little reward for a politician to allow killers and kidnappers out, particularly preceding elections.

A governor is faced with going in one direction or another: You can let someone out who shouldn't be let out and you'll hear about it, or you can keep someone in who should be let out and you'll almost never hear about that," said Franklin Zimring, a UC Berkeley criminologist. "Which way do you think most politicians will go?"

Zimring agreed with Hoch's assertion that Schwarzenegger may have seen a better crop of parole candidates right after Davis' tenure, noting "there probably were a number of completely overripe cases."

Even with the clampdown during the past few years — Schwarzenegger disagreed with 80 percent of the parole board's decisions to release inmates in 2005 — the governor has still released more killers and kidnappers than either Wilson or Davis. Wilson allowed 123 lifers to go free during his eight years in office; Schwarzenegger has allowed 140 in 3½ years.

Davis only agreed to free six lifers during his five-year tenure.

**EXHIBIT-**

**E**

SUPERIOR COURT, STATE OF CALIFORNIA, COUNTY OF STANISLAUS


PEOPLE OF THE STATE OF CALIFORNIA VS. BENJAMAN BALLARD
PLAINTIFF                                      DEFENDANT

NATURE OF HEARING:   PETITION FOR WRIT OF HABEAS CORPUS    No.1222499/202859

JUDGE: NANCY E. ASHLEY        Bailiff: NONE        Date: July 16, 2007
Clerk: V.Ramirez              Reporter: NONE       Modesto, California
APPEARANCES:  NONE


The Court has received, read, and considered the Petition
for Writ of Habeas Corpus and accompanying documentation.

The Court finds evidence to support the Board of Parole
Hearings' conclusion of unsuitability for parole and its
denial decision.  The Petition is hereby **denied**.


cc:  Benjaman Ballard
     CDC# D-04047 2N96U
     San Quentin State Prison
     San Quentin, CA 94974


**MINUTE ORDER**

**EXHIBIT-**

**F**

IN THE

# Court of Appeal of the State of California

### IN AND FOR THE

## Fifth Appellate District

COURT OF APPEAL
FIFTH APPELLATE DISTRICT
FILED

AUG 2 3 2007

LEISA V. BIGGERS, CLERK/ADMINISTRATOR
By_____
Deputy

| | |
|---|---|
| In re | F053500 |
| BENJAMIN BALLARD, | |
| On Habeas Corpus. | |

BY THE COURT*:

The "Petition For Writ Of Habeas Corpus," filed in this court on August 14, 2007, is denied.

_____ Acting P.J.

*Before Vartabedian, Acting P.J., Wiseman, J., and Hill, J.

F053500

Benjamin Ballard
CDC:D-04047
C.S.P.
2 N 96 - U.
San Quentin, CA 94974

EXHIBIT-

G

S156331

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re BENJAMIN FRANK BALLARD on Habeas Corpus

The petition for writ of habeas corpus is denied.

SUPREME COURT
FILED

MAR 2 6 2008

Frederick K. Ohlrich Clerk

_____
Deputy

GEORGE
Chief Justice

**EXHIBIT-**

**H**

MC-275

Name __Ben Ballard__

Address __D04097/ 2N8U   CSD__

__San Quentin, CA 94974.__

CDC or ID Number __D04097__

## CALIFORNIA SUPREME COURT

(Court)

Benjamin Frant Ballard, pro se
Petitioner

vs.

Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No. _____

*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

MC–275

**This petition concerns:**

| | |
|---|---|
| ☐ A conviction | ☒ Parole |
| ☐ A sentence | ☐ Credits |
| ☐ Jail or prison conditions | ☐ Prison discipline |
| ☒ Other (specify): | 4 Subsegent Parole Hearing before Board of Prison Hearings. |

1. Your name: Benjamin Ballard

2. Where are you incarcerated? California State Prison San Quentin

3. Why are you in custody?  ☒ Criminal Conviction  ☐ Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

Second Degree murder offense

b. Penal or other code sections: California Penal Code section 187 & section 13967 Gov. Code.

c. Name and location of sentencing or committing court: Stanislaus County Superior Court
800 11th Street – P.O. Box 828, Modesto, CA. 95353

d. Case number: # STA A202849

e. Date convicted or committed: April 03, 1985 / February 27, 1985.

f. Date sentenced: April 03, 1985.

g. Length of sentence: 15 years to life California parole scheme.

h. When do you expect to be released? Indeterminate Sentence needs fixed by BPH

i. Were you represented by counsel in the trial court?  ☒ Yes.  ☐ No. If yes, state the attorney's name and address:

Robert ORENSTEIN Deputy Public Defender for the County of Stanislaus.

4. What was the LAST plea you entered? *(check one)*

☐ Not guilty  ☒ Guilty  ☐ Nolo Contendere  ☒ Other: Plea Bargin for 2nd degree.

5. If you pleaded not guilty, what kind of trial did you have?

☐ Jury  ☒ Judge without a jury  ☐ Submitted on transcript  ☐ Awaiting trial

8. Did you appeal from the conviction, sentence, or commitment? ☐ Yes. ☑ No. If yes, give the following information:

    a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

         N/A

    b. Result    N/A        c. Date of decision:   N/A

    d. Case number or citation of opinion, if known:   N/A

    e. Issues raised: (1)   N/A

       (2)   N/A

       (3)   N/A

    f. Were you represented by counsel on appeal? ☐ Yes. ☑ No. If yes, state the attorney's name and address, if known:

         N/A

9. Did you seek review in the California Supreme Court? ☐ Yes ☑ No. If yes, give the following information:

    a. Result   N/A        b. Date of decision:   N/A

    c. Case number or citation of opinion, if known:   N/A

    d. Issues raised: (1)   N/A

       (2)   N/A

       (3)   N/A

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

    N/A

11. Administrative Review:

    a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

       The California Board of Prison Hearings (BPH) an administrative board of the Executive Branch of California Government, does not provide any administrative review functions of its proceedings. Therefore there is no administrative review for Petitioner to seek exhaustion remedies from.

    b. Did you seek the highest level of administrative review available? ☑ Yes. ☐ No.

    *Attach documents that show you have exhausted your administrative remedies.*

MC-275 [Rev. July 1, 2005]      **PETITION FOR WRIT OF HABEAS CORPUS**      Page five of six

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court? ☐ Yes. If yes, continue with number 13. ☑ No. If no, skip to number 15.

13. a. (1) Name of court: _____ N/A _____

    (2) Nature of proceeding (for example, "habeas corpus petition"): _____ N/A _____

    (3) Issues raised: (a) _____ N/A _____

          (b) _____ N/A _____

    (4) Result (Attach order or explain why unavailable): _____ N/A _____

    (5) Date of decision: _____ N/A _____

  b. (1) Name of court: _____ N/A _____

    (2) Nature of proceeding: _____ N/A _____

    (3) Issues raised: (a) _____ N/A _____

          (b) _____ N/A _____

    (4) Result (Attach order or explain why unavailable): _____ N/A _____

    (5) Date of decision: _____ N/A _____

  c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

    N/A

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

    As soon as Petitioner become aware that his Constitutional Rights had been violated he filed above petition for writ of habeas corpus.

16. Are you presently represented by counsel? ☐ Yes. ☑ No. If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☑ No. If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

    Already submitted this petition to Stanislaus County Superior Court and the petition was denied without a written ruling as to why. See Ex. "F"

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: _____

▶ _____

                   (SIGNATURE OF PETITIONER)

**EXHIBIT-**

**I**

BPH News (from page 7)

## EN BANC DECISIONS

Of the four split decisions reviewed in January and February, the en banc Board found *all* four lifers unsuitable for parole. The en banc panel also denied *all eight* (8) applications for compassionate release. Of the 18 en banc decisions, 17 were unanimous; *there was only one dissenting vote* in two months.

### January 15, 2008

(U) = unanimous decision

DUNMIRE, Jerry Lee, C-77085: Deny compassionate release (U)

HEWELETT, James, J-97144: Deny compassionate release (U)

MUNOZ, Armando, P-44214: Deny Compassionate release (U)

GOLDEN, Duncan, J-93007: Deny PC 1170(d) sentence recall hearing (U)

BENITES, Victor, C-34789: (split decision) Find unsuitable for parole (U)

FLORES, Manuel, E-75537: (Gov. referral) Affirm parole date (U)

O'NEAL, Brandon, P-09299: (Gov. referral) Affirm parole date (U)

### December 11, 2007

CASPERSEN, Frederick, D-45881: Deny compassionate release (U)

DANIELS, Jerold, B-94097: Deny compassionate release (U)

GALLEGOS, Benjamin, E-27963: Deny compassionate release (U)

MILTON, Nathaniel, D-01346: Deny compassionate release (U)

ROYAL, Catherine, W-20622: Deny compassionate release (U)

ALLISON, James William: Recommend that Gov. deny pardon (U)

ALARCON, Justino, J-60121: Affirm proposed suitability decision (U)

FOWLER, Chris, C-96996: (split decision) Find unsuitable for parole (U)

HENRY, Tresia, W-28321: (split decision) Find unsuitable (7-1; Davis "no")

PRATT, Dennis, C-23010: (following stay of court decision) Affirm proposed suitability decision (U)

WILCOX, Minda, W-25820: (split decision) find unsuitable for parole (U)

## 2008 BPH EXECUTIVE BOARD MEETING SCHEDULE

| | |
|---|---|
| March 18 | August 19 |
| April 15 | September 16 |
| May 20 | October 21 |
| June 17 | November 18 |
| July 15 | December 9 |

## BPH-HIRED HATCHET-PSYCHS

In *CLN* # 17, p. 5, we published a partial list of some of the new psychologists hired directly by the Board, presumably to write "bad" evaluations to conform more to the Board's anti-parole policy than the existing independent forensic psychologists and psychiatrists. Lifers who have received multiple favorable reports assessing their public safety risk as moderate, lo, or nil, are being recast as high parole risks by the Board's psychs in wholesale fashion.

When lifers and their attorneys have prudently refused these evaluations, the new psychs often write derogatory reports anyway, *in absentia!* The fact that the process runs counter to the objective of assessing a potential parolee's risk factors, for which a personal interview is required, and the State's psychology board's prohibition of such evaluations, apparently don't mean much. We can only caution lifers of the danger of being evaluated by the following BPH psychs:

Jessica Ann Wyatt Card
Robyn Kiyomi Inaba
Joseph R. Nevotti
Robert Eugene Record
Jatinder Kaur Singh
Richard Alton Starrett
Randy Eugene Stotland
Daisy K. Switzer

## BPH AND LIFER DOCUMENTS AVAILABLE

Among or in addition to some of the documents listed on the last page of this issue, CLN has obtained and makes available the Governor's annual report on his 2007 parole decisions (which includes a summary of every 2007 case reviewed and a list of those not reviewed by the Governor), the bios of the current BPH Commissioners, and the new (2007) revised edition of the District Attorneys' Association "Lifer Hearings" Manual (how to oppose parole).

(Continued on page 17)

**EXHIBIT-**

**J**



RECEIVED

MAY 19 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

OFFICE OF THE CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVENUE
SAN FRANCISCO, CALIFORNIA 94102

Benjamin Ballard, pro per...
D04047 / 1N96U
San Quentin, CA. 94974.